## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| Johana Colon, as the representative of a class of similarly situated persons, and on behalf of the Advanced Diagnostic Group Employee Stock Ownership Plan,<br><br>Plaintiff,<br><br>v.<br><br>Kevin G. Johnson, Dale L. Hersey, Nathan S. Ward, Shaun L. McGruder, Michael L. Schmickle, Michael J. Chalhub, GreatBanc Trust Co., and John and Jane Does 1-25,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br><br><br>**DECLARATORY RELIEF REQUESTED** |

## NATURE OF THE ACTION

1.      Plaintiff Johana Colon ("Plaintiff"), as the representative of the Class described herein, and on behalf of the Advanced Diagnostic Group Employee Stock Ownership Plan (the "ESOP"), brings this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants Kevin G. Johnson ("Johnson"), Dale L. Hersey ("Hersey"), the partners of Palm Beach Capital ("PBC Principals"), GreatBanc Trust Co. ("GreatBanc"), and other persons that participated in Defendants' unlawful conduct (John and Jane Does 1-25) (collectively "Defendants"). As

described herein, Defendants Johnson and Hersey wrongfully diverted value from Advanced Diagnostic Group ("ADG") employees' retirement benefits, *i.e.*, ADG's stock, to themselves and the PBC Principals. Defendant GreatBanc failed to competently execute its duty, as trustee, to protect the ESOP from Johnson and Hersey's scheme. Plaintiff, an ESOP participant, received a smaller benefits distribution from the ESOP due to Defendants' actions and omissions and brings this action to remedy Defendants' unlawful conduct.

## **INTRODUCTION**

2.     Defendant Johnson is an accountant by training. He has a longstanding business relationship with Defendant Hersey's employer, Palm Beach Capital ("PBC"), a private finance firm. As Johnson rose to occupy chief executive positions with a chain of radiology service centers known as Midtown Imaging in the early 2000s, PBC acquired a controlling stake in the same firm.

3.     The Midtown Imaging venture came to an ignominious conclusion for Johnson and PBC. Shortly after PBC sold the company in 2008, employees alleged that Johnson had been "instrumental in … various schemes" to defraud Medicare.[1] The buyer terminated Johnson for a "pattern of … disloyalty, self-dealing, and conflicts of interest."[2] The buyer then sued PBC to recover

_____

[1] *United States, ex. rel. Cortinas v. Burke et al.*, 9:09-cv-82289 (S.D. Fla.), Doc No. 1, at 4.
[2] *Id.*, Doc No. 52, at 44.

damages. A global settlement with the Department of Justice and other parties resolved the fallout from the Midtown Imaging venture in 2011.

4.    ADG was Johnson and PBC's next radiology venture. Johnson helped the founder of Midtown Imaging acquire and manage a new chain of imaging centers, ADG, in 2011. PBC later acquired an equity interest in ADG, as it had done with Midtown Imaging.

5.    In 2015, Johnson and PBC (and other owners, if any) transferred 100% of ADG's stock to a newly formed ESOP. The ESOP transfer was not an act of beneficence. Johnson and PBC used the ESOP to structure a lopsided deal that extracted the current value of the company for themselves while also allowing them to claim a large share of the future value of the company through interest payments and warrants to obtain new ADG stock.

6.    As favorable as it was, the lopsided ESOP formation deal was not enough for Johnson and PBC. The stock warrants allowed Johnson and PBC to claim 42 cents of every dollar that ADG shares increased in value after the ESOP was formed. The other 58 cents were supposed to accrue to the benefit of the ESOP and ADG's employees. Loath to allow the ESOP to realize the benefit of its share of the company, Johnson and PBC worked to deny the ESOP its 58 cents. Johnson and PBC accomplished this objective by diverting ADG's business opportunities to themselves through separate legal shells not bound

to distribute profits to ADG. In one case, Johnson and PBC's new acquisition used ADG's brand name, even though ADG had no stake in the company due to Johnson and PBC's formation of a separate legal shell to hold the company's equity interests. In another case, Johnson and PBC used a separate legal shell to acquire a valuable management contract for multiple imaging centers, even though ADG performed all of the work under a subcontract. Every one of these actions was taken while Johnson was ADG's CEO.

7.     Defendant Hersey started at PBC in 2017. In connection with his employment by PBC, he served as an officer of ADG, an administrator of the ESOP, and an officer of one of the legal entities used to siphon value from ADG. Hersey played a critical role, alongside Johnson, in the group's efforts to divert value from ADG and the ESOP to Johnson, the PBC Principals, and himself.

8.     In 2019, the scheme bore fruit. Johnson, Hersey, and PBC sold the whole portfolio—ADG and the separate entities used to divert value from ADG—for $215 million. Less than 5% of the sale proceeds—around $10 million—was distributed to ESOP participants. Concurrently, Defendants terminated the ESOP.

9.     This inequitable result was only possible through Defendants' brazen violations of their legal duties as fiduciaries of the ESOP and officers of ADG. Defendants Johnson and Hersey personally wielded, and abused, ADG's

authority as administrator of the ESOP pursuant to ERISA. Instead of ensuring that the ESOP received fair value for its ADG stock in the 2019 sale, Johnson and Hersey ensured that their separate entities received inflated valuations and captured an outsized portion of the sale proceeds. The separate entities and their assets should have belonged to ADG in the first instance, as Johnson and Hersey directed opportunities to own and operate imaging centers to these separate entities while serving as ADG's CEO and CFO in violation of their fiduciary duties as officers of ADG.

10.    Defendant GreatBanc, as ADG's shareholder of record on behalf of the ESOP, had a fiduciary duty pursuant to ERISA to monitor the ESOP's investment in ADG's stock and timely assert the ESOP's claims against Johnson and Hersey. A prudent ESOP fiduciary in GreatBanc's position would have intervened after Johnson and Hersey established new ADG-branded and ADG-managed centers separate from ADG. Yet GreatBanc took no action to redress Johnson and Hersey's blatant misconduct as officers of ADG. GreatBanc then improvidently allowed the ESOP's shareholder claims to expire by approving the sale of ADG to Akumin, despite being presented the obvious red flag that ADG's CEO and CFO had spearheaded the growth of two separate imaging companies since the ESOP acquired ADG less than three and a half years earlier.

11.    Additionally, GreatBanc failed to ensure that ADG's stock received a fair valuation in connection with the Akumin sale. A prudent investigation would have shown that Johnson and Hersey inflated the value of the separate legal entities included in the sale (which should have belonged to ADG in the first instance) in order to reduce the sale proceeds due to the ESOP. Notwithstanding, GreatBanc approved the sale price on behalf of the ESOP.

12.    The PBC Principals knowingly profited from Johnson, Hersey, and GreatBanc's abuse and neglect of their fiduciary duties under ERISA. Pursuant to well-established principles of equity enforced in ERISA cases, the PBC Principals should not be permitted to retain those profits.

13.    Plaintiff would have received a distribution from the ESOP that was several times larger had Defendants loyally and competently discharged their legal obligations to ADG and the ESOP. Plaintiff brings this action pursuant to 29 U.S.C. §§ 1104, 1106 & 1132(a)(2)-(3) to remedy Defendants' unlawful conduct, recover losses to the ESOP, and obtain other appropriate relief.

## JURISDICTION AND VENUE

14.    Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a

civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

15.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

16.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP was administered in this district and several of the fiduciary breaches occurred in this district.

## RELEVANT PARTIES AND TRANSACTIONS

### ADG

17.    The Advanced Diagnostic Group brand can be traced back to 2006. AFO Imaging Inc. ("AFO")—founded in Tampa in 2003 to provide X-ray and MRI services—registered the web domain "advanceddiagnosticgroup.com" on July 31, 2006. AFO registered the trade name "Advanced Diagnostic Group" with the Florida Secretary of State a few days later.

18.    By the end of 2010, AFO had expanded the Advanced Diagnostic Group brand to include multiple radiology service centers in Tampa, Kissimmee, Orlando, and Jacksonville.

19.    In December 2010, Defendant Johnson partnered with Dr. Robert Burke ("Burke") to establish ADG Acquisition Holdings LLC, a Florida limited

liability company based in Tampa. The purpose of ADG Acquisition Holdings LLC was to (a) acquire AFO, (b) operate its Advanced Diagnostic Group chain of imaging centers, and (c) grow the business through acquisition of additional imaging centers. Burke knew Johnson from the Midtown Imaging venture, which Burke had founded in 1990 before hiring Johnson in 2004.

20.    Upon information and belief, PBC acquired a majority equity interest in ADG Acquisition Holdings LLC some time before December 2015. Johnson remained with ADG Acquisition Holdings LLC continuously and led its expansion efforts as its CEO.

21.    Between 2011 and 2015, ADG Acquisition Holdings LLC, at Johnson's direction, added Advanced Diagnostic Group service centers in Brandon, Lakeland, Orange Park, Jupiter, and Palm Beach Gardens, Florida. The company also expanded into Georgia through management services provided to imaging centers operating under a separate brand name.

22.    The Florida expansion strategy during this time involved acquiring ownership of existing imaging centers and then rebranding them under the Advanced Diagnostic Group name. For example, ADG Acquisition Holdings LLC acquired its Jupiter location in early 2015 by acquiring Advanced Diagnostic Resources LLC ("ADR"), a company that had been around since 2005 and was not affiliated with ADG Acquisition Holdings LLC prior to

the acquisition. Shortly after the acquisition, in June 2015, Johnson filed Secretary of State paperwork for ADR to use the Advanced Diagnostic Group name. After that point, the former ADR center operated as part of the Advanced Diagnostic Group system, and its ultimate owner was ADG Acquisition Holdings LLC.

23.     The Georgia expansion began when Johnson and PBC established Advanced Diagnostic Group of Georgia LLC ("ADG Georgia"), a Florida limited liability company, in May 2015. Upon information and belief, ADG Acquisition Holdings LLC had an equity or other interest, directly or indirectly, in the profits of ADG Georgia. Upon information and belief, ADG Georgia provided management services to Georgia imaging centers that operated under another brand name (*i.e.*, not Advanced Diagnostic Group).

24.     On December 7, 2015, at Johnson's direction, ADG Acquisition Holdings LLC converted from a Florida limited liability company to a Florida stock corporation, ADG Acquisition Holdings Inc. The purpose of the conversion was to transform ADG Acquisition Holdings LLC into a stock corporation eligible to establish an ESOP pursuant to ERISA. Upon conversion, the stock corporation iteration of ADG Acquisition Holdings issued stock to the members of the limited liability company iteration.

25. For purposes of this Complaint, shorthand references to "ADG" may refer to the limited liability company iteration or the stock corporation iteration of ADG Acquisition Holdings, as context requires.

26. Upon information and belief, the ADG limited liability company members that received ADG stock upon conversion to a corporation included PBC and Johnson.[3] In a series of additional transactions immediately following the conversion, the ESOP acquired all of the ADG stock issued to former ADG members (which comprised all of the issued and outstanding ADG stock on that date). ADG appointed GreatBanc as the trustee to hold the ESOP's ADG stock.

27. In exchange for its ADG stock, the former majority owner of ADG—upon information and belief, PBC—received a combination of cash (financed by an outside lender via a loan to the company), a promissory note (at 12% interest), and warrants to obtain new ADG stock in the future. Johnson received a promissory note (at 12% interest) and warrants to obtain new ADG

---

[3] In public filings with the Department of Labor by the ESOP, and public filings with securities regulators in connection with the subsequent acquisition of the firm by a public company, identification of the selling parties in the ESOP formation transaction, and identification of the same parties in their capacity as stakeholders in the 2019 sale, is omitted or redacted. Plaintiff has thus not been able to confirm the allocation of equity interests in ADG on the date of the ESOP formation transaction or on the date of the 2019 sale. Plaintiff has drawn inferences regarding the identification of equity holders of ADG at each point in time based on, among other things, control of the company and the ownership of other ventures involving the same parties.

stock in the future. The warrants allowed PBC and Johnson, together, to take a 42% stake in ADG in the event of a future sale. The deal also included tax advantages for ADG, Johnson, and PBC.

28.    The ESOP formation transactions were complete by December 11, 2015.

29.    Sometime between June 2017 and November 2017, Defendant Hersey became ADG's Chief Financial Officer. Hersey was then, and continues to be, a PBC employee. Upon information and belief, Hersey was installed as an officer of ADG at PBC's behest to protect its ongoing interests in ADG (*i.e.*, principal and interest payments on the note and warrants to obtain new ADG stock).

30.    Over time, ADG developed relationships and expertise in the market for imaging services billed under Florida's Personal Injury Protection statute, Fla. Stat. § 627.736 ("PIP"). As of 2018, around 55% of ADG's scans were billed under PIP.

31.    On May 31, 2019, a publicly traded Canadian firm, Akumin, acquired ADG for around $115 million as part of a $215 million total transaction that included two other entities controlled by Johnson and/or Hersey (see *infra* ¶¶ 35-49). The sale allowed Johnson and PBC to realize their 42% equity stake in ADG via stock warrants. Johnson and PBC thus received

42% of the $115 million ADG sale price (around $48 million), plus repayment of outstanding notes from the ESOP formation transaction (around $37 million).

32.     The remainder of the ADG sale price paid off other debt associated with the ESOP formation transaction (around $20 million), and the amount still left after that (around $10 million) was distributed to ESOP participants. Upon closing the Akumin sale, ADG terminated the ESOP.

33.     Following the sale, on June 3, 2019, Akumin merged ADG into a newly formed Akumin subsidiary called Advanced Diagnostic Group LLC. ADG was headquartered in Tampa until the merger. Advanced Diagnostic Group LLC is headquartered in Plantation, Florida.

34.     Johnson became an officer of Akumin and continues to manage, on behalf of Akumin, Advanced Diagnostic Group centers in Florida and additional imaging centers in Georgia.

**TIC**

35.     Hersey and a PBC Principal, Nathan Ward, established TIC Acquisition Holdings LLC ("TIC"), a Florida limited liability company, in November 2017. The purpose of TIC was to acquire a chain of Florida imaging centers that operated under the name "The Imaging Centers." The TIC deal closed in January 2018 for around $18 million.

36.    Johnson and Hersey had sole authority to direct the business of TIC as its sole managers.

37.    The TIC acquisition presented a natural growth opportunity for ADG, similar to expansion opportunities that ADG had capitalized on before the ESOP. *See supra* ¶ 22. Like ADG, The Imaging Centers offered MRIs and X-Rays. The company also had clinics in cities in which ADG was not yet established.

38.    Hersey and Johnson, in fact, viewed TIC as an opportunity to expand ADG. On April 13, 2018, Hersey filed Secretary of State paperwork for TIC and its operating subsidiary to do business as "Advanced Diagnostic Group" at TIC's Port St. Lucie location. On April 30, 2018, Johnson promoted an advertisement on LinkedIn billing TIC's Port St. Lucie location as Advanced Diagnostic Group's "newest center."[4]

39.    Other TIC-owned imaging centers followed suit. Most, if not all, of the legacy locations of The Imaging Centers, including clinics in West Palm Beach, Boynton Beach, Lake Worth, and Delray Beach, are now operated under the Advanced Diagnostic Group brand name. The Imaging Centers' website—mri-imaging.com—redirects to advanceddiagnosticgroup.com.

---

[4] *See* "Advanced Diagnostic Group Opens Newest Center in Port St. Lucie Offering Only True High-Field Open MRI" (Apr. 30, 2018), *available at* https://www.linkedin.com/pulse/advanced-diagnostic-group-opens-newest-center-port-st-kevin-johnson-1.

40.    ADG never owned TIC. Upon information and belief, the equity interests in TIC were held solely by or for the benefit of Johnson, Hersey, the PBC Principals, and their non-ADG affiliates.

41.    Johnson, Hersey, and the PBC Principals sold TIC to Akumin concurrently with ADG for around $50 million. Akumin now operates TIC as its subsidiary. As an officer of Akumin, Johnson continues to manage the TIC clinics under the Advanced Diagnostic Group brand.

**SFL**

42.    Johnson and a PBC Principal, Nathan Ward, established SFL Radiology Holdings LLC ("SFL"), a Florida limited liability company, in September 2015. Johnson and Ward had sole authority to direct the business of SFL as its sole managers.

43.    The initial purpose of SFL was to acquire an imaging center in Jacksonville, Florida that operated under the name "First Coast Imaging." The First Coast Imaging deal closed in October 2015.

44.    In May 2017, Johnson and Ward caused SFL to sell First Coast Imaging to ADG on terms favorable to Johnson and the PBC Principals. SFL received $7 million up front and an additional $125,000 a month, up to $5 million, based on future performance. Upon information and belief, the $12

14

million price tag imposed on ADG was a significant increase above the price that Johnson and Ward paid to acquire First Cost Imaging 19 months earlier.

45.    The First Coast Imaging sale, however, was only the start of Johnson and Ward's use of SFL to divert value from ADG. SFL had no operations, other than buying and leasing equipment, for around one year after selling First Coast Imaging to ADG. Then, on May 1, 2018, Johnson and PBC caused SFL to acquire a contract to manage a chain of imaging centers in Georgia known as Elite Radiology.[5] But rather than hire staff and begin new management operations upon acquiring the contracts, SFL immediately subcontracted all of the work due under the contract to ADG.

46.    Upon information and belief, the contract that SFL acquired on May 1, 2018 effectively replaced the arrangement previously in place for ADG Georgia (or ADG directly, or another ADG subsidiary) to manage the same imaging centers. The purpose and effect of the May 2018 contract was to remove ultimate ownership of the Georgia contract from ADG and award it to SFL, while ADG continued to do the same work as before.

---

[5] It is unclear whether Johnson, the PBC Principals, or other affiliated parties had a formal ownership stake in Elite. State laws governing referral fees and fee-splitting with non-physicians may have necessitated formal legal separation. The parties at the very least had a close business relationship, and a substantial share of the patient service revenue generated by Elite's clinics flowed to the holder of the management services contract. Effective May 1, 2018, that was SFL.

47.    Regardless, ADG, as the party performing the work, was capable of acquiring the contract on its own. Executing the contract in the name of SFL deprived ADG of the full value of owning the contract. And upon information and belief, the contract was given to SFL not because of an independent business decision made by Elite, but instead at the direction of Johnson and the PBC Principals.

48.    ADG did not own SFL. Upon information and belief, the equity interests in SFL were held solely by or for the benefit of Johnson, the PBC Principals, and their non-ADG affiliates. Transferring the contract to SFL from ADG or an ADG subsidiary personally benefited Johnson and the PBC Principals because it generated profits for a legal entity that they fully controlled without partial employee ownership. It also increased the value of SFL as an entity because it made SFL appear to be generating much greater revenues and profits than what SFL was actually responsible for generating.

49.    Johnson and the PBC Principals sold SFL to Akumin concurrently with ADG and TIC for around $50 million. After the sale, Akumin merged SFL into one of its subsidiaries. As an officer of Akumin, Johnson continues to manage the Georgia centers covered by the May 2018 contract between SFL and Elite, as performed by ADG.

## THE ESOP

50.    The ESOP was established by ADG with an effective date of January 1, 2015.

51.    ADG was the "employer" of the ESOP within the meaning of 29 U.S.C. § 1002(5), and the "plan sponsor" of the ESOP within the meaning of 29 U.S.C. § 1002(16)(B). According to the ESOP's annual reports filed with the Department of Labor, ADG was also the "administrator" of the ESOP within the meaning of 29 U.S.C. § 1002(16)(A). In these capacities, ADG was a "party in interest" to the ESOP within the meaning of 29 U.S.C. § 1002(14)(A) & (C).

52.    The ESOP was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and an "employee stock ownership plan" within the meaning of 29 U.S.C. § 1007(d)(6).

53.    The ESOP was designed to invest primarily in "qualifying employer securities," as defined in 29 U.S.C. § 1107(d)(7).

54.    The ESOP's participants were ADG employees. The ESOP had around 200 participants.

55.    On or around December 11, 2015, the ESOP acquired 1,000,000 shares of ADG stock at $61.97 per share. The 1,000,000 shares represented 100% of the outstanding shares on that date.

56.    The ESOP's acquisition of ADG shares was accomplished through a series of transactions involving the former owners, the company, and an outside lender. With respect to 438,500 shares, ADG borrowed money from an outside lender, lent cash proceeds of the loan to the ESOP, and the ESOP used the cash proceeds to purchase the shares from ADG's former majority owner (upon information and belief, PBC). With respect to the other 561,500 shares, ADG redeemed the shares from the owners (upon information belief, PBC, Johnson, and any other investors) in exchange for promissory notes, and ADG then transferred the shares to the ESOP. The ESOP promised to repay ADG for the proceeds of the cash loan ($27,174,662) and to pay ADG the face value of the notes issued to the former owners ($34,797,201), for total acquisition indebtedness of $61,971,863. The ESOP's indebtedness to ADG was to be repaid over 40 years at 2.61% interest.

57.    Johnson and PBC received additional consideration in connection with the ESOP formation transaction beyond the cash and the face value of the notes. The notes carried a 12% interest rate, 2% of which was "paid in kind" interest that was added to the principal balance of the notes. Johnson and PBC were thus able to enjoy equity-like returns on the ADG stock that they sold to the ESOP by deferring payment of part of the purchase price. Additionally, Johnson and PBC received warrants to obtain 727,273 new shares of ADG

18

stock equal to 42% of the shares of the fully diluted company (*i.e.*, the company after execution of the warrants). The stock warrants could be exercised in the event of a sale of the company.

58.    After the ESOP formation transaction closed, the ESOP's ADG stock was held in an unallocated account as collateral for the unpaid balance of the ESOP's indebtedness to the company. Each year, the company made contributions to the ESOP, and the ESOP in turn paid down a portion of its indebtedness. Shares of ADG stock were released to individual participant accounts in the ESOP in proportion to the amount of the total indebtedness paid each year.

59.    The ESOP did not last 40 years to see the ESOP's shares fully allocated to ADG employees to fund their retirement benefits. After less than three and a half years, on April 15, 2019, Johnson, the PBC Principals, ADG, and GreatBanc (as ESOP trustee) entered into an agreement to sell all equity interests in ADG to Akumin. The transaction closed at around $65.86 per share on May 31, 2019.  Having sold its ADG stock, the ESOP was terminated effective that same date.

60.    Akumin's acquisition of ADG was accomplished through a series of underlying transactions. First, ADG redeemed a sufficient number of the ESOP's unallocated shares from the collateral account in order to extinguish

the ESOP's acquisition indebtedness. There were 882,497 shares in the collateral account on the eve of the sale. Based on the $65.86 price per share, ADG needed to redeem 845,528 unallocated shares to extinguish the ESOP's indebtedness. The balance of the shares in the unallocated account—36,969 shares—were then allocated to participant accounts.

61.    Second, ADG sold the 845,528 shares redeemed from the ESOP's unallocated account to Akumin for the same price of $65.86 per share. Proceeds of the sale of the unallocated shares were then paid to Johnson and PBC in exchange for cancellation of the notes due from ADG in connection with the ESOP formation transaction. The remaining proceeds of the sale of the unallocated shares were used, upon information and belief, to pay other remaining debt owed by ADG in connection with the ESOP formation transaction.

62.    Third, the ESOP sold participants' allocated shares—154,472 shares—to Akumin for $65.86 per share. This sale yielded around $10 million for distribution to participants.

63.    Fourth, Akumin paid Johnson and PBC $65.86 per share for each of the 727,273 shares that Johnson ad PBC obtained by redeeming their warrants.

64.    After the sale, the ESOP held proceeds of participants' allocated shares (plus an additional sum of less than $300,000 received from excess escrow funds) pending permission from the Internal Revenue Service to finalize its termination. In July 2020, the IRS provided the necessary clearance.[6] By November 2020, the ESOP completed all distributions to participants totaling around $10.4 million and dissolved with no assets. Participants received, and are scheduled to receive, no other benefits from the ESOP.

65.    It would be futile for Plaintiff to pursue the claims in this case administratively through the ESOP. The ESOP was terminated nearly three years ago, and the ESOP has no assets. *See Hutchinson v. Wickes Companies, Inc.*, 726 F. Supp. 1315, 1321 (N.D. Ga. 1989) (holding that "resort to administrative remedies . . . would be futile because the Plan no longer exists" and "it would be impossible for the Plan to pay the [money] sought by the plaintiffs without the intervention of the Court.").

## PLAINTIFF

66.    Plaintiff Johana Colon resides in Tampa, Florida. Plaintiff worked for ADG between 2015 and 2020. Plaintiff had ADG shares allocated to her

---

[6] This is a routine measure associated with the tax status of ESOPs, and a favorable IRS determination does not imply that the consideration received by an ESOP in liquidation was fair.

individual ESOP account at the time of the Akumin sale. Plaintiff was a vested participant in the ESOP as contemplated by 29 U.S.C. § 1002(7). Plaintiff would have received a large distribution from her ESOP account had Defendants complied with their legal duties as fiduciaries of the ESOP and officers of ADG, as described herein.

## DEFENDANTS

### JOHNSON

67.    Defendant Johnson is a natural person. Between 2010 and Akumin's 2019 merger of ADG into a new company, Johnson was an officer of ADG.

68.    Johnson used various styles in his capacity as ADG's business leader, including Chief Executive Officer and Manager (of ADG's LLC iteration) and Chief Executive Officer and President (of ADG's stock corporation iteration).

69.    As an officer of ADG, Johnson wielded and exercised authority to act on behalf of the company. He had authority to enter contracts, obtain financing, and make acquisitions on behalf of ADG.

70.    Upon information and belief, Johnson was also an ADG stockholder at the time of the Akumin sale due to his stock warrants redeemed in connection with the sale.

71.    Johnson also acted as a fiduciary of the ESOP. According to filings with the Department of Labor, Johnson, together with Defendant Hersey, exercised the company's authority as the "administrator" of the ESOP. *See supra* ¶ 51. In this capacity, Johnson had "any discretionary authority or discretionary responsibility in the administration" of the ESOP, and therefore was a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(iii).

72.    Upon information and belief, Johnson also performed duties on behalf of the ESOP in connection with the ESOP's sale of its ADG stock, including providing valuation information to GreatBanc and its agents, and approving the sale price (which was the same price he would receive for his warrants). In these efforts, Johnson acted as a *de facto* fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(i) because he exercised "any authority or control respecting … disposition of [the ESOP's] assets."

73.    In his capacity as a fiduciary of the ESOP, an officer of ADG, and a stockholder of ADG (via his redeemed warrants), Johnson was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(A) and (H).

74.    Johnson was also a manager of TIC and SFL. Upon information and belief, Johnson also held equity interests in TIC and SFL.

75.    Johnson took actions to increase the value of TIC and SFL at the expense of ADG by, among other things, (a) acquiring and/or managing

imaging centers for TIC and SFL in transactions that ADG could have undertaken for its own benefit, (b) using ADG's brand name and services for the benefit of TIC and SFL without fair compensation to ADG, (c) causing ADG to enter into service contracts with TIC and/or SFL that were more favorable to TIC and SFL than would have been negotiated at arms' length; (d) causing ADG to purchase assets from SFL for more than ADG would pay for similar assets in an arms-length transaction; and (e) promoting inflated valuations of TIC and SFL and a deflated valuation of ADG in the process of negotiating the Akumin sale.

76.    Upon closing the Akumin sale, through his interests in TIC and SFL, Johnson received a financial benefit due to Defendants' diversion of value from ADG prior to, and in connection with, the sale. Upon information and belief, Johnson's percentage stake in TIC and SFL was larger than his stake in ADG, and thus his share of the total Akumin sale proceeds increased for every dollar of value allocated to TIC and SFL instead of ADG.

### HERSEY

77.    Defendant Hersey is a natural person and an employee of PBC. At some time between June 2017 and November 2017, Hersey became ADG's Chief Financial Officer. Hersey served as the CFO of ADG until the Akumin sale closed in May 2019.

78. As an officer of ADG, Hersey wielded and exercised authority to act on behalf of the company. He managed the company's finances and worked alongside Johnson in evaluating the company's financial capabilities and executing its business strategy.

79. Hersey also acted as a fiduciary of the ESOP. According to filings with the Department of Labor, Hersey, together with Johnson, exercised the company's authority as the "administrator" of the ESOP. *See supra* ¶ 51. In this capacity, Hersey had "any discretionary authority or discretionary responsibility in the administration" of the ESOP, and therefore was a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(iii).

80. Upon information and belief, Hersey also performed duties on behalf of the ESOP in connection with the ESOP's sale of its ADG stock, including providing valuation information to GreatBanc and its agents and approving the sale price (which was the same price his employer PBC would receive for its warrants). In these efforts, Hersey acted as a *de facto* fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(i) because he exercised "any authority or control respecting … disposition of [the ESOP's] assets."

81. In his capacity as a fiduciary of the ESOP and an officer of ADG, Hersey was a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(A) and (H).

82.    Hersey was also the founder of TIC and a manager of TIC. Upon information and belief, Hersey had a direct financial interest in TIC, or an indirect financial interest through compensation tied to PBC's profits from the sale of TIC.

83.    Hersey took actions to increase the value of TIC at the expense of ADG by, among other things, (a) acquiring and managing imaging centers for TIC in transactions that ADG could have undertaken for its own benefit, (b) using ADG's brand name for the benefit of TIC without fair compensation to ADG, (c) causing ADG to enter into service contracts with TIC that were more favorable to TIC than would have been negotiated at arms' length; and (d) promoting an inflated valuation of TIC and a deflated valuation of ADG in the process of negotiating the Akumin sale.

84.    Upon closing the Akumin sale, through his interest in TIC and/or the terms of his compensation with PBC, Hersey received a financial benefit from Defendants' diversion of value from ADG prior to, and in connection with, the sale.

## GREATBANC

85.    GreatBanc is an Illinois corporation headquartered in Lisle, Illinois. GreatBanc is the surviving independent wing of a banking group that was largely subsumed by Citizens Bank in 2007. GreatBanc generates 90% of

its revenue from services to employee benefit plans and promotes ESOP trustee services as its core line of employee benefits service.

86.    The market for ESOP fiduciary services is competitive. GreatBanc competes for jobs doled out by a small group of firms that regularly advise business owners on ESOP transactions.

87.    Although technically representing the interests of the employee plan, an ESOP trustee is hired, paid, and may be removed by persons that often have interests in conflict with the interests of employees. An ESOP trustee's need to appease the customer to stay employed and earn repeat business from company-side advisor firms "make[s] it … difficult for a fiduciary to maintain its independence from its counterparts[.]" *Brundle v. Wilmington Tr.*, 241 F. Supp. 3d 610, 643 (E.D. Va. 2017) ("*Brundle I*"), *aff'd*, 919 F.3d 763 (4th Cir. 2019 ("*Brundle II*").

88.    ADG—upon information and belief, through Johnson or agents of PBC—appointed GreatBanc as the trustee of the ESOP. As trustee, GreatBanc, was responsible for holding the ESOP's ADG stock and reviewing ADG's financials on a periodic basis. GreatBanc's mandate was to act as an independent party serving the interest of ESOP participants. When Johnson and PBC pursued the Akumin sale, GreatBanc had a duty to evaluate the deal

from the perspective of the ESOP and determine whether to support the sale. Upon information and belief, GreatBanc's approval was a condition of the sale.

89.    In these capacities, GreatBanc acted as a fiduciary of the ESOP within the meaning of 29 U.S.C. § 1002(21)(A)(i) because GreatBanc exercised "any discretionary authority or discretionary control respecting management" of the ESOP and "any authority or control respecting … disposition of [the ESOP's] assets."

## PBC PRINCIPALS

90.    PBC is an investment firm based in West Palm Beach, Florida that executes and manages investments in closely-held businesses ("PBC portfolio companies") through an array of limited partnerships, general partnerships, limited liability companies, and other vehicles ("PBC funds").

91.    PBC is a small firm with around 10 employees, including the PBC Principals.

92.    The firm includes an investment advisory firm registered with the SEC to provide investment advice (the "PBC advisor"). The PBC advisor advises the PBC funds.

93.    PBC takes positions in PBC portfolio companies on behalf of the firm's partners, the PBC Principals, and other investors that contribute money to the PBC funds ("PBC investors").

28

94.     Defendant Nathan Ward ("Ward") is a natural person, a co-founder of PBC (in 2001), a PBC Principal, and a managing member of the PBC advisor.

95.     Defendant Shaun McGruder ("McGruder") is a natural person, a co-founder of PBC (in 2001), a PBC Principal, and a managing member of the PBC advisor.

96.     Defendant Michael Schmickle ("Schmickle") is a natural person, a PBC Principal, the managing partner of PBC, and a managing member of the PBC advisor.

97.     Defendant Michael Chalhub ("Chalhub") is a natural person and a PBC Principal.

98.     The PBC Principals, through PBC funds advised by the PBC advisor, had interests in ADG, TIC, and SFL at the time of the Akumin sale. Upon information and belief, their interest in TIC and SFL was larger than their interest in ADG, and thus the PBC Principals profited through the diversion of value from ADG to TIC and SFL.

## JOHN AND JANE DOES

99.     The names of additional persons that (i) acted as fiduciaries of the ESOP, (ii) knowingly benefited, through financial interests in TIC and SFL, from Defendants' diversion of value from ADG, or (iii) hold the proceeds of a knowing beneficiary are not currently known to Plaintiff. Such additional

Defendants are therefore sued in the names of John and Jane Does 1-25. After discovery regarding seller information that has been redacted from public documents and other information not presently available to Plaintiff, Plaintiff intends to amend this pleading to identify and seek appropriate relief from such culpable parties in their true names.

## DEFENDANTS' UNLAWFUL CONDUCT

### ERISA

100.   An ERISA fiduciary must act prudently and loyally with respect to any matter involving the fiduciary's duties to the plan. 29 U.S.C. § 1104(a)(1); *see also Brundle II*, 919 F.3d at 773 ("[A]n ESOP fiduciary is liable to the plan participants if it breached its fiduciary duties, *i.e.*, failed to act '*solely* in the interest of the participants,' with the care, skill, prudence, and diligence used by a 'prudent man acting in a like capacity.'").

101.   ERISA prohibits transactions between a plan and a party in interest, and transactions designed to benefit a party in interest. *See* 29 U.S.C. § 1106(a)(1)(A) and (D). ERISA also prohibits transactions for the benefit of a fiduciary, transactions in which a fiduciary is adverse to the plan, and transactions in which a fiduciary receives consideration from a party to the transaction. *See* 29 U.S.C. § 1106(b)(1)-(3).

102.   ERISA's per se prohibition on party-in-interest transactions and transactions with a fiduciary involving an ESOP are excused only if the fiduciaries and other parties to the transaction can prove that the plan received "adequate consideration." *See* 29 U.S.C. § 1108(e)(1); *see also Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) ("[A] fiduciary … has the burden of proving … that  the ESOP received adequate consideration."); *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 935 (N.D. Ill. 1998) ("[D]efendants bear the burden of proving that the transaction [redeeming ESOP shares] was fair and of benefit to the ESOP shareholders.").

103.   The duty to pay adequate consideration extends to unallocated shares of stock held by an ESOP. *See Spires v. Schools*, 271 F. Supp. 3d 795, 811 (D.S.C. 2017) ("[C]ancellation of shares held by the Plan and forgiveness of notes collateralized by those shares was a transaction involving Plan assets [for purposes of 29 U.S.C. § 1106(a)]."); *Baggett v. Woodbury*, 1987 WL 383796, at *12 (N.D. Fla. Jan. 16, 1987) ("[S]tock held in an unallocated … account … is an asset of the ESOP" and may be redeemed only if "the exchange … is supported by adequate consideration."), *aff'd*, 874 F.2d 819 (11th Cir. 1989).

104.   "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations

promulgated by the Secretary." 29 U.S.C. § 1002(18). "Fair market value" is customarily considered to be

> the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset.

*See Proposed Regulation Relating to the Definition of Adequate Consideration*, 53 Fed. Reg. 17637 (May 17, 1988).[7]

105.    A fiduciary is liable for causing a plan to enter into a non-exempt prohibited transaction. *See* 29 U.S.C. § 1106(a) ("A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect [prohibited transaction].").

106.    Any other person is liable for knowingly benefiting from a violation of ERISA. *See Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000) (holding that a "transferee … demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful" is liable under ERISA); *Walsh v. Vinoskey*, 19 F.4th 672, 677–78 (4th Cir. 2021) (finding that "to knowingly participate" in an ERISA

---

[7] Courts and practitioners customarily use this definition for guidance, although the regulation was never enacted. *See Brundle*. 919 F.3d at 770 ("DOL[] has proposed, but never enacted, regulations [defining "adequate consideration."] … [C]ourts look to these regulations for guidance[.]").

violation pursuant to *Harris Trust* is to "have knowledge" that a party in interest received consideration "in excess of fair market value" from the ESOP); *Fish v. GreatBanc Tr. Co.*, 109 F. Supp. 3d 1037, 1043 (N.D. Ill. 2015) (participants may seek relief from "a knowing, gratuitous transferee" of an ESOP transaction); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 571 (S.D. Tex. 2003) ("Liability under *Harris Trust* applies … to a knowing participation in a fiduciary's breach of fiduciary duties under § 404(a).").

## COMMON LAW DUTIES OF CORPORATE OFFICERS

107.   "Corporate directors and officers owe a fiduciary obligation to the corporation and its shareholders and must act in good faith and in the best interest of the corporation." *Cohen v. Hattaway*, 595 So. 2d 105, 107 (Fla. 5th DCA 1992). Officers of a corporation are liable for damages to the corporation for breach of these duties. *Taubenfeld v. Lasko*, 324 So. 3d 529, 537–38 (Fla. 4th DCA 2021) (citing *Flight Equip. & Eng'g Corp. v. Shelton*, 103 So. 2d 615, 627 (Fla. 1958)). An action for breach of fiduciary duty brought by a shareholder generally must be brought as a derivative action on behalf of the corporation. *Karten v. Woltin*, 23 So. 3d 839, 841 (Fla. 4th DCA 2009).

108.   "Florida courts have recognized that corporate officers and directors owe both a duty of loyalty and a duty of care to the corporation that

they serve." *McCoy v. Durden*, 155 So. 3d 399, 403 (Fla. 1st DCA 2014). "The duty of care is the requirement to use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, with alleged breaches giving rise to liability only if the actions are grossly negligent." *Taubenfeld*, 324 So. 3d at 537.

109. "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Id.* A corporate officer may not "either directly or indirectly, in their dealings on behalf of the fiduciary beneficiary . . . make any profit or acquire any other personal benefit or advantage, not also enjoyed by the fiduciary beneficiary, and if they do, they may be compelled to account to the beneficiary in an appropriate action." *Cohen*, 595 So. 2d at 107.

110. Disloyal conduct can take the form of either diverting current property from the corporation for personal benefit, or diverting a business opportunity that should belong to the corporation. As to the former, claim for conversion is stated wherever a corporate director or officer takes money or property into his or her own name, titles corporate property in his or her own name or in the name of an entity in which the director/officer has an ownership

34

stake. *Id.* Conversion includes not only money and other tangible property, but also the "wrongful taking over of intangible interests in a business venture." *In re Estate of Corbin*, 391 So. 2d 731, 732 (Fla. 3rd DCA 1980). Thus, the tort of conversion "properly extends to the goodwill of a business." *Taubenfeld*, 324 So. 3d at 542.

111. Officers also breach the duty of loyalty when they usurp a business opportunity that should belong to the corporation. "Florida has long recognized the doctrine of corporate opportunity." *Farber v. Servan Land Co., Inc.*, 541 F.2d 1086, 1088 (5th Cir. 1981) (citing *News–Journal Corp. v. Gore*, 2 So.2d 741 (Fla. 1941)). "[A] director or officer breaches the fiduciary duty he or she owes to the corporation by exploiting, for his or her own profit, a beneficial opportunity that rightly belongs to the corporation." *Summerland Key Cove Park, LLC v. Murphy*, 321 So. 3d 888, 894 (Fla. 3d DCA 2021). The corporation "need not have an existing right in the business opportunity (property) and the opportunity need not be 'of the utmost importance to the welfare of the corporation.'" *Cohen*, 595 So. 2d at 109 (quoting *Pan American Trading & Trapping v. Crown Paint, Inc.*, 99 So.2d 705, 706 (Fla. 1957)).

112. A corporation may recover from a breaching officer or director under the usurpation of corporate opportunity doctrine if "(1) there was a business opportunity, (2) that the corporation is financially capable of

undertaking, and (3) this opportunity fit into the present activities of the corporation or into an established corporate policy that acquisition of the opportunity would forward." *Summerland Key Cove Park*, 321 So. 3d at 894.

### JOHNSON AND HERSEY'S SCHEME TO DIVERT VALUE FROM THE ESOP

113.  The Advanced Diagnostic Group enterprise has experienced substantial growth since AFO started using the Advanced Diagnostic Group name more than 15 years ago. Akumin now operates 23 Advanced Diagnostic Group branded centers in Florida, and 6 additional centers in Georgia that use Advanced Diagnostic Group's management and expertise.

114.  A key driver of value of the enterprise has been its ability to take over new imaging centers and integrate them into Advanced Diagnostic Group's system. Even before Johnson acquired AFO and the Advanced Diagnostic Group brand name on behalf of ADG, AFO advertised that its Advanced Diagnostic Group chain "keeps growing to serve you better."[8] Johnson then continued to enlarge the "Group" by buying previously unaffiliated imaging centers on behalf of ADG (such as ADR—see *supra* ¶ 22) and integrating them into the Advanced Diagnostic Group chain, where new centers benefit from ADG's corporate branding, advertising, referral network,

---

[8] *See* "Florida Locations Overview," *available at* https://web.archive.org/web/20090516205657/http://www.advanceddiagnosticgroup.com/ADG_Locations.htm

36

and business model. When Akumin bought the whole enterprise in 2019 for $215 million, it touted the deal to its shareholders as a single package led by ADG: "27 imaging centers ... [a]ll ... managed by *ADG's* management" (emphasis added).[9] Akumin further championed its ability to rebrand some of its *own* centers under the Advanced Diagnostic Group name and "optimize" them by leveraging ADG's PIP expertise and referral network.[10]

115.  Thus, the value of the enterprise was derived from assets owned by ADG: the Advanced Diagnostic Group brand name, its existing network of imaging centers, its experience integrating new centers, its management processes and expertise, its relationships and referral networks, its business strategies, and its personnel.

116.  Yet nearly $100 million of the price that Akumin paid was not allocated to ADG shareholders. Instead, nearly $100 million went to the owners of TIC and SFL in exchange for interests that Johnson and Hersey had acquired on behalf of those entities only a year earlier, while still serving as officers of ADG. In the case of SFL, Johnson was scrambling to add value to the SFL side of the ledger even as the parties executed the Akumin purchase

---

[9] *See* "Akumin to acquire approximately US$30.3 million of EBITDA through expansion in Florida and Georgia" (Apr. 15, 2019), *available at* www.sec.gov/Archives/edgar/data/0001776197/000119312520233781/d929223 dex997.htm.

[10] *See id.*

agreement, with 2 new centers (of 6 total) due to come under SFL's Georgia contract in the last month before closing.[11]

117.   The 2018-2019 acquisitions that Johnson and Hersey executed through TIC and SFL could have been made by ADG, and thus the additional $100 million could have accrued to ADG's shareholders—principally, the ESOP. Indeed, the acquisition of The Imaging Centers and its growth under TIC was ultimately an expansion of Advanced Diagnostic Group imaging centers in Florida—ADG's well-honed business development strategy. At least one TIC clinic even started using ADG's brand name *before* the Akumin sale. The other TIC clinics, under Johnson's continuous management, followed suit shortly after the sale closed by rebranding as Advanced Diagnostic Group centers. Upon information and belief, incorporating TIC-owned clinics into Advanced Diagnostic Group—or offering a buyer such as Akumin the opportunity to do so with benefit of Johnson's experience and expertise—was Johnson and Hersey's plan from the start.

118.   Managing additional centers in Georgia was also part of ADG's well-established business activity. Indeed, SFL's Georgia contract not only could have been acquired by ADG, but it appears that Johnson *removed* the master Georgia contract from ADG in 2018 in order to give that contract to

---

[11] *See id.*

SFL. Regardless, as SFL's subcontractor under the arrangement put into effect in May 2018, ADG possessed the resources and expertise to perform the contract in full and could have obtained the full value of owning the contract, as opposed to the lesser value of owning a subcontract.

119.   ADG also had the financial wherewithal in 2018 and 2019 to make the acquisitions that Johnson and Hersey executed through TIC and/or SFL. None of the approximately $18 million that TIC paid for The Imaging Centers came in the form of up-front cash payments. Instead, TIC promised the prior owners $12 million in deferred payments, which were to be generated by the business; equity in TIC worth $3.3 million; and $2.7 million in subordinated loans that similarly could have been paid using business proceeds. Given that this deal did not require any up-front capital or bank financing, ADG could have made the exact same offer to the sellers.

120.   Additionally, while the deferred payment obligations were satisfied two months after the purchase through an $11 million bank loan extended to TIC, given that the assets and revenues of TIC were sufficient to obtain this loan, there is no reason that ADG could not have obtained the exact same terms had ADG made the initial asset purchase. Moreover, ADG had substantial independent borrowing capacity during this time, which Johnson had no problem leveraging to acquire a clinic (First Coast Imaging) from

himself and PBC (through SFL) at a high price. *See infra* ¶ 128. Yet when it came to the opportunity to buy The Imaging Centers from an independent party at a low price and increase its value as part of ADG's network, Johnson did not tap ADG's capital resources and instead cut ADG out of the deal.

121.  Likewise, ADG had sufficient access to capital, if necessary, to make any additional investments needed to be the principal owner of SFL's Georgia contract and to fully perform under that contract.

122.  While ADG could and should have realized the benefit of the TIC and SFL deals in 2018-2019, it was not in Johnson and Hersey's *personal* interests to pursue these deals on behalf of ADG. Although the ESOP formation terms were favorable to Johnson and the PBC Principals through high interest payments and the right to obtain 42% of ADG's stock, Johnson and PBC Principals also had to share 58% of ADG's growth with ADG employees through the ESOP. If Johnson and Hersey wanted to capture more than 42% of the increase in value of ADG's stock for themselves and PBC Principals, they needed to grow through other legal vehicles not bound to distribute profits to the ESOP.

123.  Upon information and belief, that is what Johnson and Hersey did in 2018 and 2019 with TIC and SFL, and the acquisitions made by TIC and SFL constituted a scheme to divert value from the ESOP. By comparison to

market benchmarks alone, ADG's stock should have experienced substantially higher growth than the 1.76% per year reflected in the Akumin sale. The ESOP acquired its ADG stock at $61.97 per share in December 2015 and sold it for $65.86 per share in May 2019, which equals cumulative growth of 6.28% and annualized growth of 1.76%. During the same period, the Morningstar Global Diagnostics & Research NR USD index, which tracks the performance of companies that provide imaging and other diagnostic testing services for the medical industry, grew 81.07% cumulatively and 18.59% per year. Another related index, the S&P 600 Sector Health Care TR index, which tracks the performance of small cap companies classified as members of the Global Industry Classification Standards Health Care sector, grew 51.28% cumulatively and 12.62% per year during this period.

124.    There does not appear to have been any negative change to ADG's business during this period that would explain the depressed rate of growth of ADG's stock price compared to other companies in the same industry. Indeed, ADG's patient service revenue increased 10.6% from 2017 to 2018. The business was healthy and should have reflected growth at least as strong as other companies in the same industry.

125. The depressed rate of growth of ADG's stock price can be explained, however, by Johnson and Hersey's diversion of value from ADG to

TIC and SFL. In respect to TIC, Johnson and Hersey booked more than 250% growth between the price paid to acquire The Imaging Centers in January 2018 (around $18 million) and the price that Johnson and Hersey sold TIC to Akumin for 16 months later (around $47 million). The enormous growth of TIC did not reflect the sudden appreciation of the assets acquired by TIC from The Imaging Centers. For example, TIC's brand name—The Imaging Centers— was valued at $1.1 million in the $18 million acquisition transaction. Akumin did not pay $29 million more for TIC in order to use the name "The Imaging Centers." Instead, it was Akumin's ability to use the Advanced Diagnostic Group brand name and ADG's superior resources and management capabilities that made TIC worth so much more. In this way (among others), Johnson and Hersey diverted value from the ESOP by establishing and operating TIC as a separate entity and then offering TIC for sale inclusive of the potential to use ADG's assets, taking ADG's growth potential and transferring that value to TIC.

126.   In respect to SFL, Johnson's gambit was similar to how he and Hersey used TIC. SFL was effectively dormant for a full year between 2017 and 2018, such that its 2018 financial statements do not include a customary comparison to 2017 figures and note only that SFL "had no other operating

activities at that time other than acquiring and leasing medical equipment."[12] As of the end of the first quarter of 2019, just two weeks before the Akumin purchase agreement, SFL valued that equipment at only $2.7 million. SFL also valued its goodwill at only $850,000, which was likely a fair approximation of the value of *SFL's* goodwill. The $48 million in value attributed to SFL in the Akumin deal is a reallocation of ADG's value: its reputation for quality management services and its ability to perform the Georgia contract. By executing and expanding the Georgia contract through SFL in 2018 and 2019, Johnson captured that value for himself and the PBC Principals and removed that value from the ESOP's ADG shares.

127.  In respect to ADG, the execution of the initial ESOP transaction in 2015 resulted in approximately $34 million in subordinated notes payable to Johnson and PBC bearing an interest rate of 12%. Though this debt generated significant financial benefits to Johnson and PBC, it was a significant drag on ADG's cash flow and balance sheet, as ADG was required to make quarterly interest payments to Johnson and PBC amounting to 10% per year with an additional 2% added to the principal balance of the notes. Had

---

[12] *See* "Business Acquisition Report" (Aug. 22, 2019), *available at* https://www.sec.gov/Archives/edgar/data/0001776197/000119312520233781/d929223dex9936.htm.

Johnson and Hersey been acting in ADG's best interests, they would have re-financed this debt.

128. ADG's cash flow and assets easily would have supported such a transaction. But instead, in 2017, Johnson and Hersey used a portion of ADG's borrowing capacity to obtain $7 million of new senior secured debt to purchase First Coast Imaging from SFL. In 2018, Johnson and Hersey re-financed all $42 million of ADG's senior secured debt in 2018 at a 6.85% interest rate, even though the terms of the senior secured debt were less onerous for ADG than the subordinated notes due to Johnson and PBC. And through TIC, Johnson and Hersey were able to refinance all of TIC's acquisition debt in 2018 using a bank loan bearing a 4.63% interest rate. By keeping the 12% notes on ADG's books, and failing to act diligently to seek refinancing opportunities or to prioritize refinancing the 12% notes versus other liabilities, Johnson and Hersey drained capital from ADG for their own personal benefit.

129. Because Johnson and Hersey's conversion of ADG's assets and usurpation of corporate opportunities had a severe impact on the ESOP, having a materially negative effect on the value of ESOP participants' benefits, Johnson and Hersey had an affirmative duty to disclose their malfeasance to GreatBanc, the ESOP trustee, which would have permitted GreatBanc to take affirmative steps to protect the assets of the ESOP, such as instituting a

derivative suit. *Pension & ESOP Admin. Committee of Community Bancshares, Inc. v. Patterson*, 547 F. Supp. 2d 1230, 1243–45 (N.D. Ala. 2008). Additionally, failing to disclose to GreatBanc the transfer of value from ADG to other entities owned by Johnson and Hersey while GreatBanc was contemplating whether to approve the sale of ADG to Akumin "imposed upon [them] a duty to disclose" their malfeasance, and they "breached [their] duty by remaining silent." *Id.* at 1246. Johnson and Hersey failed to provide a complete and accurate picture to GreatBanc with respect to the sources of value assigned to TIC and SLF because permanently removing that value from ADG was part of the scheme.

130.   ADG, the ESOP, and ESOP participants were entitled undivided loyalty and reasonable care from Johnson and Hersey. By acquiring new assets through TIC and SFL and then shifting value from ADG to those entities in connection with the Akumin sale, Johnson and Hersey fell far short of their duties and are liable for the claims set forth herein. *See infra* ¶ 163 *et seq.*

## GREATBANC'S DERELICTION OF DUTY

131.   An ESOP fiduciary is bound by ERISA's fiduciary duty to act prudently and loyally with respect to any matter involving the administration and management of the Plan. 29 U.S.C. § 1104(a)(1); *see also Brundle II*, 919 F.3d at 773 ("[A]n ESOP fiduciary is liable to the plan participants if it

breached its fiduciary duties, *i.e.*, failed to act '*solely* in the interest of the participants,' with the care, skill, prudence, and diligence used by a 'prudent man acting in a like capacity.'"). The fiduciary duties that ERISA imposes are among the "highest known to law." *Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997). "Case law imposes on an ESOP fiduciary a still more demanding duty of prudence than a typical ERISA fiduciary because an ESOP holds employer stock only, making diversification impossible." *Neil v. Zell*, 677 F. Supp. 2d 1010, 1019 (N.D. Ill. 2009).

132. These duties are not limited to the purchase or sale of an investment. Pursuant to these fiduciary duties, GreatBanc had a separate duty to monitor the investments of the Plan on an ongoing basis. *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015). The duty to perform a thorough and impartial investigation is heightened where the parties proposing the transaction or its terms are laboring under a conflict of interest. *See Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617, 636 (W.D. Pa. 1999) ("[A]n ESOP trustee must make an intensive independent investigation into the basis for a decision which presents a potential conflict of interest."); *Reich v. Valley Nat'l Bank of Ariz.*, 837 F. Supp. 1259, 1273 (S.D.N.Y. 1993) ("A trustee must make reasonable investigation into the representations of interested parties and

where that investigation would have revealed evidence that the investment was unsound, the trustee can be held liable.").

133. Though an ESOP trustee has no duty to "continuously audit operational affairs," a duty to investigate corporate affairs arises "when there is some reason to suspect that investing in company stock may be imprudent—that is, there must be something akin to a 'red flag' of misconduct." *Pugh v. Tribune Co.*, 521 F.3d 686, 700 (7th Cir. 2008); *see also Barker v. Am. Mobil Power Co.*, 64 F.3d 1397, 1403 & n.4 (9th Cir. 1995) (fiduciary's failure to investigate suspicions of improper plan funding constituted breach of duty of prudence).

134. "An ESOP trustee has a duty to bring a derivative action if he is aware that the officers and directors of the sponsoring employer have breached the fiduciary duties that they owe to their shareholders." *Delta Star*, 76 F. Supp. 2d at 637; *see also Martin v. Feilen*, 965 F.2d 660, 667 (8th Cir. 1992) (holding that the decision to have the ESOP bring a derivative suit "is one of plan administration" subject to ERISA's fiduciary duties and that plan fiduciaries "may have had an obligation to bring a derivative action if they were aware that the officers and directors of the entities whose stock was held by the ESOP had breached fiduciary duties owed their shareholders"); *Gamache v. Hogue*, 446 F. Supp. 3d 1315, 1327–28, 1330 (M.D. Ga. 2020) (plaintiffs

stated a claim that ESOP fiduciaries and monitoring fiduciaries failed to bring suit to remedy malfeasance by bringing "derivative claim").

135.   Johnson, as an officer of ADG from the time the ESOP was created to the time it was closed, and Hersey, CFO from 2017 until the Plan's closure in 2019, breached their fiduciary duties of loyalty and care owed to ADG. First, they breached the duty of loyalty in the following ways: (a) Johnson initiated the sale of First Coast Imaging to ADG on behalf of SFL because of the benefit he received from the sale, not because it was in ADG's best interests; (b) Johnson transferred ADG's management relationship with Georgia imaging centers from ADG Georgia to SFL; (c) Johnson and Hersey allowed TIC to use ADG's brand name, business model, expertise, and referral network without fair compensation to ADG; and (d) Johnson and Hersey failed to refinance the 12% ESOP transaction notes payable to Johnson and PBC.

136.   Second, Johnson and Hersey, during the time that they were officers of ADG, breached the duty of loyalty to ADG by usurping its corporate opportunities in the following ways: (a) Johnson entered into the May 2018 Georgia contract on behalf of SFL, and added new centers to the contract in 2019 in anticipation of the Akumin sale, when that contract was within the scope of ADG's current business activities; and (b) Johnson and Hersey purchased The Imaging Centers clinics on behalf of TIC, an entity in which

Johnson and PBC had an interest (but ADG had none), despite the fact that ADG had the financial ability to purchase the clinics, and purchasing clinics such as The Imaging Centers was within the scope of ADG's business activities.

137.  GreatBanc was presented with multiple red flags regarding Johnson and Hersey's breaches of their fiduciary duties to ADG and its shareholders (*i.e.*, the ESOP and its participants) prior to approving the Akumin sale. ADG provided GreatBanc with annual financial statements for GreatBanc to perform its duty as trustee to value the ESOP's assets each year in connection with the ESOP's Department of Labor filings. The First Coast Imaging sale is described in ADG's 2017 financial statements, which were provided to GreatBanc in 2018, as a purchase by ADG from an entity affiliated with ADG's management. This disclosure—a $12 million insider transaction worth one-fifth of the ESOP's initial investment—should have put GreatBanc on notice of Johnson's self-dealing and resulted in an investigation that would have revealed the existence of other self-dealing, such as SFL's acquisition of ADG's Georgia contract and the TIC deal.

138.  If GreatBanc had not yet discovered Johnson and Hersey's scheme by the time that it was notified of the proposed Akumin sale, the proposal itself constituted sufficient notice to GreatBanc. The ADG purchase agreement, which, upon information and belief, is signed by GreatBanc and was received

and reviewed by GreatBanc with sufficient time to consider its contents, memorializes that ADG was sold "concurrently" with TIC and SFL and that the sale of TIC and SFL on the terms stated in separate purchase agreements was a condition precedent to the sale of ADG.[13] GreatBanc thus had an obligation to review the TIC and SFL agreements in order to understand the terms of the ADG deal and whether those terms were fair to the ESOP. Any inquiry into TIC and SFL in the weeks or months leading to the Akumin sale would have revealed Johnson and Hersey's wrongdoing: somehow, the CEO and CFO of ADG had come to manage two companies worth $100 million that were engaged in the exact same line of business as ADG and did not exist when the ESOP was created. The concurrent TIC and SFL deals were thus a blaring red alarm that mandated further investigation that, if undertaken, would have revealed to GreatBanc multiple acts of conversion and usurpation of corporate opportunities constituting breaches of Johnson and Hersey's duties of loyalty and care as officers of ADG.

139.   An ERISA claim for failure to bring a derivative suit accrues when "it is no longer possible for the fiduciary to bring that claim—either due to the applicable statute of limitations or some other circumstance." *Blankenship v.*

---

[13] *See* "Share Purchase Agreement for ADG Acquisition Holdings Inc." (Apr. 15, 2019), *available at* https://www.sec.gov/Archives/edgar/data/0001776197/000119312520233781/d929223dex9911.htm.

*Chamberlain*, 695 F. Supp. 2d 966, 972 (E.D. Mo. 2010). Under Florida's common law "contemporaneous stock ownership rule," to maintain a derivative suit, the shareholder must maintain "continuous ownership" of the stock "throughout the pendency of the suit." *Timko v. Triarsi*, 898 So. 2d 89, 91 (Fla. 5th DCA 2005). A merger agreement that results in liquidation of a stockholder's shares thus requires dismissal of a derivative suit. *Siegmund v. Xuelian*, 2016 WL 1444582, at *3, 6 (S.D. Fla. April 11, 2016). GreatBanc's ability to bring a derivative action on behalf of ADG to remedy the common law fiduciary breaches perpetrated by Johnson and Hersey expired when GreatBanc sold the ESOP's ADG shares to Akumin on May 31, 2019. Because that sale could not have proceeded absent GreatBanc's approval, had GreatBanc brought a derivative suit at any time prior to the merger, it could have seen that suit to its successful completion. The ESOP's derivative claims were thus forfeited due to GreatBanc's decision to approve the sale without asserting those claims.

140.   GreatBanc also breached its duty to conduct a thorough and independent investigation before approving the sale price for the ESOP's ADG shares to Akumin. Had it conducted an independent and thorough investigation, it would have determined that ADG was worth far more in the deal than the 53.5% of the total value that it was assigned (only $115 million

of the $215 million price, or 53.5%, was attributed to ADG). The use of ADG's brand name, expertise, networks, and/or other assets drove the collective value of the enterprise, and the proposed valuations assigned to TIC and SFL individually, and warranted that a materially larger portion of the sale price be apportioned to ADG. Had GreatBanc conducted a reasonable investigation of the proposed deal and negotiated diligently on behalf of the ESOP, the ESOP would have received a higher price for its ADG shares and, as a result, Plaintiff and other ESOP participants would have received far greater benefits when the ESOP was terminated.

### THE PBC PRINCIPALS' KNOWING PARTICIPATION IN THE SCHEME

141.   The PBC Principals were not passive investors in TIC and SFL. PBC's investment in ADG, SFL, and TIC, starting with ADG sometime between 2010 and 2015 and ending with the Akumin sale of all 3 companies in 2019, reflects a coordinated investment strategy to develop an imaging center business and sell it profitably. The PBC Principals accomplished their objective, but they exploited ERISA violations along the way.

142.   The PBC Principals served in multiple capacities that brought them in contact with—if not to the helm of—the scheme executed by Johnson and Hersey.

143.   First, the PBC Principals managed the PBC funds by serving as the general partners of the PBC funds—or as the managers of certain PBC funds designated as the general partner of other PBC funds—that held interests in ADG, TIC, and SFL. As managers of the PBC funds, the PBC Principals had fiduciary duties to PBC investors to understand the investments of the PBC funds, including transactions involving PBC portfolio companies such as ADG, TIC, and SFL. The PBC Principals thus had an obligation to understand, and, upon information and belief, did understand, that Johnson and Hersey executed the TIC and SFL deals in 2018 and 2019 in order to shift value from ADG to TIC and SFL. Further, as managers, the PBC Principals were required to approve the sale of ADG, TIC, and SFL to Akumin on behalf of the PBC funds. The PBC Principals thus understood that GreatBanc was a party to the deal on behalf of the ESOP and that GreatBanc had fiduciary duties to the ESOP.[14] Upon closing the sale, the PBC Principals understood the Johnson and Hersey's efforts to divert value from ADG to TIC and SFL had gone unremedied by GreatBanc (through its failures to assert derivative claims on behalf of ADG or re-negotiate the proceeds split in

---

[14] The PBC Principals also would have understood the fiduciary nature of GreatBanc's role with respect to the ESOP from the initial ESOP formation transaction in which the PBC Principals sold PBC funds' outstanding ADG stock to GreatBanc as ESOP trustee.

recognition of ADG's greater value), and therefore that GreatBanc had breached its fiduciary duty to the ESOP.

144.   Second, the PBC Principals employed Defendant Hersey. The PBC Principals placed Hersey in his position as the CFO of ADG and authorized him to establish TIC and act as a manager of TIC. Hersey thus acted as agent of the PBC Principals and, upon information and belief, the PBC Principals understood the scheme to divert value from ADG to TIC and SFL through communications with their agent Hersey. Upon information and belief, the PBC Principals also understood that Hersey's employment with ADG included ESOP administrator functions and that therefore Hersey had a fiduciary relationship with the ESOP. The PBC Principals further would have understood that the scheme to divert value from ADG violated Hersey's fiduciary duties to the ESOP.

145.   Third, three of the PBC Principals, Defendants Ward, McGruder, and Schmickle—also served as managers of the PBC advisor. As managers of the PBC advisor, Ward, McGruder, and Schmickle were subject to an additional set of fiduciary obligations to PBC investors. Similar to the PBC Principals' fiduciary obligations as general partners of the PBC funds, *supra* ¶ 143, their duties as managers of the PBC advisor required the PBC Principals to understand the firm's imaging business investments (ADG-TIC-SFL) and

all terms of the Akumin sale. The PBC Principals thus would have understood the scheme to divert value from ADG, GreatBanc's fiduciary role, and GreatBanc's failure to remedy the damage to the ESOP caused by the scheme and the sale.

146.    Fourth, Defendant Ward served as a manager and founder of SFL (along with Johnson) and one of the persons that established TIC (along with Hersey).  Defendant Ward thus had an additional role with respect to the PBC portfolio companies involved in the scheme and would have understood the transactions executed through TIC and SFL to divert value from ADG.  Based on his knowledge of GreatBanc and Hersey's fiduciary roles with respect to the ESOP and the ultimate success of the scheme, Defendant Ward further would have understood that their ERISA violations increased his profits on PBC's imaging center strategy.

147.    The PBC Principals had a practice to segregate their own interests in PBC funds from the interests of PBC investors through the designation of particular PBC funds to hold only the interests of the PBC Principals. The interests of the PBC Principals included their equity stake in the PBC funds and a percentage of the equity return received by PBC investors, payable as performance fees known as "carried interest" equal to 20% of the profits earned by the funds above certain benchmarks (on top of other management fees).

148. Upon information and belief, such segregable PBC funds distributed profits from the sale of TIC and SFL to the PBC Principals, or entities under the control of the PBC Principals, and such profits can be precisely traced to the PBC Principals individually through accounting and tax records not available to Plaintiff at this stage.

**PLAINTIFF'S LACK OF KNOWLEDGE OF THE SCHEME**

149. Plaintiff's position at ADG did not involve finance, mergers and acquisitions, or ESOP administration. Therefore, Plaintiff did not have knowledge of ADG's purchase of First Coast Imaging, ADG's operations in Georgia or the party that held the contract, the purchase of The Imaging Centers or the entity making the purchase, or the administration and management of the ESOP. Plaintiff did not have knowledge of such facts (among others) demonstrating a scheme to divert value from the ESOP, or GreatBanc's role with respect to the ESOP, until 2022, after an investigation initiated by legal counsel. Prior to formal discovery in this case, Plaintiff does not have access to company documents and other insider information involving the transactions at issue or the negotiations related to the Akumin sale. Plaintiff's allegations are based on public disclosures related to the Akumin sale, other public information involving the parties to the sale, and reasonable inferences based on the information available at this stage.

## PLAN-WIDE RELIEF

150.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the ESOP pursuant to this statutory provision.

151.    Plaintiff seeks recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches during the statutory period and seeks equitable relief on behalf of the ESOP as a whole.

152.    Plaintiff is adequate to bring this derivative action on behalf of the ESOP, and her interests are aligned with the ESOP's other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede her ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation, and intends to pursue this action vigorously on behalf of the ESOP.

## CLASS ACTION ALLEGATIONS

153.    Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

154.    Plaintiff asserts her claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

All participants and beneficiaries of the Advanced Diagnostic Group Employee Stock Ownership Plan at the time that the ESOP

was terminated, except that Johnson, Hersey, the PBC Principals, any PBC employee, any member of ADG's board of directors, and any other person that acted as an ESOP fiduciary, to the extent that such person would otherwise be a class member, shall be excluded from the class.

155.   Numerosity: The Class is so numerous that joinder of all Class members is impracticable.  The ESOP had around 200 participants.

156.   Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was an ESOP participant and suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiff consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

157.   Adequacy: Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff's interests are aligned with the Class that they seek to represent, and she has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede her ability to represent such Class members.

158.   Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a. Whether GreatBanc was a fiduciary with respect to the ESOP;

b. Whether Johnson and Hersey were fiduciaries with respect to the ESOP;

c. Whether the ESOP's fiduciaries failed to comply with ERISA's fiduciary standards of prudence and loyalty in the process of approving the share price due to the ESOP in connection with the Akumin sale;

d. Whether ADG, Johnson, Hersey, and Does were parties in interest to the ESOP;

e. Whether the Akumin sale constituted one or more prohibited transactions;

f. Whether any prohibited transaction exemption pursuant to ERISA applies;

g. Whether Johnson, Hersey, the PBC Principals, and Does knowingly participated in one or more non-exempt prohibited transactions and may be compelled to account for proceeds to the ESOP;

h. Whether Johnson and Hersey breached their fiduciary duties as officers of ADG in connection with their actions taken with respect to TIC and SFL, or through other actions adverse to ADG;

i. Whether GreatBanc breached its fiduciary duties of prudence and loyalty pursuant to ERISA by failing to competently monitor the ESOP's investment in ADG and by allowing the ESOP's derivative claims on behalf of ADG to expire in connection with the Akumin sale;

j. The proper form of equitable and injunctive relief; and

k. The proper measure of monetary relief.

159. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class

members that would establish incompatible standards of conduct for Defendants.

160. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

161. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent

judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

162.   Plaintiff and undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

**COUNT I**
**Breaches of ERISA Fiduciary Duties of Prudence and Loyalty in Connection with the Determination and Approval of the ADG Sale Price**
**29 U.S.C. § 1104(a)(1)**
**Against Defendants GreatBanc, Johnson, Hersey, and Does**

163.   Plaintiff incorporates by reference the foregoing paragraphs as though fully stated herein.

164.   Defendant GreatBanc failed to conduct a prudent and loyal investigation focused solely on obtaining the best sale price for the ESOP's ADG stock for ADG employees. A competent, independent investigation of the Akumin sale proposal would have discovered that ADG officers and ESOP administrators (Johnson and Hersey) proposed to sell other assets (TIC and SFL) owned by them or their non-ADG affiliates to Akumin as part of the same deal. The conflicts of interest inherent in joining ESOP-owned and ADG officer-owned and -controlled assets in the same transaction required scrutiny by GreatBanc. A competent inquiry would have concluded that the value reflected

in the nearly $100 million of sale proceeds attributed to TIC and SFL was derived from TIC and SFL's ability to use ADG's brand and/or other assets. That value thus rightly belonged to ADG, and GreatBanc had a duty to negotiate a higher share price for the ESOP's ADG shares as a result (or to block the unfair deal by declining to support it, if Johnson and Hersey refused to make concessions on behalf of TIC and SFL). Based on GreatBanc's approval of the Akumin sale on terms that failed to reflect ADG's fair value, GreatBanc failed to prudently and loyally discharge its fiduciary duties, in violation of 29 U.S.C. § 1104(a)(1).

165.  As ESOP administrators—and due to their control of the process for selling the ESOP's asset, ADG—Johnson and Hersey were ESOP fiduciaries and were required to act prudently and loyally in the process of appraising the value of ADG stock in connection with the Akumin sale. Johnson and Hersey were responsible for providing information pertinent to the value of ADG for appraisal by GreatBanc and its agents. Johnson and Hersey were further responsible for approving the ADG sale price. Yet Johnson and Hersey had incentives to devalue ADG's stock because they and/or their employer or non-ADG affiliates would receive an additional 58 cents for every dollar of value removed from ADG's stock and allocated to TIC and SFL in the deal. Upon information and belief, Johnson and Hersey thus provided an

incomplete or inaccurate picture to GreatBanc that failed to credit ADG for the full value of its brand and services to TIC and SFL. Ultimately, Johnson and Hersey approved the deflated sale price for ADG that they had deliberately engineered. By these actions, Johnson and Hersey performed their ERISA fiduciary duties imprudently and disloyally in violation of 29 U.S.C. § 1104(a)(1).

166.   Defendant Does include persons that acted as ESOP fiduciaries in concert with GreatBanc, Johnson, and/or Hersey and violated 29 U.S.C. § 1104(a)(1) in the same manner and to the same extent.

167.   The ESOP would have received a higher price for its ADG shares had Defendants complied with their fiduciary obligations in connection with the determination and approval of the ADG sale price. Participants, in turn, would have received larger distributions.

168.   ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

169.   ERISA, 29 U.S.C. § 1132(a) permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

170.   Defendants GreatBanc, Johnson, Hersey, and Does caused losses to the ESOP resulting from the above-mentioned fiduciary breaches and are liable to the ESOP for those losses, in addition to appropriate equitable relief to be determined by the Court.

### COUNT II
**Breaches of ERISA Fiduciary Duties of Prudence and Loyalty in Connection with Failure to Monitor the ESOP's Investment and Allowing the ESOP's Shareholder Claims to Expire**
**29 U.S.C. § 1104(a)(1)**
**Against Defendant GreatBanc**

171.   Plaintiff incorporates by reference the foregoing paragraphs as though fully stated herein.

172.   GreatBanc had a fiduciary duty, as the ESOP's independent trustee, to monitor the performance of the ESOP's investment in ADG stock. GreatBanc's monitoring duty included conducting periodic reviews of information pertinent to the valuation of ADG. A diligent review of ADG's financials would have alerted GreatBanc to self-dealing by ADG officers and led to discovery of the scheme to divert value from the ESOP. Upon notification of the proposed Akumin sale in 2019, GreatBanc further should have been alerted to Johnson and Hersey's control of TIC and SFL and conducted an

64

investigation into how ADG's officers had developed other imaging companies supposedly worth nearly $100 million. A cursory examination would have revealed that Johnson and Hersey acquired assets on behalf of TIC and SFL that could have been acquired by ADG, and that value attributed to TIC and SFL in the proposed deal was derivative of value that belonged to ADG.

173. In short, if GreatBanc had acted prudently, it would have discovered that Johnson and Hersey violated their fiduciary duties owed to ADG as its corporate officers. GreatBanc thus had a duty to assert or preserve the ESOP's shareholder derivative claims against Johnson and Hersey. However, by agreeing to sell all of the ESOP's ADG stock to Akumin before seeking redress for Johnson and Hersey's fiduciary breaches, GreatBanc caused the ESOP and its participants to forfeit their standing to assert derivative claims against Johnson and Hersey on behalf of the corporation. GreatBanc's failure to discover, assert, or preserve the ESOP's shareholder claims violated GreatBanc's fiduciary duties pursuant to 29 U.S.C. § 1104(a)(1).

174. GreatBanc's failures prejudiced Plaintiff and other ESOP participants because participants lost standing to seek relief for Johnson and Hersey's breaches of fiduciary duty years before the statute of limitations ran on those claims. GreatBanc thus caused the ESOP and its participants to forgo

damages and equitable relief that would have been available for those claims. Such damages and equitable relief would have resulted in larger distributions to ESOP participants.

175.   ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

176.   ERISA, 29 U.S.C. § 1132(a), permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

177.   Defendant GreatBanc caused losses to the ESOP resulting from the above-mentioned fiduciary breaches and is liable to the ESOP for those losses in addition to appropriate equitable relief to be determined by the Court.

## COUNT III
### Causing Prohibited Transactions between the Plan and Parties in Interest
### 29 U.S.C. § 1106(a)
### Against Defendants Johnson, Hersey, GreatBanc, and Does

178.   Plaintiff incorporates by reference the foregoing paragraphs as though fully stated herein.

179. The Akumin sale included multiple underlying transactions that violated 29 U.S.C. § 1106(a)(1)(A) and (D). ADG, the plan employer and a party in interest to the ESOP, acquired the ESOP's unallocated ADG shares in violation of 29 U.S.C. § 1106(a)(1)(A) and (D). *See Baggett*, 1987 WL 383796, at *12 ("[S]tock held in an unallocated … account … is an asset of the ESOP."). Additionally, Defendants used ADG stock in a scheme to benefit parties in interest, Johnson and Hersey, as selling ADG's stock as a deflated price allowed Johnson and Hersey to profitably sell TIC and SFL in the same deal, in violation of 29 U.S.C. § 1106(a)(1)(D). *See Carter v. San Pasqual Fiduciary Trust Co.*, 2016 WL 6803768, at *6 (C.D. Cal. Apr. 18, 2016) (company directors "caused …[the company] to redeem [the company's] stock held by the Plan" in order to sell that stock to a third-party and thereby "indirectly transferred Plan assets to [themselves]" because the directors received other consideration from the third-party buyer in the same deal).

180. Defendants Johnson, Hersey, and GreatBanc caused the prohibited transactions in their capacities as the ESOP fiduciaries responsible for approving the Akumin sale.

181. Defendant Does include persons that acted as ESOP fiduciaries in concert with GreatBanc, Johnson, and/or Hersey and violated 29 U.S.C. § 1106(a) in the same manner and to the same extent.

182.   The circumstances around the Akumin sale demonstrate that the price received by the ESOP for its ADG shares was inadequate and less than fair market value.

183.   ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

184.   ERISA, 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

185.   Defendants Johnson, Hersey, GreatBanc, and Does caused losses to the Plan resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses in addition to appropriate equitable relief to be determined by the Court.

## COUNT IV
### Prohibited Transactions between the Plan and Fiduciaries
### 29 U.S.C. § 1106(b)
### Against Defendants Johnson, Hersey, and Does

186.   Plaintiff incorporates by reference the foregoing paragraphs as though fully stated herein.

187.   Johnson and Hersey, in their fiduciary capacities, (a) dealt with the ESOP's assets for their own benefit in violation of 29 U.S.C. § 1106(b)(1) by engineering an artificially low sale price for ADG stock in the Akumin sale; (b) acted on behalf of parties adverse to the ESOP in a transaction involving the ESOP in violation of 29 U.S.C. § 1106(b)(2) by representing the interests of TIC and SFL in the Akumin sale; and (c) received consideration from a transaction involving the assets of the ESOP in violation of 29 U.S.C. § 1106(b)(3) by realizing a financial benefit from the misallocation of value from ADG to TIC and SFL in the sale of ADG's stock to Akumin.

188.   Defendant Does include persons that acted as ESOP fiduciaries in concert with Johnson and/or Hersey and violated 29 U.S.C. § 1106(b) in the same manner and to the same extent.

189.   The circumstances around the Akumin sale demonstrate that the price received by the ESOP for its ADG shares was inadequate and less than fair market value.

190.   ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such

breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

191.  ERISA, 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

192.  Johnson, Hersey, and Does caused losses to the Plan resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses in addition to appropriate equitable relief to be determined by the Court.

**COUNT V**
**Co-Fiduciary Liability**
**29 U.S.C. § 1105(a)**
**Against Defendants GreatBanc, Johnson, Hersey, and Does**

193.  Plaintiff incorporates by reference the foregoing paragraphs as though fully stated herein.

194.  Johnson and Hersey knew that GreatBanc failed to conduct a prudent assessment of the value of ADG's stock focused solely on obtaining the best price on behalf of ESOP participants. Indeed, Johnson and Hersey specifically desired and enabled that result by failing to discharge their own fiduciary duties to provide complete and accurate information pertinent to the valuation of the ESOP's shares. Johnson and Hersey are therefore liable

pursuant to 29 U.S.C. § 1105(a) for enabling GreatBanc's breach through their own imprudence and disloyalty.

195.   GreatBanc knew that Johnson and Hersey had a conflict of interest in connection with the Akumin sale due to their interest in obtaining a larger share of the combined value of the ADG-TIC-SFL enterprise for TIC and SFL. GreatBanc also knew that Johnson and Hersey served in fiduciary capacities with respect to the ESOP. Yet GreatBanc participated in the Akumin sale with Johnson and Hersey knowing that Johnson and Hersey were committing prohibited transactions and violating their duty of loyalty to the ESOP. GreatBanc is therefore liable pursuant to 29 U.S.C. § 1105(a) for knowingly participating in Johnson and Hersey's violations of ERISA and failing to remedy those violations.

196.   Defendant Does include persons that acted as ESOP fiduciaries in concert with GreatBanc, Johnson, and/or Hersey and violated 29 U.S.C. § 1105(a) in the same manner and to the same extent.

197.   The ESOP would have received a higher price for its ADG shares had Defendants complied with their fiduciary obligations as co-fiduciaries pursuant to ERISA. Participants, in turn, would have received larger distributions.

198.   ERISA, 29 U.S.C. § 1109(a), provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

199.   ERISA, 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

200.   Defendants GreatBanc, Johnson, Hersey, and Does are jointly liable for their failures as co-fiduciaries for losses to the ESOP resulting from the above-mentioned violations of ERISA and are liable to the Plan for those losses in addition to appropriate equitable relief to be determined by the Court.

<u>**COUNT VI**</u>
**Knowing Participation in a Violation of ERISA**
**29 U.S.C. § 1132(a)(3)**
**Against Johnson, Hersey, PBC Principals, and Does**

201.   Plaintiff incorporates by reference the foregoing paragraphs as though fully stated herein.

202.   Johnson and Hersey are also liable in a non-fiduciary capacity (in the alternative), along with the PBC Principals and Does.

203. Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering proceeds of a fiduciary breach or prohibited transaction from a knowing participant in the ERISA violation, without regard to whether that person was a fiduciary. *See Harris Trust*, 530 U.S. at 238; *In re Enron.*, 284 F. Supp. 2d at 571.

204. Johnson, Hersey, and the PBC Principals knew that that the financial benefits that they received through their interests in TIC and/or SFL were due to Defendants' violations of ERISA in connection with the sale of the ESOP's ADG stock to Akumin. Indeed, Johnson, Hersey, and the PBC Principals specifically manipulated and intended that result. As officers of ADG and TIC and/or SFL, Johnson and Hersey diverted value from ADG to TIC and SFL in order to capture more of ADG's growth for themselves and the PBC Principals. For their part, the PBC Principals were not passive investors. The PBC Principals installed their employee, Hersey, at ADG in order to be able to control his conduct as an ADG officer and ESOP fiduciary. The PBC Principals understood that Hersey violated his fiduciary duties to the ESOP by advancing their interests instead of the interests of ESOP participants. The PBC Principals also had fiduciary duties to PBC investors to understand the scheme executed by Johnson and Hersey involving PBC portfolio companies.

205.   Upon receiving proceeds of the Akumin deal through their interests in TIC and SFL, Johnson, Hersey, and the PBC Principals knew that GreatBanc failed to intervene on behalf of the ESOP in violation of its fiduciary duties, and that their scheme to divert value from the ESOP had worked.

206.   Defendant Does include other persons that knowingly benefited from the ERISA violations described herein alongside Johnson, Hersey, and the PBC Principals.

207.   Pursuant to principles of equity, as applied by federal courts in ERISA cases, Johnson, Hersey, the PBC Principals, and Does, without regard to their status as fiduciaries to the ESOP, are liable to the ESOP for proceeds of the fiduciary breaches and prohibited transactions described herein.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A.   Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.   Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative, and her counsel as class counsel;

C.   Declare that GreatBanc, Johnson, Hersey, and Does breached their fiduciary duties pursuant to 29 U.S.C. § 1104(a);

D.   Declare that GreatBanc, Johnson, Hersey and Does caused prohibited transactions in violation of 29 U.S.C. § 1106(a)(1)(A),(D);

E.      Declare that Johnson, Hersey, and Does caused prohibited transactions in violation of 29 U.S.C. § 1106(b)(1)-(3);

F.      Declare that Defendants' prohibited transactions did not satisfy all requirements for any prohibited transaction exemption under ERISA;

G.      Declare that Johnson, Hersey, and Does knowingly participated in Defendants' prohibited transactions in violation of ERISA;

H.      Order GreatBanc, Johnson, and Hersey to make good to the ESOP all losses resulting from their violations of ERISA;

I.      Order that Johnson, Hersey, and Does are liable for any profits received through use of the assets of the ESOP;

J.      Impose a constructive trust on, and an accounting of, all proceeds of the prohibited transaction and fiduciary breaches received by Johnson, Hersey, the PBC Principals, and Does;

K.      Order that Defendants provide other appropriate equitable relief to the ESOP and its participants and beneficiaries;

L.      Approve a fair and equitable plan of allocation of any losses, profits, or proceeds recovered on behalf of the ESOP such that the ESOP and its participants will be made whole;

M.      Appoint an independent trustee of the ESOP to oversee the allocation of losses, profits, and proceeds recovered on behalf of the ESOP consistent with the terms of the Plan and ERISA;

N.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

O.      Award prejudgment and post-judgment interest; and

P.      Award such other and further relief as the Court deems just and equitable.

Dated: April 14, 2022                    Respectfully submitted,

*/s/ Brandon J. Hill*
**BRANDON J. HILL**
Florida Bar Number: 0037061
Direct Dial: 813-337-7992
**LUIS A. CABASSA**
Florida Bar Number: 053643
Direct No.: 813-379-2565
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
Direct Dial: 813-379-2560
**Wenzel Fenton Cabassa, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
        Main Number: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN No. 022084X*
Brock J. Specht, MN No. 0388343*
Brandon McDonough, MN No. 0393259*
Jacob T. Schutz, MN Bar 0395648*
Caroline E. Bressman, MN No. 0400013*
* *pro hac vice applications forthcoming*
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
bspecht@nka.com
bmcdonough@nka.com
jschutz@nka.com
cbressman@nka.com

ATTORNEYS FOR PLAINTIFFS