**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| Johana Colon, Christine Rundberg, and Anthony Womack, as representatives of a class of similarly situated persons, and on behalf of the Advanced Diagnostic Group Employee Stock Ownership Plan,<br><br>    Plaintiffs,<br>v.<br><br>Kevin G. Johnson, Nathan S. Ward, Shaun L. McGruder, Michael L. Schmickle, Leigh A. Fernandes, Dale L. Hersey, Joshua A. Blacksten, and GreatBanc Trust Co.,<br><br>    Defendants. | Case No. 8:22-cv-888-TPB-TGW<br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DECLARATORY RELIEF REQUESTED** |

## TABLE OF CONTENTS

LIST OF ABBREVIATIONS AND REFERENCES ........................................... iv

I.    INTRODUCTION .............................................................. 1

II.   JURISDICTION AND VENUE .................................................... 1

III.  PARTIES ................................................................... 2

      A.  THE ESOP ............................................................. 2

      B.  PLAINTIFFS ........................................................... 2

      C.  DEFENDANTS ........................................................... 3

IV.   PRE-ESOP COMPANY BACKGROUND ............................................... 4

V.    ESOP TRANSACTIONS AND GOVERNANCE BACKGROUND ......... 5

      A.  ESOP FORMATION ....................................................... 5

      B.  COMPANY AND ESOP GOVERNANCE .......................................... 11

          i.    Board of Directors ........................................... 11

          ii.   Trustee ...................................................... 14

          iii.  ADGMH ........................................................ 15

          iv.   Officers ..................................................... 17

      C.  ESOP TERMINATION ..................................................... 19

VI.   DEFENDANTS' ACTIONS AND OMISSIONS  DETRIMENTAL TO THE ESOP .......................................................... 24

      A.  MISCONDUCT RELATED TO ESOP FORMATION ................................. 25

          i.    Concealment of Scheme to Divert Value from the ESOP in Connection  with Georgia Centers ........................... 26

          ii.   Concealment of Scheme to Divert Value from the ESOP in Connection  with Jacksonville Centers ..................... 31

          iii.  Concealment of Other Agreements Between ADG and Related Parties ............................................. 34

          iv.   Misrepresentation of Johnson's Interests in SFL ..................... 36

          v.    Concealment of Johnson's Termination for Disloyalty from a Similar Company ......................................... 36

          vi.   Unwarranted and Excessive Consideration Due to False Statements  and Omissions ....................................... 38

      B.  MISCONDUCT DURING THE ESOP PERIOD ..................................... 40

      i.    Diversion of Value from the ESOP in Connection with Georgia Centers ..................................................................... 41

      ii.   Diversion of Value from the ESOP in Connection with Jacksonville Centers .................................................................. 50

      iii.  Diversion of Value from the ESOP in Connection with Southeast Florida Centers ........................................................ 57

      iv.  Diversion of Value from the ESOP in Connection with Port St. Lucie Center ................................................................. 63

      v.    Failure to Refinance Costly Sellers' Notes ............................... 66

      vi.  Red Flags During the ESOP Period and Lack of Trustee Process ........................................................................................ 67

   C.  MISCONDUCT RELATED TO ESOP TERMINATION ............................. 71

      i.    Favor to SFL and TIC in Negotiations and Price Manipulation ................................................................... 72

      ii.   False Statements to GreatBanc Regarding the Sale and Failure to Disclose Misconduct ............................................... 75

      iii.  Miscalculation of Warrant Proceeds ....................................... 77

      iv.  Johnson's Retention of the Price Adjustment ......................... 79

      v.    Appointment of Conflicted Members to the Board................... 80

      vi.  Unwarranted and Unlawful Officer Bonuses and Severance . 81

      vii.  Payment of SFL's Contingent Earnout at Future Value......... 83

      viii. Trustee's Failure to Fulfill its Duties to the ESOP.................. 84

      ix.  Independent Director's Failure to Fulfill His Duties to the ESOP ........................................................................................ 90

VII.  PLAINTIFFS' LACK OF ACTUAL KNOWLEDGE ............................. 91

VIII. PLAN-WIDE RELIEF ............................................................................. 92

IX.   CLASS ALLEGATIONS ........................................................................ 93

X.    CAUSES OF ACTION ........................................................................... 97

     Count I – Breach of Fiduciary Duty ............................................... 97

     Count II – Prohibited Transactions Between Plan and Fiduciary 103

     Count III – Breach of Fiduciary Duty ........................................... 105

     Count IV – Breach of Fiduciary Duty ........................................... 114

     Count V – Prohibited Transaction Between Plan and Party in

ii

      Interest ............................................................................ 123

      Count VI – Prohibited Transaction Between Plan and Fiduciary 126

      Count VII – Knowing Participation in ERISA Violation................ 128

XI.    PRAYER FOR RELIEF ...................................................................... 131

iii

## LIST OF ABBREVIATIONS AND REFERENCES

- "**ADG**" refers to ADG Acquisition Holdings, Inc. and its subsidiaries.

- "**ADGMH**" refers to ADG Management Holdings, LLC.

- "**ADGMH Fee Agreement**" refers to the agreement entered into as part of the ESOP formation transaction that required ADG to pay ADGMH $150,000 per year.

- "**Akumin**" refers to Akumin Corporation.

- "**Bylaws**" refers to the restatement of the ADG bylaws adopted as part of the ESOP formation transaction.

- "**Elite**" refers to Elite Radiology of Georgia, LLC.

- "**ESOP**" refers to the Advanced Diagnostic Group Employee Stock Ownership Plan.

- "**ESOP formation transaction**" refers to the concurrent transactions and arrangements wherein the ESOP acquired all 1,000,000 shares of ADG's issued and outstanding stock, which closed on December 11, 2015.

- "**ESOP Note**" refers to the ESOP's note payable to the company for $61.97 million entered into as part of the ESOP formation transaction.

- "**ESOP termination transaction**" refers to the concurrent transactions and arrangements wherein Akumin acquired ADG, TIC, and SFL.

- "**ESOP period**" refers to the period of the ESOP's existence, from December 8, 2015 through May 31, 2019.

- "**FCI**" refers to First Coast Imaging, LLC.

- "**Fernandes Employment Agreement**" refers to the Employment Agreement between Fernandes and ADG.

- "**Formation SPA**" refers to the Stock Purchase Agreement entered into as part of the ESOP formation transaction.

- "**Hersey Employment Agreement**" refers to the Employment Agreement between Hersey and ADG.

iv

- "**ICWPB**" refers to Imaging Center of West Palm Beach LLC.

- "**IRA**" refers to the Investor Rights Agreement entered into as part of the ESOP formation transaction.

- "**Jacksonville SMSA**" refers to the Shared Management Services Agreement related to the management of an affiliated medical imaging center in Jacksonville entered into as part of the ESOP formation transaction.

- "**Johnson Employment Agreement**" refers to the Employment Agreement between Johnson and ADG entered into as part of the ESOP formation transaction.

- "**K12**" refers to K12 Investments LLC.

- "**Medley**" refers to Medley Capital.

- "**PBC**" refers to Palm Beach Capital Management III, LLC.

- "**PIP**" refers to Florida's Personal Injury Protection statute.

- "**Priority**" refers to Priority Funding, LLC.

- "**PwC**" refers to PricewaterhouseCoopers.

- "**SFL**" refers to SFL Radiology Holdings, LLC.

- "**SRSIA**" refers to the Stock Redemption and Securities Issuance Agreement entered into as part of the ESOP formation transaction.

- "**Strategic Healthcare Fee Agreement**" refers to the agreement entered into as part of the ESOP formation transaction that required ADG to pay Strategic Healthcare Partners LLC a fee of 5% of certain note payments.

- "**Stout**" refers to Stout Risius Ross, LLC.

- "**TIC**" refers to TIC Acquisition Holdings, LLC.

v

## I.    <u>INTRODUCTION</u>

1.    Plaintiffs Johana Colon, Christine Rundberg, and Anthony Womack ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the Advanced Diagnostic Group Employee Stock Ownership Plan ("ESOP"), bring this action against Kevin G. Johnson, Nathan S. Ward, Shaun L. McGruder, Michael L. Schmickle, Leigh A. Fernandes, Dale L. Hersey, Joshua A. Blacksten, and GreatBanc Trust Company.

2.    As described herein, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey wrongfully diverted value from the ESOP. Blacksten and GreatBanc failed to competently execute their duties to protect the ESOP from their co-Defendants. Due to Defendants' greed and carelessness, ESOP participants received a fraction of what they were owed. Plaintiffs bring this action pursuant to the Employee Retirement Income Security Act ("ERISA") to recover stolen ESOP benefits and remedy Defendants' unlawful conduct.

## II.    <u>JURISDICTION AND VENUE</u>

3.    This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1332(e)(1).

4.    Venue is proper in this district because the ESOP was administered in this district and fiduciary breaches occurred in this district.

### III.    PARTIES

#### A.    THE ESOP

5.    The ESOP was an "employee benefit plan," as defined by 29 U.S.C. § 1002(3), sponsored by ADG Acquisition Holdings Inc., a Florida corporation ("ADG"). The ESOP was established on December 8, 2015 and terminated on May 31, 2019 ("ESOP period").

6.    The ESOP's participants were ADG employees. The purpose of the ESOP was to invest in ADG stock as a retirement benefit for participants.

#### B.    PLAINTIFFS

7.    Plaintiff Johana Colon is a natural person residing in Tampa, Florida. She worked for ADG as an X-ray Technologist and MRI Technologist during the ESOP period and participated in the ESOP.

8.    Plaintiff Christine Rundberg is a natural person residing in Orlando, Florida. She worked for ADG as a front desk clerk from the start of the ESOP period until around May 2017 and participated in the ESOP. She was formerly known as Christine Chong.

9.    Plaintiff Anthony Womack is a natural person residing in Tampa, Florida. He worked for ADG as a Lead MRI Technologist throughout the ESOP period and participated in the ESOP.

2

## C.    DEFENDANTS

10.    Defendant Kevin G. Johnson ("Johnson") is a natural person residing in West Palm Beach, Florida. Johnson was an ADG board member and the Chief Executive Officer (CEO) of ADG throughout the ESOP period.

11.    Defendant Nathan S. Ward ("Ward") is a natural person residing in West Palm Beach, Florida. Ward was an ADG board member during the ESOP period. Ward was also one of three members of ADG Management Holdings, LLC ("ADGMH"), which had authority to appoint ADG board members and veto ADG transactions during the ESOP period.

12.    Defendant Shaun L. McGruder ("McGruder") is a natural person residing in Palm Beach Gardens, Florida. McGruder was a member of ADGMH throughout the ESOP period and therefore had authority to appoint ADG board members and veto ADG transactions during the ESOP period.

13.    Defendant Michael L. Schmickle ("Schmickle") is a natural person residing in Palm Beach Gardens, Florida. Schmickle was a member of ADGMH throughout the ESOP period and therefore had authority to appoint ADG board members and veto ADG transactions during the ESOP period.

14.    Defendant Dale L. Hersey ("Hersey") is a natural person residing in West Palm Beach, Florida. Hersey was an ADG board member at the time the ESOP was terminated. Hersey was also the Chief Financial Officer (CFO) of ADG from July 2017 through the end of the ESOP period.

3

15. Defendant Leigh A. Fernandes ("Fernandes") is a natural person residing in Lakewood Ranch, Florida. Fernandes was an ADG board member at the time the ESOP was terminated. Fernandes was also the Chief Operating Officer (COO) of ADG throughout the ESOP period.

16. Defendant Joshua A. Blacksten ("Blacksten") is a natural person residing in Plantation, Florida. Blacksten was an ADG board member throughout the ESOP period.

17. Defendant GreatBanc Trust Company ("GreatBanc") is an Illinois corporation headquartered in Lisle, Illinois. GreatBanc was the ESOP trustee throughout the ESOP period.

18. All Defendants were fiduciaries of the ESOP pursuant to the authority granted to them by the company and ESOP governance documents and their authority exercised in fact.

## IV.   PRE-ESOP COMPANY BACKGROUND

19. Before the ESOP period, Johnson, Ward, McGruder, and Schmickle (among others) were ADG stockholders.

20. The group formed ADG in 2010 to acquire an existing chain of imaging centers. The acquired chain operated under the business name Advanced Diagnostic Group.

21. ADG and its subsidiaries (collectively, "ADG") specialized in magnetic resonance imaging (MRI) services.

4

22.    ADG specialized in providing imaging services to accident victims and obtaining reimbursements from insurance companies and law firms representing personal injury plaintiffs.

23.    ADG developed specialized processes for obtaining maximum reimbursements under Florida's Personal Protection ("PIP") law and from personal injury settlements.

24.    Johnson served as ADG's CEO. Ward, McGruder, and Schmickle invested in ADG as part of a group of investors associated with private investment firm Palm Beach Capital.

25.    Ward, McGruder, and Schmickle provided advisory services to ADG through their registered investment adviser firm, Palm Beach Capital Management III, LLC ("PBC").

26.    Between 2011 and 2015, Johnson, Ward, McGruder, and Schmickle caused or advised ADG to (1) acquire new centers and (2) operate them under the name Advanced Diagnostic Group.

## V.    ESOP TRANSACTIONS AND GOVERNANCE BACKGROUND

### A.    ESOP FORMATION

27.    In or around April 2015, Johnson, Ward, McGruder, and Schmickle began preparing to sell ADG to an employee stock ownership plan.

28. In September 2015, Johnson hired a trustee, GreatBanc, to act as their counterparty in the sale. Upon information and belief, Ward was also a decisionmaker in the selection of GreatBanc to serve as trustee.

29. After the parties exchanged information related to the company and the proposed transaction, the ESOP was established on December 8, 2015, and the sale of ADG to the ESOP closed three days later.

30. The ESOP acquired all 1,000,000 issued and outstanding shares of ADG stock in the deal.

31. Johnson and Ward acted as directors of ADG in connection with the sale to the ESOP and approved the sale on behalf of the company.

32. Ward, McGruder, and Schmickle, as member-managers of PBC, received a $500,000 success fee in connection with the sale.

33. Blacksten acted as the third director of ADG in connection with the sale to the ESOP and approved the sale on behalf of the company, alongside his co-directors Johnson and Ward.

34. Blacksten was outside the ADG management and ownership group. Other transaction parties recommended that ADG engage an outside director for the ESOP, and Blacksten—an attorney who had represented Johnson individually in the past—accepted the position. Blacksten received a $24,000 annual fee.

6

35.    The sale of ADG to the ESOP comprised several concurrent and contingent transactions and arrangements. The concurrent and contingent transactions and arrangements included, among other things:

- the establishment of the ESOP by the company, evidenced by a Plan Document setting forth the terms of the ESOP and appointing the company as a Named Fiduciary of the ESOP;

- the adoption of the Trust Agreement setting forth the powers and duties of GreatBanc and the company's board with respect to the ESOP, and appointing GreatBanc and the company's board of directors as additional Named Fiduciaries of the ESOP;[1]

- the company's redemption of 561,500 shares from Ward, McGruder, Schmickle, trusts associated with Johnson, and other investors in exchange for $34.8 million, approximately $7.76 million of which was satisfied in cash at closing, and approximately $27.04 million of which was satisfied by the issuance of 12% notes payable by the company to the sellers,

---

[1] The Trust Agreement was signed by Johnson, on behalf of ADG, and a Senior Vice President of GreatBanc, on behalf of GreatBanc. The Trust Agreement appoints an "ESOP committee" to be a Named Fiduciary of the ESOP (in addition to GreatBanc) and deems ADG's board of directors to be the ESOP committee if no separate committee is appointed. No separate committee was appointed.

memorialized by a Stock Redemption and Securities Issuance Agreement ("SRSIA");

- the company's sale of the same number of shares, 561,500, to the ESOP for the same price, $34.8 million, as the redemption transaction, memorialized by a Stock Purchase Agreement ("Formation SPA");

- Johnson's sale of 438,500 shares to the ESOP for $27.17 million, approximately $6.22 million of which was satisfied in cash at closing, and approximately $20.96 million of which was satisfied by the issuance of a 12% note payable by the company to Johnson, memorialized by the Formation SPA;[2]

- the company's issuance of a warrant to Johnson to acquire 727,273 company shares in the future at $5.00 per share, memorialized by the SRSIA;

- the company's borrowing of approximately $38 million from outside parties, arranged by Medley Capital ("Medley"), which

---

[2] Johnson's stock sale to the ESOP was fictionalized in certain deal documents as a 100% cash sale; however, the majority of the cash used in the Johnson stock sale constituted proceeds of a one-day loan from an outside lender that was repaid at the end of closing. Johnson left closing with around 22% of his sale price paid in cash and around 78% payable via a note from the company, the same as the other selling shareholders.

was used to facilitate cash components of the closing transaction and pay off the company's existing debts;

- the ESOP's note payable to the company for $61.97 million, which comprised the purchase price of the 561,500 shares that the ESOP acquired from the company and the 438,500 shares that it acquired from Johnson ("ESOP Note");[3]

- the restatement of the Bylaws of the company ("Bylaws");

- the agreement between the ADG, the sellers, and GreatBanc (as ESOP trustee) relating to corporate governance and transaction procedures during the ESOP period, memorialized by the Investor Rights Agreement ("IRA");[4]

- the agreement between Johnson and ADG relating to Johnson's continued employment by the company as CEO, memorialized by the Employment Agreement ("Johnson Employment Agreement");[5]

---

[3] $61.97 million represented the valuation of the company's pre-transaction equity agreed to by GreatBanc. The parties calculated the pre-transaction enterprise value of the company to be between $80 million and $90 million.

[4] The IRA was signed by Johnson, Ward, McGruder, Schmickle, and an Assistant Vice President of GreatBanc (among others).

[5] The Johnson Employment Agreement was signed by Johnson and, on behalf of the company, Fernandes.

9

- the agreement related to ADG's management of a medical imaging center in Jacksonville acquired by Johnson, Ward, McGruder, and Schmickle through a newly formed company called SFL Radiology Holdings, LLC ("SFL"), memorialized by a Shared Management Services Agreement ("Jacksonville SMSA");[6] and

- GreatBanc's review and approval of a fairness opinion from its financial advisor Stout Risius Ross, LLC ("Stout").

36.    The ESOP formation documents, transactions, and arrangements were bound together as a single transaction by the obligations and contingencies created therein, such that the documents were executed or delivered at the same time; the documents were assembled together in a single closing binder titled "ESOP Transaction"; the Formation SPA was contingent on adoption of the Plan Document, Trust Agreement, and the fairness opinion; the SRSIA was contingent on the Formation SPA; and closing the deal was contingent on the Bylaws, Johnson Employment Agreement, IRA, and Jacksonville SMSA.

37.    Outside the closing binder, but nevertheless a part of the ESOP formation transaction, all sellers directed ADG to pay Strategic Healthcare

---

[6] The Jacksonville SMSA was signed by Johnson on behalf of both ADG and SFL.

Partners LLC—a company 100%-owned by Johnson—a fee of 5% of all interest and principal payments due on the notes received in exchange for their shares ("Strategic Healthcare Fee Agreement"). Johnson's 5% of his co-sellers' notes was "in recognition of the time and effort expended" by Johnson on the sale of ADG to the ESOP.

38.    In addition, Johnson and Ward caused ADG and ADGMH to execute an agreement requiring ADG to pay ADGMH an annual fee of $150,000 ("ADGMH Fee Agreement").

### B.    COMPANY AND ESOP GOVERNANCE

39.    The closing documents established a governance structure for the company and the ESOP, which applied throughout the ESOP period.

#### i.    Board of Directors

40.    GreatBanc, acting as the company's sole shareholder in its capacity as ESOP trustee, adopted the company Bylaws by written consent at closing.

41.    By the same written consent, GreatBanc appointed Johnson, Ward, and Blacksten to retain their positions on ADG's board of directors and approved two additional directors to be appointed in the future pursuant to the IRA.

11

42. The Bylaws and IRA required that the company have five directors, two appointed by ADGMH, two appointed by the company's officers, and one appointed by a majority of the other directors.

43. The Bylaws required a shareholder meeting to be conducted each year to elect the company's board of directors. The board of directors was required to set the time and place for the annual shareholder meeting.

44. The Bylaws also allowed directors to be elected at a special shareholder meeting or by written consent of the shareholder in lieu of a meeting.

45. The Bylaws and IRA required the board of directors to establish a nominating committee consisting of the two directors appointed by ADGMH and one additional director. The nominating committee of the board was entitled to direct GreatBanc regarding how to vote the ESOP's shares in director elections conducted at annual shareholder meetings, special shareholder meetings, or by written consent.

46. The Bylaws provided that directors would serve until replaced or until their resignation or removal. The Articles of Incorporation of ADG did not require "cause" for a director to be removed, as contemplated by the Florida Business Corporation Act, Section 607.0808(1) (2015), and directors therefore could be removed by shareholder vote.

12

47.    Pursuant to the Trust Agreement, the board was entitled to direct GreatBanc with respect to voting its shares in any matter requiring a shareholder vote.

48.    Pursuant to the Trust Agreement, the board was entitled to direct GreatBanc to sell the ESOP's shares.

49.    Pursuant to the Trust Agreement, the board was a Named Fiduciary with respect to its authority to direct GreatBanc to (1) sell the ESOP's shares and (2) vote the ESOP's shares in director elections and other matters requiring a shareholder vote.

50.    The board also exercised the Named Fiduciary powers reserved to the company by the Plan Document. The Plan Document appointed the company the "Administrator" of the ESOP with authority to "control and manage the operation and administration of the Plan." In this capacity, the company acted as a Named Fiduciary pursuant to ERISA. ADG's board exercised the company's fiduciary duties as the Administrator of the ESOP, except as delegated to ADGMH or officers of the company.

51.    The company, acting through the board, had sole authority to terminate the ESOP. Upon termination, the ESOP was required to take account of and distribute its assets.

52.    Johnson, Ward, and Blacksten retained their board positions throughout the ESOP period. Fernandes and Hersey were added to board in

May 2019 for purposes of closing the ESOP and authorizing the ESOP termination transaction.

## ii.    Trustee

53.    GreatBanc's obligation to follow the board instructions was qualified, under the Trust Agreement and the IRA, by its fiduciary duties pursuant to ERISA.

54.    Under the Trust Agreement and IRA, GreatBanc could override any instruction that would cause a prohibited transaction or a breach of its standard of care under ERISA.

55.    To enforce its override rights with respect to any proposed sale of the ESOP's shares, GreatBanc had discretionary authority, pursuant to the Trust Agreement, to refuse to transfer the ESOP's stock certificates.

56.    GreatBanc was entitled, pursuant to the Trust Agreement, to attend shareholder meetings and act as the shareholder of record of the company in connection with director elections and other matters that required a shareholder vote. Pursuant to the Bylaws, GreatBanc had the authority to call a special shareholder meeting.

57.    Pursuant to the Trust Agreement, GreatBanc had exclusive discretion to exercise shareholder powers not subject to voting direction by the board.

14

58.     GreatBanc's shareholder powers included, among other things, the authority to enter, terminate, or modify a shareholder agreement (Section 607.0732 (2015)); inspect corporate records (Section 607.1602) (2015)); and demand legal redress on behalf of the company (Section 607.07401 (2015)).

59.     The Trust Agreement and IRA reinforced statutory powers held by GreatBanc. Pursuant to the Trust Agreement, GreatBanc had discretionary authority to initiate litigation as necessary to protect the ESOP and to settle such claims. Pursuant to the IRA, GreatBanc had a right to periodic financial statements and other financial information from the company upon request.

### iii.     ADGMH

60.     ADGMH was created in connection with the ESOP formation transaction for the purpose of granting Ward, McGruder, and Schmickle positions in the ESOP and ADG governance structure during the ESOP period. The instrument used to establish ADGMH's powers was the IRA.

61.     The Bylaws designated the IRA a "shareholder agreement" pursuant to the Florida Business Corporation Act, Section 607.0732 (2015)). Through the IRA, GreatBanc transferred certain shareholder powers held by the ESOP to ADGMH. In addition, ADG transferred certain powers with respect to ESOP administration to ADGMH.

15

62.     The stated purpose of the IRA was to protect the value of ADG for the benefit of the ESOP and the pre-ESOP-stockholders-turned-noteholders. In deciding to enter into the IRA, GreatBanc believed that the ESOP and ADGMH had a unity of interest in the success of ADG and that ADGMH would protect the ESOP.

63.     The IRA authorized ADGMH to appoint two board members initially or, if ADG took any significant action without the prior written consent of ADGMH, a board majority.

64.     Actions of the company subject to ADGMH's written consent pursuant to the IRA included, among other things:

- amending provisions of the Plan Document and Trust Agreement related to benefits distributions;

- amending provisions of the Plan Document and Trust Agreement related to voting the ESOP's shares;

- changing the manner of nominating directors;

- terminating officers or appointing new officers;

- selling any company stock (including the ESOP's stock);

- amending the Bylaws;

- incurring new debt in excess of $250,000;

- entering into any arrangement for more than $100,000;

- entering into any arrangement with an affiliate; and

16

- prepaying notes to pre-ESOP stockholders.

65. The IRA further provided that it could not be terminated or amended without the approval of ADGMH and the noteholders.

66. Ward, McGruder, and Schmickle managed ADGMH throughout the ESOP period as its three members and wielded the powers transferred to ADGMH by GreatBanc and ADG pursuant to the IRA.[7]

#### iv. Officers

67. Pursuant to Bylaws and IRA, the board was responsible for appointing ADG's officers, subject to the consent of ADGMH.

68. The board further had authority to remove officers, subject to the consent of ADGMH.

69. Johnson served as CEO of ADG throughout the ESOP period pursuant to the Johnson Employment Agreement and ratification by the board. The Johnson Employment Agreement provided a $100,000 per year increase to Johnson's pre-ESOP base salary (from $300,000 to $400,000) and $200,000 per year in incentive compensation tied to company performance. The Johnson Employment Agreement also contained non-solicitation, non-

---

[7] In response to Plaintiff's discovery request, Ward, McGruder, and Schmickle stated that they do not have an operating agreement for ADGMH. Plaintiff further asked Ward, McGruder, and Schmickle to state whether they had an operating agreement at one time but disposed of it, and Ward, McGruder, and Schmickle failed to identify an operating agreement to have existed at any time. As a Delaware limited liability company, ADGMH was managed by its members, Ward, McGruder, and Schmickle, by default. Del. Code tit. VI, § 18–402.

disclosure, and non-competition clauses. Johnson could be terminated with cause and without severance (or without cause and with severance).

70.    Fernandes served as COO of ADG pursuant to appointment by the board prior to the ESOP formation transaction. Fernandes retained this position throughout the ESOP period. The board also granted Fernandes an employment agreement ("Fernandes Employment Agreement"). Upon information and belief, the Fernandes Employment Agreement contained non-solicitation, non-disclosure, and non-competition clauses materially similar to the Johnson Employment Agreement. Fernandes could be terminated with cause and without severance (or without cause and with severance).

71.    Hersey served as CFO of ADG pursuant to appointment by the board on July 13, 2017. Hersey retained this position for the duration of the ESOP period. The board also granted Hersey an employment agreement ("Hersey Employment Agreement"), which provided a $37,500 relocation bonus, a $250,000 per year base salary, $125,000 per year in incentive compensation tied to company performance, "equity participation" and/or a "success fee" to be determined, and $187,500 in severance pay if Hersey was terminated without cause.[8] The Hersey Employment Agreement also

---

[8] The Hersey Employment Agreement was signed by Hersey and Johnson.

18

contained non-solicitation, non-disclosure, and non-competition clauses. Hersey could be terminated with cause and without severance (or without cause and with severance).

72.    The board also delegated authority to Hersey to act as the Administrator of the ESOP in connection with taking account of the ESOP's assets after termination and overseeing distribution of the ESOP's assets to participants.

### C.    ESOP TERMINATION

73.    ADG's board—then comprising Johnson, Ward, Fernandes, Hersey, and Blacksten—terminated the ESOP by written and signed consent dated May 31, 2019.

74.    Concurrently, the board authorized the sale of ADG to a third-party, Akumin Corp. ("Akumin"), in a series of concurrent and contingent transactions and arrangements.

75.    The Akumin sale was based on an enterprise valuation of ADG of $117.5 million and shareholder equity of around $17.9 million.

76.    Pursuant to the governing terms of the company and the ESOP, the sale required three consents, each requiring discretion and control by the responsible party, and each equal in force and necessity to the others: ADGMH consented to the sale pursuant to the IRA; the board directed GreatBanc, as ESOP trustee, to sell the ESOP's shares; and GreatBanc

19

declined to exercise the ESOP's override rights established by the Trust Agreement.[9]

77.   The termination sale comprised, among other things, the following concurrent and contingent transactions and arrangements:

- the company's satisfaction, through proceeds of the sale, of all notes to former ADG shareholders (including Johnson, Ward, McGruder, and Schmickle) or their transferees, for consideration of $49.42 million;

- the company's satisfaction, through proceeds of the sale, of debts to third-party lenders (including the bank that refinanced the Medley loan in 2018 and a credit investor that made a new loan to the company in 2017), for total consideration of $47.37 million;

- the company's redemption, through proceeds of the sale, of warrants from Kevin Johnson and another investor for consideration of $6.65 million;[10]

- the company's acceleration and satisfaction, through proceeds of the sale, of a contingent future obligation owed by ADG to SFL in

---

[9] The Trust Agreement also granted GreatBanc specific authority to impose its override rights by refusing to transfer the ESOP's stock certificates.

[10] Six months after the ESOP formation transaction, Johnson transferred a portion of his warrant rights to this other investor.

connection with a 2017 transaction (discussed *infra* ¶¶ 291–94), for consideration of $2.875 million;

- the payment, through proceeds of the sale, of a transaction bonus to Fernandes of $475,000;

- the payment, through proceeds of the sale, of a transaction bonus to Hersey of $250,000 and severance of $187,500;

- the agreement between Johnson and Akumin relating to Johnson's continued employment by the company as CEO, including participation in Akumin's stock option plan;

- the agreement between Fernandes and Akumin relating to Fernandes' continued employment by the company as COO, including new incentive compensation of up to $400,000 and participation in Akumin's stock option plan;

- the company's repurchase of 845,528.318 shares from the ESOP in exchange for cancellation of the ESOP Note, which had a principal amount due of $55.68 million at the time of cancellation;

- the ESOP's sale of 154,471.682 shares (all remaining ESOP shares after the company's repurchase of 845,528.318 shares) to Akumin, for consideration of $10.44 million;

21

- Akumin's purchase of SFL (owned by Johnson, Ward, McGruder, Schmickle, and others, see *supra* ¶ 35) for consideration of $47.73 million plus contingent future consideration based on earnings, of which $39.85 million represented the supposed equity value of SFL at the time of closing and was distributed for the benefit of the owners after payment of the company debts and other expenses, and which yielded an additional $9.38 million in payments to the owners after closing in satisfaction of the contingent future consideration provision;

- Akumin's purchase of a company established in 2017 by Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey (among others) called TIC Acquisition Holdings, LLC ("TIC") for consideration of $47.06 million, of which $37.13 million represented the supposed equity value of TIC and was distributed for the benefit of the owners after payment of the company's debts and other expenses;

- the payment, through proceeds associated with the SFL deal, of a transaction bonus to Fernandes of $1.525 million;

- the payment, through proceeds associated with the SFL deal, of a transaction bonus to Hersey of $750,000; and

22

- GreatBanc's review and approval of a fairness opinion from Stout.

78. The ESOP termination documents, transactions, and arrangements were bound together as a single transaction by the obligations and contingencies created therein, such that the documents were executed or delivered at the same time; the documents were combined in a single closing index, inclusive of both the ADG-related documents and the TIC- and SFL-related documents; the ADG sale was contingent on the fairness opinion; the ADG deal was contingent on the TIC and SFL deals; the TIC and SFL deals were contingent on the ADG deal; and ADG's redemption of the warrants was triggered by, and a condition of, the sale of the ESOP's stock. Further, closing the deals was contingent on satisfaction of the $49.42 million in notes payable to the original ADG shareholders and their transferees; acceleration and payment in full of ADG's contingent future obligation of $2.875 million to SFL; delivery of the Johnson and Fernandes post-ESOP employment agreements; payment of the transaction bonuses to Fernandes and Hersey; and payment of severance to Hersey.

79. After termination, ESOP participants received $10.5 million in distributions from the ESOP, comprising $10.44 million in stock sale proceeds from the Akumin deal, plus interest earned on such proceeds pending repayment, minus administrative expenses. All distributions to

23

ESOP participants occurred in 2020. ESOP proceeds represented a loss of approximately $1.25 million compared to the $11.69 million in contributions made to the ESOP on employees' behalf during the ESOP period.

80.    Johnson signed and filed the ESOP's final annual report to the Department of Labor on September 14, 2021. He stated therein that the ESOP had distributed all its assets and had no outstanding receivables.

## VI.    DEFENDANTS' ACTIONS AND OMISSIONS DETRIMENTAL TO THE ESOP

81.    The ESOP was never for the benefit of its participants. The pre-ESOP owners of ADG—Johnson, Ward, McGruder, Schmickle, and others—used the ESOP as a means to (1) fix a price for their interests in ADG and limit their exposure to potential devaluation of the business due to legal and regulatory changes, (2) liquidate a portion of their interests in cash, (3) receive interest income on the portion of the price satisfied through notes, and (4) retain control of the company to (a) ensure payment of the notes and (b) divert additional value from the business and future business opportunities to themselves.

82.    Hersey and Fernandes were knowing and willing accomplices to Johnson, Ward, McGruder, and Schmickle. Although not part of the original ADG stockholder group, Hersey and Fernandes engaged in actions as officers and directors of ADG to further the objective of diverting value from ADG

24

and the ESOP. Hersey and Fernandes were compensated for their efforts through equity interests in TIC and transaction bonuses and other consideration paid upon the successful sale of the portfolio to Akumin.

83.    Blacksten and GreatBanc were the supposed independent protectors of ADG and the ESOP. They failed to satisfy their obligations. Blacksten and GreatBanc accepted their fees and went through the motions of due diligence and consent, failing to competently review the actions of the self-interested Defendants or advocate, or even comprehend, the rights of ADG and the ESOP.

84.    Defendants caused ADG and the ESOP tens of millions of dollars in losses through unchecked greed and lack of due care. Their actions and omissions repeatedly violated provisions of contract and law intended to protect the company and the ESOP. The following sections are illustrative examples.

### A.    MISCONDUCT RELATED TO ESOP FORMATION

85.    In the three months prior to the ESOP formation transaction in 2015, Johnson, Ward, McGruder, and Schmickle misappropriated ADG assets using their newly established company, SFL. They then knowingly and intentionally concealed their misappropriation of ADG assets and ongoing conflicts of interest in order to (1) induce GreatBanc to buy their shares

without a significant discount and (2) maintain a separate vehicle to extract additional value from ADG after the formation transaction closed.

### i.    Concealment of Scheme to Divert Value from the ESOP in Connection with Georgia Centers

86.    Prior to the ESOP period, ADG took substantial steps to expand into Georgia.

87.    Georgia law requires medical imaging centers to be owned by physicians. However, ADG could maintain a financial interest in Georgia centers by supplying clinic space, staffing, equipment, financing, and other services to a physician-owned practice.

88.    In May 2015, ADG purchased MRI equipment and an MRI equipment service contract for its Georgia expansion. In June 2015, after a months-long search, ADG leased space for its first Georgia clinic.

89.    ADG also engaged a Georgia-licensed physician, Dr. Chintan Desai ("Desai"), to form a company that could legally own centers in Georgia. ADG had an existing contract with Desai—who lives in Florida—to read scans for ADG's Florida centers. ADG and Desai agreed to call the new Georgia company Elite Radiology of Georgia, LLC ("Elite").

90.    ADG and Desai agreed that ADG would control the business and supply Elite with staff, equipment, clinic space, financing for expenses, and other resources. Desai did not contribute any capital to Elite.

26

91.   Elite filed for regulatory approval in Georgia in July 2015. In a September 2015 addendum to its application, Elite stated that ADG was "providing expertise in assisting Dr Desai in setting up his medical practice and will lease the MRI equipment and other assets to Elite."

92.   On September 4, 2015, ADG formally leased the MRI equipment it had purchased for the Georgia expansion to Elite and submitted the lease to Georgia regulators. Johnson signed the equipment order, service contract, and lease on behalf of ADG.

93.   Less than two weeks later, Johnson, Ward, McGruder, and Schmickle formed a new company: SFL. The next day, Johnson signed a new lease for the MRI equipment that ADG had already leased to Elite, replacing ADG with SFL as the lessor.

94.   On or prior to that date, Johnson, Ward, McGruder, and Schmickle, knowing that they would sell ADG to the ESOP, decided to divert value from ADG's relationship with Elite to themselves through SFL and other vehicles.[11]

---

[11] Johnson handled day-to-day details of the Georgia expansion and kept his ADG and SFL co-owners—Ward, McGruder, and Schmickle—informed regarding the progress. For example, Johnson was notified on September 18, 2015 that Elite had passed a key regulatory hurdle, and he immediately notified Ward by email, who immediately notified McGruder and Schmickle.

95.    Johnson, Ward, McGruder, and Schmickle planned to use ADG's business plan, contracts, staff, executive team, clinic space, equipment, technical expertise, processes and procedures, strategic relationships, business-generation sources, cash, and other assets to support Elite, while claiming the profits for themselves.

96.    Johnson, Ward, McGruder, and Schmickle failed to compensate ADG for the value of its time, planning, expertise, relationships, and expected future profits related to the Georgia expansion.

97.    Johnson, Ward, McGruder, and Schmickle also failed to obtain a board-approved shared services agreement that would compensate ADG for ongoing services related to Elite and the ongoing use of ADG's assets.

98.    In connection with the ESOP formation transaction, Johnson, Ward, McGruder, and Schmickle knowingly and intentionally concealed from GreatBanc (among other parties) ADG's Georgia expansion, the transfer of ADG's interest in the Georgia expansion to themselves, and their plans for future use of ADG assets to support Elite for their own benefit.

99.    Specifically, Johnson, Ward, McGruder, and Schmickle made two sets of misrepresentations and omissions regarding the Georgia expansion and ADG's relationship to Elite.

28

100.   First, in the Johnson Employment Agreement executed by

Johnson on December 11, 2015 and delivered to GreatBanc and other parties

that day, Johnson:

- identified outside business interests but omitted his interest in

  Elite;

- stated that, in the case of any overlap between ADG and his

  outside business interests, ADG would be compensated pursuant

  to a board-approved shared services agreement;

- stated that, effective that day, he would not divert ADG

  employees or use ADG's "Confidential Information" for his

  personal benefit.[12]

---

[12] The following constituted ADG's Confidential Information pursuant to the Johnson Employment Agreement: "(1) Any and all lists, notes, records, files, memoranda, contracts, and other documents relating to or containing the names and addresses of current or former clients, and the names and addresses of current or former employees (both leased and non-leased); (2) Any and all lists, notes, brochures, records, files, memoranda, contracts, and other documents relating to or containing information relating to research and development, pricing, management systems, policies or procedures, including related forms, charts and all other demonstration aids, accounting, financial data, contract proposals or bidding, business plans, training and operations methods and manuals, marketing, merchandising, software programs and computer systems, technology, strategic partnerships and alliances, referral sources, broker relationships, workers' compensation and other insurance policies, benefits, and any other information relative to the Business; (3) Any and all notes, records, files, memoranda, contracts, and other documents relating to future development such as future marketing or acquisition plans or ideas, potential new locations, and information about the Company's executives, officers, directors and employees."

29

101.    Second, in the SRSIA executed by Johnson, Ward, McGruder, and

Schmickle on December 11, 2015 and delivered to GreatBanc and other

parties that day, Johnson, Ward, McGruder, and Schmickle each in his

individual capacity:

- identified real property leases to which ADG was a party but

  omitted the Georgia clinic lease;[13]

- identified contracts in excess of $100,000 entered in the last

  twelve months but omitted the Georgia MRI equipment purchase

  contract and the Georgia MRI equipment service contract;

- stated that no other person claimed an interest in assets used or

  held by ADG;

- stated that ADG had no obligation to any affiliate in an amount

  greater than $50,000 (despite an understanding that ADG would

  advance payroll and other costs for their benefit in connection

  with the Georgia clinic in excess of that sum).[14]

---

[13] Although Johnson, Ward, McGruder, and Schmickle decided to capture the profits
of ADG's Georgia expansion for themselves, they continued to use ADG as the
contract party in several agreements fundamental to that endeavor at the time of
ESOP formation and thereafter, including the initial clinic lease and the MRI
equipment service contract.
[14] Johnson made the same misrepresentations and omissions, on behalf of himself
and ADG, in the Formation SPA.

*ii.   Concealment of Scheme to Divert Value from the ESOP in Connection with Jacksonville Centers*

102.   Prior to the ESOP period, ADG scouted new opportunities in Jacksonville and entered discussions to take over an existing imaging center on University Boulevard. The University Boulevard location would be ADG's third center in Jacksonville.

103.   On August 31, 2015, Johnson registered the University Boulevard center to do business as Advanced Diagnostic Group by filing a fictitious name registration with the Florida Secretary of State. Johnson identified ADG (specifically, the ADG subsidiary that owned ADG's other two Jacksonville centers) as the owner of the business name.

104.   On September 17, 2015, Johnson registered the University Boulevard center to do business as Advanced Diagnostic Group again. This time, he identified First Coast Imaging, LLC ("FCI"), the owner of the University Boulevard center, as the owner of the business name. ADG had no interest in FCI.

105.   Two days prior, on September 15, 2015, Johnson and Ward signed an operating agreement to manage FCI upon the successful acquisition of FCI by their new company, SFL. SFL's purchase of FCI and related assets closed on September 30, 2015.

31

106.   On or prior to September 15, 2015, Johnson, Ward, McGruder, and Schmickle, knowing that they would sell ADG to the ESOP, decided to seize ADG's University Boulevard opportunity for themselves by buying the center and profiting from it through misappropriation of ADG's business name and other assets. Their plan included, among other things, diverting business from ADG's original Jacksonville location—just 2.2 miles away—to the University Boulevard center and using ADG's proprietary business information and processes to drive revenue growth to the SFL-owned center.

107.   In connection with the ESOP formation transaction, Johnson, Ward, McGruder, and Schmickle knowingly and intentionally mispresented ADG's relationship to the University Boulevard center and their plans for the University Boulevard center.

108.   Specifically, they made three sets of misrepresentations and omissions regarding the University Boulevard center.

109.   First, in the Johnson Employment Agreement executed by Johnson on December 11, 2015 and delivered to GreatBanc and other parties that day, Johnson stated that effective that day he would not (1) divert business from ADG or (2) use ADG's Confidential Information for his personal benefit.

110.   Second, in the SRSIA executed by Johnson, Ward, McGruder, and Schmickle on December 11, 2015 and delivered to GreatBanc and other

32

parties that day, Johnson, Ward, McGruder, and Schmickle, each in his individual capacity stated that:

- no related party claimed an interest in assets used in the operation of ADG's business;

- ADG had not licensed its trade name to any other person; and

- no other person was infringing on ADG's trade name rights.[15]

111.   Third, in financial projections sent to GreatBanc and Stout on October 27, 2015, Johnson and Ward represented, or caused to be represented on their behalf, that ADG had entered a "contractual agreement" in October 2015 to manage the University Boulevard center on behalf of SFL. No such agreement existed.

112.   In the same projections, Johnson and Ward represented, or caused to be represented on their behalf, that ADG expected to receive $70,000 per month from the non-existent SFL contract (yielding net profit of $57,000 per month based on an estimated $13,000 cost of ADG's services). Stout incorporated this falsified revenue into its ADG growth projections for 2016 and beyond and cited it as a positive factor supporting the valuation and price.

---

[15] Johnson made the same misrepresentations and omissions, on behalf of himself and ADG, in the Formation SPA.

33

113.    The actual University Boulevard agreement—the Jacksonville SMSA (see *supra* ¶ 35)—was not executed until the day the ESOP formation transaction closed (by Johnson, who signed on behalf of all parties to the deal) and paid ADG only $2,000 per month. On an annual basis, Johnson and Ward overstated the management deal by $816,000, or 2.75% of ADG's total projected revenue.

114.    In a letter to Stout signed by Johnson and delivered at closing, Johnson:

- affirmed that revenue projections that included the non-existent $70,000 per month from University Boulevard were accurate;[16] and

- stated that he had not omitted any information that would render information previously submitted to Stout to be misleading.

*iii.    Concealment of Other Agreements Between ADG and Related Parties*

115.    The day before closing, Johnson and Ward caused ADG and ADGMH to execute the ADGMH Fee Agreement. The ADGMH Fee

---

[16] Johnson's closing letter to Stout projected $29.776 million in 2016 revenue. This figure was calculated by taking ADG's September 2015 monthly revenue and then adding (1) volume increases for two centers that ADG acquired in 2015 and (2) the $70,000 in non-existent revenue from SFL for the University Boulevard center, multiplied by 12.

34

Agreement and $150,000 ADGMH fee were not disclosed to GreatBanc at or prior to closing.

116.   The day of closing, Johnson, Ward, McGruder, Schmickle, and other sellers signed the Strategic Healthcare Fee Agreement. Johnson signed the agreement on behalf of ADG, accepting the company's obligation to transfer the 5% payments to Johnson's company. The scheduled payments to Johnson's company exceeded $50,000 per year (the SRSIA and Formation SPA disclosure threshold). The Strategic Healthcare Fee Agreement and 5% fee were not disclosed to GreatBanc at or prior to closing.

117.   The terms of the ADGMH Fee Agreement and Strategic Healthcare Fee Agreement could have been included in the sellers' notes and IRA, respectively. Johnson, Ward, McGuder, and Schmickle entered these agreements outside the closing binder in order to conceal their terms from GreatBanc.

118.   As of the day of closing, SFL used ADG's headquarters in Tampa as its offices. SFL did not pay rent to ADG or compensate ADG for other office expenses. SFL's use of ADG's headquarters was not disclosed to GreatBanc at or prior to closing.

119.   In the SRSIA executed by Johnson, Ward, McGruder, and Schmickle on December 11, 2015 and delivered to GreatBanc and other parties that day, Johnson, Ward, McGruder, and Schmickle each in his

35

individual capacity, falsely stated that (1) ADG had no undisclosed obligation to any affiliate of an ADG director in an amount greater than $50,000 per year and (2) no such affiliate had an interest in any asset used for ADG business.

### iv.   *Misrepresentation of Johnson's Interests in SFL*

120.   Johnson also knowingly and intentionally mispresented his interests in SFL.

121.   In the Johnson Employment Agreement executed and delivered by Johnson on December 11, 2015 to GreatBanc and other parties, Johnson stated that he had a 40% membership interest in SFL. In fact, he had a 50% membership interest.

122.   Further, Johnson was SFL's CEO, yet he described his interest in SFL solely as an "investment," implying a passive role and omitting the critical fact that he bore primary responsibility for running SFL.

123.   Johnson's representations regarding SFL also omitted SFL's interest in Elite (indeed, Johnson failed to disclose Elite's existence or ADG's services to Elite in any way, *see supra* ¶¶ 99–101).

### v.   *Concealment of Johnson's Termination for Disloyalty from a Similar Company*

124.   Months before he joined ADG, Johnson was terminated "for cause" from his position as CEO of another chain of imaging centers. His

36

dismissal letter alleged that he, among other things, "devoted a significant amount of time to outside and conflicting business interests during standard working hours"; "solicited a direct competitor . . . to engage [him] for consulting services to make their operations more efficient and profitable"; and "attempted to sell, for [his] own personal benefit" certain medical equipment owned by his employer.

125. In connection with the ESOP formation transaction, Johnson did not disclose his prior for-cause dismissal or its grounds to GreatBanc and Stout.

126. Johnson's history of misappropriation of assets and conflicts of interest as an imaging center CEO was material information necessary for GreatBanc and Stout to consider in connection with their analysis of the fairness of the ESOP formation transaction. Due to his concealment of this information, Johnson's letter statement to Stout on December 11, 2015 that he had disclosed all material information necessary for completion of the fairness opinion was false and misleading.[17]

---

[17] Although Johnson's employment history was concealed from GreatBanc and Stout, it was known to Ward, McGruder, Schmickle, and Blacksten. Ward, McGruder, and Schmickle sold Johnson's prior company to the person who fired Johnson, and then they formed ADG with him shortly after his termination. Blacksten represented Johnson in litigation related to the other company after his termination.

*vi.    Unwarranted and Excessive Consideration Due to False Statements and Omissions*

127.    Each false statement by Johnson, Ward, McGruder, and Schmickle was identified by the transaction documents as a representation or warranty that was material to the transaction, and the accuracy of their representations and warranties was a condition precedent to closing.

128.    Stout's fairness opinion relied on the false revenue projections, absence of conflicts of interests, and absence of other related-party transactions attested to by Johnson, Ward, McGruder, and Schmickle. GreatBanc's approval of the ESOP's purchase of ADG was based on its review and approval of Stout's flawed fairness opinion.

129.    A prudent trustee apprised of Johnson, Ward, McGruder, and Schmickle's usurpation of ADG's Georgia and University Boulevard opportunities and misappropriation of ADG's trade name during the ESOP formation process would have required that those assets be returned to ADG or, alternatively, that ADG be compensated for the fair value of its interests through sale price concessions or other consideration.

130.    A prudent trustee would not have authorized the Jacksonville SMSA had Johnson, Ward, McGruder, and Schmickle accurately represented the terms of the deal. A prudent trustee also would not have awarded the

38

$150,000 management fee to Ward, McGruder, and Schmickle through ADGMH, had the arrangement been disclosed.

131.    A prudent trustee apprised of all conflicts between ADG and Johnson, Ward, McGruder, and Schmickle, and of ADG's actual projected revenue (or lack thereof) from services to related parties, would have required a substantial discount to the purchase price to compensate the ESOP for the risk that Johnson, Ward, McGruder, and Schmickle would use their ongoing control of the company to benefit themselves at the expense of ADG and ESOP. A prudent trustee also would have obtained material revisions to the ESOP and corporate governance structure to limit the power of ADGMH and the board to dictate shareholder action or interfere with shareholder powers.

132.    Further, a prudent trustee apprised of Johnson's self-interested actions prior to the ESOP formation, his plans for the Georgia venture and University Boulevard center, and his termination from his prior company would not have compensated Johnson in the ESOP formation transaction with warrants and an increase to his salary and bonuses on top of the price paid for the ADG shares he owned. This additional consideration was exclusive to Johnson, and not received by other selling shareholders, due to the perceived value, from GreatBanc's perspective, of retaining him as CEO and binding him to the limitations of the Johnson Employment Agreement in connection with the ESOP's purchase of the company. Johnson's false

39

statements and omissions caused GreatBanc to overvalue Johnson's services and award him undue warrant, salary, and bonus consideration in connection with the ESOP formation transaction. A prudent trustee also would not have authorized the Strategic Healthcare Fee Agreement, had the arrangement been disclosed.

133.   Johnson, Ward, McGruder, and Schmickle's misrepresentations and omissions inflated the value of ADG's shares and caused GreatBanc to acquire ADG shares for more than fair market value. As selling shareholders in the deal, Johnson, Ward, McGruder, and Schmickle received excessive and unfair consideration for their shares.

### B.    MISCONDUCT DURING THE ESOP PERIOD

134.   During the ESOP period, Defendants failed to observe the governance structure designed to protect ADG and the ESOP. Johnson, Ward, and Blacksten, as ADG's board, did not schedule shareholder meetings, and GreatBanc, as ADG's shareholder, never insisted on one. Ward, McGruder, and Schmickle, as ADGMH's managers, left board seats vacant and disregarded their obligation to issue prior written consent to significant corporate actions on behalf of ADG. Instead, Johnson, Ward, McGruder, and Schmickle worked against the interests of ADG and the ESOP to benefit themselves. Hersey and Fernandes abetted their disloyalty while GreatBanc and Blacksten turned a blind eye to brazen misconduct.

*i.   Diversion of Value from the ESOP in Connection with Georgia Centers*

135.   Elite opened for patients in March 2016 in the clinic space leased by ADG using ADG's MRI equipment.

136.   At the same time, Johnson caused himself to be appointed CEO, and Fernandes COO, of Elite. He deployed a current ADG employee to serve as Elite's director of operations. He signed MRI reading agreements on behalf of Elite with ADG-contracted radiologists, including Desai and a second ADG vendor.

137.   Johnson and Fernandes used ADG's business-generation relationships, including at least one law firm that represents injured persons in both Florida and Georgia, to source business to Elite.

138.   Johnson and Fernandes caused ADG to advance expenses on behalf of Elite in excess of $200,000.

139.   Elite opened two new Georgia clinics in 2017, one new clinic in 2018, and two new clinics in 2019. Johnson and Fernandes selected the locations and equipment, managed the regulatory approval process, and provided executive oversight of the new centers.

140.   As Elite grew, Johnson and Fernandes caused ADG to hire new workers and then deployed them in service of Elite. Elite had no employees of its own. ADG evaluated, screened, trained, and employed Elite's staff. The

41

Elite clinics were covered under ADG's workers compensation insurance. The Elite workers were participants in the ESOP.

141. Johnson and Fernandes provided Elite with access to ADG's confidential information, including business processes, relationships, contracts, training resources, and other technical expertise, to make the venture more efficient and profitable.

142. Johnson and Fernandes caused ADG to manage billing and collections on behalf of Elite.

143. Johnson and Fernandes allowed Elite to use ADG's Tampa headquarters and other office resources.

144. Hersey joined ADG in July 2017. Johnson deployed him in service of Elite as its CFO. Hersey continued Johnson and Fernandes' practice of using ADG's confidential information on behalf of Elite.

145. Despite ADG's critical role in the development and operation of Elite, none of the above was designed to increase ADG shareholder value. Johnson, Fernandes, and Hersey limited ADG to a reimbursement that covered only a fraction of the ADG's Elite-related expenses. ADG received no compensation for the value of its confidential information and expertise, no participation in profits, no equity in the operation, and no interest on funds advanced.

42

146. Multiple transactions regarding ADG and Elite required the prior written consent of ADGMH pursuant to the IRA—a requirement expressly designed for the protection of ADG and the ESOP. Ward, McGruder, and Schmickle abdicated this duty and never issued prior written consents under their IRA authority (instead, they joined actions against the interest of ADG in their individual capacities).

147. The relationship between ADG and Elite required a board-approved shared services agreement. The board allowed Johnson, Fernandes, and Hersey to carry on the arrangement without one.

148. Johnson, Fernandes, and Hersey's actions constituted violations of their employment contracts' prohibition of the use of ADG's confidential information and employees for their personal benefit. The board did nothing to enforce the Johnson Employment Agreement, Fernandes Employment Agreement, or Hersey Employment Agreement on behalf of ADG.

149. Johnson, Fernandes, and Hersey's actions constituted violations of their common law duty of loyalty to ADG. The board made no attempt to remedy the ADG officers' disloyalty or stop further actions contrary to the interests of ADG and the ESOP.

150. The board and ADGMH failed to protect ADG's interests because the unfair dealings between ADG and Elite benefited members of the board and ADGMH—Johnson, Ward, McGruder, and Schmickle, and later

43

Fernandes and Hersey—in their individual capacities. They had knowledge of unfair dealings between ADG and Elite in their official capacities but failed to follow official processes under contract and law to protect ADG and the ESOP because of such individual benefits, in breach of the standard of conduct of corporate directors pursuant to the Florida Business Corporation Act, Section 607.0830 (2015), and in violation of the IRA.

151.   Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey further failed, in their capacity as ESOP fiduciaries, to account and seek redress for officer misconduct or their participation in it as directors and ADGMH members, or to disclose the same unlawful acts and circumstances to other ESOP fiduciaries. They served ADG only to the extent of their personal interests in ADG and diverted additional value and opportunity to themselves through other vehicles.[18]

---

[18] Ward, McGruder, Schmickle, Fernandes, and Hersey's personal interests in ADG were limited to ESOP formation notes (Ward, McGruder, and Schmickle) and salary, bonuses, and fractional ESOP stakes (Fernandes and Hersey). Johnson had a warrant to acquire ADG shares, but his 50% stake in SFL was larger than his warrant interest in ADG. After selling a portion of his warrant, and taking account of the warrant redemption cost, his potential interest in ADG's equity value was around 20% to 25% (and a maximum of 35%), depending on the warrant exercise method selected (see *infra* ¶¶ 261–68). Fernandes and Hersey's ESOP stakes were split *pro rata* based on total compensation with all other ADG employees. The bonuses and TIC equity interests that they received for assisting Johnson, Ward, McGruder, and Schmickle to divert value from ADG yielded a windfall more than four times greater than their interests in the ESOP. Due to their role as fiduciaries and beneficiaries of the wrongful conduct at issue, Fernandes and Hersey are excluded from the class in this case. *See infra* ¶ 327.

44

152.   Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey's strategy to profit from Elite included multiple parts.

153.   First, the group used SFL to provide additional credit and equipment to Elite beyond the credit and equipment contributed by ADG. The group caused Elite to pay SFL 10% interest and rent.

154.   ADG had the financial ability to provide Elite with the additional credit and equipment contributed by SFL, and ADG should have had the opportunity to earn the income that was instead paid to SFL. The amount of capital that ADG needed to serve the same role as SFL was between $1 million and $2 million between March 2016 and May 2018, and an additional $2 million to $3 million between May 2018 and May 2019. ADG had sufficient cash and credit on hand to fully fund these opportunities. Further, most or all of this capital could have been financed from the profits that Elite was generating, had Johnson, Fernandes, and Hersey attempted in good faith to provide fair consideration to ADG for its contributions to Elite.

155.   Second, Johnson, Ward, McGruder, and Schmickle used a second shell company called Priority Funding, LLC ("Priority"), established in 2016, to capitalize on receivables generated by Elite. The average time between the date of scan and revenue collection is longer in Georgia than in Florida due to the absence of a PIP law. Scans not reimbursed by insurance or paid out-of-pocket await reimbursement from personal injury settlement proceeds

45

months or years later. After the delay, the party holding the receivable can typically demand a high reimbursement rate.

156. Johnson, Ward, McGruder, and Schmickle profited by causing Elite to assign collection rights and more than 50% of collected revenue on a portion of scans in the personal injury settlement pool to Priority. As written, the deal required Priority to advance Elite's share of each scan to Elite in cash within fifteen days of service. In practice, Priority and Elite split revenue after it was collected—by ADG's billing and collections team—and Priority did not advance cash to Elite according to the agreement.

157. ADG had the financial ability to own the interest in Elite receivables that Johnson, Ward, McGruder, and Schmickle granted to themselves through Priority, and ADG should have received the benefit of Priority's interest in those receivables. ADG contributed the relationships, clinic and collections staff, and industry know-how that generated Priority's income, and Priority contributed nothing.

158. In 2018, Johnson, Ward, McGruder, and Schmickle decided to prepare their imaging center portfolio for sale. This included restructuring the Elite venture to maximize its sale price. While the existing structure based on ownership of receivables, notes, and equipment was adequate for income generation, the group believed that it could obtain a larger windfall

46

from a potential sale by restructuring their supposed interests in the venture in the form of a long-term management contract.

159.   Hersey spearheaded the effort to design the management contract and supporting arrangements. He acted with the knowledge and blessing of Johnson, Ward, McGruder, Schmickle, and Fernandes. The project resulted in four related transactions in 2018.

160.   First, SFL and Elite executed a 10-year contract (signed by Ward and Johnson on behalf of SFL and Elite, respectively) that required Elite to pay SFL monthly service fees, a "bonus," and its expenses (plus a 10% markup). The group later explained to Akumin that the "bonus" was designed to capture all profits of Elite's clinics not captured by the monthly fees.

161.   Second, SFL agreed to pay Desai 10% of net proceeds of the future sale of SFL in exchange for serving as the nominal owner of Elite and following SFL's directives. The agreement allowed SFL to "replace" him as the nominal owner of Elite if he failed to follow their instructions.

162.   Third, Elite and Priority discontinued the receivables-splitting arrangement.

163.   Fourth, SFL secured ADG's continued support of Elite through a shared services agreement between SFL and ADG (signed by Ward and

47

Hersey, respectively).[19] The shared services agreement was calculated to cover payroll, insurance, and commissions for ADG employees assigned to Elite plus certain other expenses. The agreement yielded no value for ADG or its shareholder, the ESOP.[20]

164.   The purpose of the management contract and supporting arrangements was to allow SFL to be valued and sold on an enterprise basis as if SFL owned Elite, notwithstanding Georgia law barring direct ownership by non-physicians.

165.   The linchpin of the management contract and supporting arrangements was ADG. The SFL-Elite agreement falsely characterized the services and capabilities that ADG had provided to Elite since its inception as services and capabilities that had been provided by SFL. The agreement contemplated that SFL would continue to provide those services, but in fact, ADG would continue to be responsible for them. SFL had no employees and relied entirely on ADG to fulfill its duties under the contract.

---

[19] The ADG-SFL shared services agreement secured SFL's ability to profit from ADG's services to Elite, but it did not satisfy the requirement of the Johnson Employment Agreement related to shared services agreements (see *supra* ¶ 100) because it was not submitted to and approved by ADG's board.

[20] Although ADG showed a paper profit of around $22,000 per month in the first seven months of the contract, this was due to the failure to include all shared personnel time in the calculation of ADG's expenses. The ADG payment amount was not engineered to produce a profit for ADG, and ADG's paper profit was ultimately reversed for purposes of valuing ADG in the sale. *See infra* ¶ 248.

48

166.  Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey knew that the management contract and supporting arrangements falsely attributed ADG's past, present, and future contributions to Elite to SFL. They engineered the false narrative and corresponding compensation split because they wanted to divert the value of ADG's contributions to Elite from the ESOP to themselves.

167.  ADG had the financial ability to own the interests in the Elite management contract that Johnson, Ward, McGruder, Schmickle, Hersey and Fernandes granted to SFL, and ADG should have received the benefit of the contract. The contract required no capital investment by SFL. ADG provided the consideration for the contract in the form of its personnel, services, and confidential business information.[21]

168.  In each phase of the Georgia venture, Johnson, Ward, McGruder, and Schmickle generated unnatural returns for themselves as the equity owners of SFL and Priority by using ADG to develop and operate Elite's clinics and then cutting ADG out of the profit- and value-generating parts of the venture.

---

[21] Extensions of credit by SFL to Elite were expressly subject to separate agreements and consideration and were not required by the shared services agreement.

49

169.    The SFL management contract was responsible for more than $45 million in equity proceeds stolen from the ESOP. The Priority receivables yielded another $4 million in free income. SFL received an additional $700,000 or more in interest and rental income from Elite. In exchange for their complicity, Fernandes received a $1.525 million bonus from the sale of SFL, and Hersey received a $750,000 bonus from the sale of SFL and an equity stake in Priority.

*ii.   Diversion of Value from the ESOP in Connection with Jacksonville Centers*

170.    In the first 18 months after the ESOP formation transaction, Johnson, Ward, McGruder, and Schmickle carried out their scheme to siphon value from ADG through the University Boulevard imaging center in Jacksonville.

171.    Two months before the ESOP formation transaction closed, Johnson, Ward, McGruder, and Schmickle (through SFL) purchased the University Boulevard center and a related firm for only $4.3 million.

172.    After the ESOP transaction closed, Johnson and Fernandes removed the prior business name "Jacksonville Upright MRI" from the building and roadside signage and replaced it with "Advanced Diagnostic Group."

173.    Johnson and Fernandes used ADG's trade name in all aspects of the business, including with patients, vendors, and business-generation

50

sources. Use of ADG's trade name was not part of the deal for ADG to manage the center on behalf of SFL. The Jacksonville SMSA did not authorize SFL to use ADG's name.

174.   ADG also advanced expenses for the University Boulevard center on behalf of SFL. In the second half of 2016, SFL carried a credit balance with ADG of over $200,000 for four months. Financing expenses for the University Boulevard center was not part of the deal for ADG to manage the center on behalf of SFL. The Jacksonville SMSA did not require ADG to advance expenses.

175.   ADG managed all strategic, executive, accounting, collections, and training functions of the University Boulevard center. As ADG officers responsible for the University Boulevard center, Johnson and Fernandes used ADG's business processes, employees, and other confidential information to boost scan volume, revenue collection, and overall profitability for SFL.

176.   For example, Johnson and Fernandes re-directed high value PIP referrals from the ADG-owned centers in Jacksonville to the SFL-owned center. ADG's original Jacksonville center on Southpoint Highway—just 2.2 miles from the University Boulevard center—suffered a 32% drop in MRI scans billed under the PIP law from 2015 to 2016. In contrast, ADG's centers

51

that did not compete with SFL achieved a 15% increase in PIP scan volume from 2015 to 2016.[22]

177.  SFL's University Boulevard center siphoned off this business volume from ADG's Southpoint Highway center and posted a 17% increase in its average monthly MRI scans in 2016 compared to the first three months under SFL's ownership at the end of 2015.[23]

178.  MRI scans billed under the PIP law are particularly vulnerable to usurpation, as the scans are often administered to car accident victims who are directed or advised on where to receive the scans by a personal injury attorney's office. ADG devotes significant personnel and resources to developing long-term relationships with attorneys in each of its markets. The sudden drop in PIP scans at Southpoint Highway and the increase in scan volume at University Boulevard is consistent with Johnson and Fernandes' re-direction of personal injury referral sources to SFL's University Boulevard center, and constituted stolen goodwill due to SFL's use of ADG's name.

---

[22] This analysis excludes the two centers that ADG added mid-2015 and compares the nine centers operated by ADG throughout 2015 to the same centers' results in 2016.

[23] Scan volume at University Boulevard prior to SFL's ownership, and scan volume segregated by payor type including PIP at University Boulevard in 2015 and 2016, is not currently available to Plaintiffs. Plaintiffs believe that, after further discovery, records will show that PIP volume at University Boulevard increased substantially after SFL took ownership and continued to increase in 2016, and that that this volume increase was due to the redirection of ADG referrals and confusion caused by SFL's use of ADG's name.

179.   Despite ADG's critical role in the University Boulevard center, none of the above was designed to increase ADG shareholder value. ADG received only the $2,000 per month that Johnson determined would be the price of ADG's services on the day of ESOP closing, not the $70,000 per month pledged in negotiations with GreatBanc and affirmed in Johnson's closing letter to Stout.

180.   The $2,000 monthly fee was grossly deficient in light of the services and assets contributed by ADG to the University Boulevard center. Considering unreimbursed executive time alone, ADG operated the University Boulevard center at a substantial loss.

181.   The scheme was not complete until May 2017. In order to maximize their return on the University Boulevard center, Johnson, Ward, McGruder, and Schmickle needed to sell the center using 2016 earnings—the year in which they misappropriated ADG's name and referrals, used ADG's cash, and grossly underpaid ADG to manage the center—as the baseline for valuing the center. Cynically, they turned to ADG as the buyer most likely to pay this inflated price.

182.   Johnson, Ward, McGruder, and Schmickle presented the potential acquisition of the University Boulevard center as an "opportunity" for ADG. SFL offered to sell certain rights to the center to ADG for $12 million—$7 million upfront to be financed through Medley, and $5 million in

53

future monthly payments of $125,000 triggered by an earnings target. The price was based solely on a multiple of 2016 earnings at the center.

183. The deal did not include membership interests in FCI (the SFL subsidiary that directly owned the center) or all the assets associated with the center. For example, Johnson, Ward, McGruder, and Schmickle retained a portion of the University Boulevard center's receivables accounts and transferred them to a new shell company called K12 Investments LLC ("K12") for one dollar. The members of K12 included Johnson, Ward, and Hersey. The deal also excluded an MRI machine and any intellectual property or goodwill of FCI.

184. The deal also required ADG to close its original Jacksonville center on Southpoint Highway and merge ADG's other Jacksonville center with the University Boulevard center.

185. The deal was degrading to ADG. SFL stole ADG's business and then made ADG buy it back from them. What is more, they set the price based on valuation of the entire business and then only transferred part of it.

186. The construction and execution of the deal violated Johnson's duty of loyalty to the company and the Johnson Employment Agreement; Johnson and Ward's standard of conduct as directors pursuant to the Florida Business Corporation Act; and Ward, McGruder, and Schmickle's IRA duties.

54

187.   Unlike their Elite strategy, Johnson, Ward, McGruder, and Schmickle did not attempt to execute this heist on their own. They presented the deal to Blacksten and GreatBanc for supposed legal cover and directed them to consent to it. In their capacity as ESOP fiduciaries, Johnson, Ward, McGruder, and Schmickle did not account for or disclose their misconduct as officers, directors, and IRA managers when they directed Blacksten and GreatBanc to approve the deal.

188.   Blacksten and GreatBanc obliged Johnson, Ward, McGruder, and Schmickle and consented to the deal. Blacksten assented to the terms as a board member. GreatBanc executed a written shareholder action pursuant to the Florida Business Corporation Act, Section 607.0704, approving the sale on behalf of the ESOP.

189.   Blacksten and GreatBanc's tolerance of the University Boulevard arrangement was naïve before the sale. In the valuation of ADG's stock that occurred during 2016, Johnson and Ward stated that SFL's University Boulevard center was only taking "overflow" from ADG's original Jacksonville center. This representation was adopted in the valuation report prepared by Stout in 2016 and approved by GreatBanc. The report also continued to rely on $70,000 per month in non-existent ADG revenue from the center.

55

190.   While their tolerance before the sale may have been naïve, Blacksten and GreatBanc's approval of the sale was imprudent and could not have occurred absent a total dereliction of their duties as ESOP fiduciaries. Blacksten and GreatBanc failed to investigate or ignored the following inequities: (1) SFL usurped the University Boulevard center from ADG in the first instance after ADG had registered to do business at that location; (2) SFL supposedly tripled the value of the center in a year and a half; (3) ADG managed the center during the period in which its value supposedly tripled while being grossly underpaid for its services and not compensated for use of its name and other assets; (4) SFL began stealing referrals from ADG during the course of the year (*i.e.*, re-directed referrals were not "overflow"); (5) the earnings target contingency was functionally a guarantee due to the relocation of ADG's original Jacksonville center as part of deal, where ADG's legacy center would contribute to the earnings target of the acquired center; (6) there was no discount from assumed earnings for the receivables diverted to K12 and not sold to ADG; (7) ADG would need to perform collections for the receivables transferred to K12 without compensation; and (8) there was no evaluation of the effect of other assets excluded from the sale.

191.   Between 2017 and 2019, ADG paid the full $5 million in deferred sale consideration to SFL—the first $2.125 million in scheduled monthly payments, and the balance through proceeds of the Akumin sale. ADG also

56

collected more than $1 million on behalf of K12 and transferred those funds to K12, even though Johnson, Ward, McGruder, and Schmickle transferred those collectibles to K12 for only a dollar.

192.   Johnson and Ward had one final scheme to extract value from ADG using the University Boulevard center. In March 2016, Johnson and Ward bought the underlying real estate and became the University Boulevard center's landlord. While attempting to generate high earnings for the center before selling it to ADG, they kept the rent level. After selling it to ADG, they raised the rent by more than 20%.

### iii.   Diversion of Value from the ESOP in Connection with Southeast Florida Centers

193.   During the first half of 2017, prior to purchasing the University Boulevard center from SFL, ADG became aware of another acquisition opportunity.

194.   Imaging Center of West Palm Beach LLC ("ICWPB") was a chain of seven imaging centers in Southeast Florida. ADG had previously made a $10 million offer to purchase the chain in 2015, before the ESOP formation transaction. The chain's principal owner, Dr. Richard Sarner ("Sarner"), rejected that offer.

195.   In 2017, Johnson and Ward engaged in new communications with Sarner regarding a potential acquisition and agreed on a valuation of the

57

company of around $18 million. The value of ICWPB could be quickly and significantly enhanced by contributing ADG's back-office support, business model, marketing resources, and referral network.

196. Johnson, Ward, McGruder, and Schmickle's first attempt to profit from ICWPB—by acquiring it for ADG and thereby augmenting the value of their ADG shares before the ESOP formation transaction—had failed. Having now sold their ADG shares, Johnson, Ward, McGruder, and Schmickle needed a different vehicle to personally capitalize on the ICWPB opportunity. For this purpose, they formed TIC in 2017. They granted membership interests to Hersey and Fernandes.

197. The TIC group recognized that the ICWPB acquisition opportunity belonged to ADG. The group also recognized that ADG's officers investing in ICWPB individually would violate their duty of loyalty to ADG and the strict mileage limits placed on new imaging center investments in their employment contracts, as ICWPB maintained a center within 20 miles of an existing ADG center. The group further recognized that ADG's directors investing in ICWPB individually would violate their standard of conduct as directors.

198. To circumvent these issues, the TIC group manufactured false pretenses to justify their pursuit of the deal individually, then recorded these pretenses in ADG board minutes and a letter to GreatBanc. First, the group

58

postured that ADG could not afford to buy ICWPB. Second, the group represented that ICWPB and ADG did not compete and had no overlapping referral sources. Third, the group raised the alarm that someone else might buy ICWPB and cause ICWPB to compete with ADG, whereas the TIC group would instead make ICWPB an "ally" of ADG. Fourth, the group resolved that they would obtain for ADG a right of first refusal to acquire ICWPB if TIC ever considered selling it. Each of these justifications was false or misleading.

199.    First, ADG had the credit capacity available to do the ICWPB deal when ADG first learned that Sarner was interested in selling again in early 2017. The group only stretched ADG's credit capacity with Medley by later causing ADG to borrow $7 million from Medley to buy the University Boulevard center from SFL on unfair terms.

200.    Even after the University Boulevard deal, ADG could have made the ICWPB acquisition. The TIC group obtained a letter from Medley stating that it would not support ADG's acquisition of ICWPB, but the group failed to pursue other financing in good faith. Medley was on the brink of bankruptcy, and ADG successfully paid off Medley with new financing just three weeks after TIC raised sufficient funds to close the acquisition of ICWPB in 2018.[24]

---

[24] The TIC-ICWPB purchase agreement was not signed until 2018 and was based on an unsecured and indefinite promise to pay once the TIC group raised sufficient

ADG's new financing included $5 million of unused funds on a revolving line of credit. ADG only needed to come up with $3 million of the $10 million in cash paid to the sellers in the ICWPB deal, as $7 million of the cash paid was bank financing supported by ICWPB assets.[25] There was sufficient capacity within ADG and the target company for ADG to have obtained the funds to pay off Medley and buy ICWPB, had ADG's officers and directors pursued the deal diligently and in good faith on behalf of ADG.[26]

201.   Second, ADG and ICWPB did have overlapping referral sources. Dozens of doctors who referred patients to ICWPB also referred patients to ADG.

202.   Third, the TIC group did not intend to protect ADG and convert ICWPB into an ally of ADG. Rather, the TIC operating agreement was openly hostile to ADG. Although ADG was not a party to the deal and received no consideration, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey each pledged through the TIC operating agreement to not cause ADG to

---

funds. ADG likewise could have entered an agreement that delayed closing until appropriate financing could be arranged.

[25] The group comprising Johnson, Ward, McGruder, Schmickle, Fernandes, Hersey, and other investors held a 60% stake in TIC. Sarner reinvested a portion of his ICWPB interest in exchange for a 40% stake in TIC. The ADG-affiliated group therefore needed to come up with only a portion of the total $18 million valuation to do the deal. ADG likewise would have needed only around $10 million to acquire the interest in TIC and ICWPB that was usurped by the ADG-affiliated group.

[26] Another avenue to raise cash for the deal for ADG was to fairly compensate ADG for services to Elite and University Boulevard with backpay. ADG's officers and directors never considered this due to their conflicts of interest.

60

expand within the three Southeast Florida counties that were home to ICWPB centers. Rather than protect ADG, they caused ADG to cede valuable territory to ICWPB.

203.   Fourth, there was no right of first refusal in favor of ADG. Although the TIC group recorded in ADG's board minutes and in a letter to GreatBanc that ADG would be granted a right of first refusal, no such right was ever obtained.

204.   After the TIC group acquired ICWPB, the group consolidated management, billing, accounting, and other functions with ADG. There was no intercompany recharge for services provided by ADG and no shared services agreement, in violation of the Johnson Employment Agreement and the duty of loyalty owed by Johnson and Ward as members of ADG's board and by Johnson, Hersey, and Fernandes as officers of ADG.

205.   The TIC group also evaluated how to maximize ICWPB profits through future additional consolidations with ADG and sketched out a plan for further consolidation.

206.   The purpose of the post-acquisition consolidation and planning was to package TIC for sale to Akumin. By the time the ICWPB acquisition closed, if not before, Johnson, Ward, McGruder, Schmickle, Hersey, and

61

Fernandes were looking to quickly sell TIC for an unnatural profit after enhancing its value through consolidation with ADG.[27]

207.  Within eight months of closing the ICWPB acquisition at a valuation of $18 million, the TIC group had a letter of intent with Akumin valuing the company at $42 million. The Akumin deal ultimately closed based on a valuation of $47 million, yielding net proceeds of more than $35 million for TIC members, $21 million of which constituted stolen equity proceeds paid to the ADG-affiliated group led by Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey.

208.  Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey, in their capacity as ESOP fiduciaries, failed to account and seek redress for their disloyalty to ADG in the ICWPB acquisition, the consolidation of ICWPB with ADG, and the re-sale of ICWPB based on its ADG-enhanced value. They also failed to disclose their violations of their contractual and legal duties to other ESOP fiduciaries.

---

[27] Johnson had a personal interest in pursuing the deal individually and not through ADG, notwithstanding his warrant to acquire ADG shares. Johnson acquired 40% of the non-Sarner membership interests in TIC—thus his 40% ownership of the block of interests available for acquisition was larger than his potential interest in ADG derived from the warrant. *See supra* note 18.

### iv. Diversion of Value from the ESOP in Connection with Port St. Lucie Center

209. In December 2016, Johnson prepared an outline of ADG business objectives for 2017 and distributed it to his fellow board members (Ward and Blacksten), Medley, Fernandes, and the investor who acquired a portion of Johnson's warrants.

210. Johnson's outline identified expansion into Port St. Lucie, Florida as an ADG business objective.

211. By March 2017, Johnson, Ward, McGruder, and Schmickle had decided to steal ADG's Port St. Lucie expansion for themselves through SFL. Johnson identified a location and obtained a contract to purchase MRI equipment for the putative Port St. Lucie center. In the equipment contract, he listed "SFL" in the subject line. SFL formally leased space for the center in August 2017. Johnson, Ward, and Hersey each signed the lease—Johnson on behalf of SFL and Ward and Hersey as his witnesses.

212. In obtaining the equipment contract for the center, Johnson listed Advanced Diagnostic Group as the business name, and ADG was the contracting party. Johnson used the Advanced Diagnostic Group name, reputation, credit history, and purchase history to obtain discounted pricing and misrepresented SFL to be a subsidiary of ADG. The contract was for more than $100,000.

63

213.   Johnson also used the Advanced Diagnostic Group name with the architect and building contractor engaged to design and build the vacant space to the specifications of an ADG imaging center. Again, ADG was the contracting party. ADG had hired the same contractor on multiple renovation projects prior to Port St. Lucie. Using the Advanced Diagnostic Group name ensured that SFL would receive the pricing and service benefits earned by ADG's past patronage. The contract was for more than $100,000.

214.   Shortly before the Port St. Lucie center commenced patient services in April 2018, Hersey filed a fictitious name registration formally identifying the center as Advanced Diagnostic Group, despite its ownership by SFL.

215.   Johnson, Fernandes, and Hersey caused ADG to supply the Port St. Lucie center with ADG's confidential business information, including access to it contracts, business processes, training resources, business-generation sources, management team, and other assets in order to make the business profitable for them.

216.   ADG received no consideration for contributing its trade name, business generation sources, training, management, and other assets to the Port St. Lucie center, and no compensation for the value of the business opportunity usurped by SFL.

64

217. SFL's execution of the Port St. Lucie lease in August 2017 and subsequent development of the center violated the terms of its sale of the University Boulevard center to ADG in May 2017. The University Boulevard sale prevented SFL from, among other things, taking an interest in any imaging business near a location in which ADG had taken material steps to conduct business in the last 12 months. ADG's research identifying the Port St. Lucie market as an appealing expansion opportunity constituted material steps to conduct business there, and SFL's seizure of that opportunity violated the terms of the sale.

218. Johnson, Hersey, and Fernandes' actions constituted flagrant violations of the confidential information clause of their contracts and their duty of loyalty to ADG. Johnson and Ward's actions violated their standard of conduct as directors. Ward, McGruder, and Schmickle accepted the stolen opportunity in their capacity as SFL owners despite their obligation as ADGMH members to issue prior written consent to the equipment and renovation contracts—which were in ADG's name—to ensure that the contracts were in the interests of ADG.

219. ADG had the financial ability to develop and operate the Port St. Lucie center. The site was developed over the course of more than a year at a total cost of less than $2 million. ADG has sufficient cash or credit capacity during the period to execute the Port St. Lucie expansion, or would have had

ADG's officers pursued the opportunity in good faith on behalf of ADG and fairly compensated ADG for other related-party services.

220. Johnson, Ward, McGruder, Schmickle, Hersey, and Fernandes ultimately obtained their windfall from the Port St. Lucie center through TIC. After TIC closed its acquisition of ICWPB, SFL assigned its interests in the Port St. Lucie center to ICWPB. The Port St. Lucie center generated $4.05 million of the sale price attributed to TIC in the Akumin deal.

221. In their capacity as ESOP fiduciaries, Johnson, Ward, McGruder, and Schmickle did not account and seek redress for or disclose to other fiduciaries their misconduct as officers, directors, and IRA managers regarding the Port St. Lucie center.

### v.    Failure to Refinance Costly Sellers' Notes

222. The notes that Johnson, Ward, McGruder, Schmickle and other investors obtained through the ESOP formation transaction were expensive for ADG to service. ADG made quarterly interest payments to the noteholders at a 10% annual rate, and 2% was added to principal each year.

223. Johnson and his trusts received around $7 million in interest payments alone between January 2016 and May 2019. Total interest payments on notes to ADG's original stockholders and their transferees was around $16 million.

66

224.   The notes had no prepayment penalty. The only authority that ADG needed to prepay the notes was the consent of Ward, McGruder, and Schmickle pursuant to the IRA.[28]

225.   Johnson, Ward, McGruder, and Schmickle never considered refinancing the notes at a lower interest rate because it was in their personal interests to continue to collect substantial interest payments.

226.   Had Johnson, Ward, McGruder, and Schmickle caused ADG to diligently seek refinancing opportunities and remedy disloyal actions that hurt ADG's financial position, ADG would have been able to materially reduce its interest expense and allocate more funds to growth objectives.

   vi.   *Red Flags During the ESOP Period and Lack of Trustee Process*

227.   GreatBanc failed to monitor the ESOP's investment in ADG during the ESOP period and failed to identify or remedy misconduct by Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey—the persons trusted to ensure the value of the ESOP's investment.

228.   GreatBanc failed to exercise its right to call or attend shareholder meetings. GreatBanc failed to ensure that required shareholder actions— such as the annual election of directors—occurred.

---

[28] Johnson, Ward, McGruder, and Schmickle arranged prepayment of the notes only once, a few months after the ESOP formation transaction closed. Rather than attempt to reduce ADG's interest expense, Johnson, Ward, McGruder, and Schmickle simply sold a portion of the notes, at the same interest rate, to an advisor who helped them with the ESOP formation transaction.

67

229.    GreatBanc therefore failed to engage in the process necessary to exercise its override authority on behalf of the ESOP. GreatBanc permitted Johnson, Ward, McGruder, and Schmickle to determine who would control the company—and who would have the power to direct GreatBanc—without accountability.

230.    GreatBanc also ignored red flags regarding Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey's actions with respect to the Georgia venture, the Jacksonville centers, and the Southeast Florida centers.

231.    In its valuation of ADG as of year-end 2016, GreatBanc (adopting a report submitted by Stout) identified Georgia as a potential expansion territory for ADG and justified the report's conclusions regarding ADG's projected growth, in part, by the future Georgia expansion.

232.    In its analysis of the future Georgia expansion, GreatBanc and Stout missed that ADG had already expanded into Georgia and was managing Georgia clinics under another name for the benefit of Johnson, Ward, McGruder, and Schmickle. GreatBanc missed this despite the fact that an increasing number of Georgia residents appeared in the ESOP's account records maintained by GreatBanc as participants in the ESOP.

233.    The ESOP's peril in the hands of ADG's control group was also evident from the proposed University Boulevard center purchase in Jacksonville from SFL (which GreatBanc approved).

68

234.   GreatBanc had a positive view of the University Boulevard arrangement with SFL before the proposed sale, with respect to which GreatBanc wrongly believed that ADG was earning $840,000 per year assisting a clinic that served "overflow" patients from ADG's center 2.2 miles away. Given (1) the high price of $12 million for a single center, (2) the requirement that ADG merge its nearby center into the acquired center, and (3) GreatBanc's favorable view of the current arrangement that required no cash, a prudent fiduciary in GreatBanc's position would have investigated whether the proposed purchase was an improvement relative to the results of ADG's nearby center and existing profits from the SFL-owned center.

235.   Such an investigation would have revealed the heist in progress—ADG was not being paid the $840,000 expected by GreatBanc; SFL was infringing on ADG's trade name rights and other assets to boost the sale price of the proposed acquisition target; and ADG's most valuable business line at its merging center had declined 32% due to competition from the acquisition target. Johnson, Ward, McGruder, Schmickle, and Fernandes' misconduct would have been evident had GreatBanc asked for information necessary to compare the proposed transaction to ADG's current results at the centers subject to the merger proposal.

236.   GreatBanc also ignored the ICWPB acquisition by TIC. Hersey issued the letter to GreatBanc notifying GreatBanc of the deal. The

69

transaction raised alarms on its face because the deal violated express terms of the Johnson Employment Agreement. GreatBanc accepted the self-serving—and false—justifications for the deal submitted by Hersey. Had GreatBanc requested the TIC operating agreement and transaction documents, GreatBanc would have learned that Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey were pursuing the deal contrary to the interests of ADG.

237.   Red flags regarding the Georgia venture, the Jacksonville centers, and the ICWPB-TIC deal required additional investigation. A prudent trustee in GreatBanc's position would have requested records sufficient to determine the true state of affairs between ADG and related parties owned by its officers, directors, and the IRA managers.

238.   The true state of affairs demanded additional shareholder and trustee remedies, including (1) calling a shareholder meeting to remove directors (and overriding any instruction to vote against removal); (2) appointing new independent directors; (3) terminating or modifying the IRA to remove ADGMH and allow GreatBanc or independent directors to appoint and remove officers (and seeking to invalidate the provision of the IRA that requires ADGMH's consent to amendments as contrary to Section 607.0732(2)(b) of the Florida Business Corporation Act); and (4) asserting claims on behalf of the company and ESOP against Johnson, Ward,

70

McGruder, Schmickle, Fernandes, and Hersey for violations of the SRISA, the Johnson Employment Agreement, the Fernandes Employment Agreement, the Hersey Employment Agreement, their duties of loyalty under common law, the Florida Business Corporation Act, and ERISA. Because the ESOP acquired all causes of action that belonged to ADG prior to the ESOP being formed, such action could have included seeking redress for disloyalty and usurpation of business opportunities prior to the ESOP formation transaction.

239.    GreatBanc failed to prudently monitor the ESOP's investment and therefore failed to take these actions necessary to protect the ESOP.

### C.    MISCONDUCT RELATED TO ESOP TERMINATION

240.    Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey's scheme to divert value from ADG and the ESOP was not complete until the ESOP was terminated. In order to obtain their windfall, the group needed to sell ADG, SFL, and TIC as a portfolio. Packaged with ADG, SFL and TIC could be valued based on ADG's contributions, multiplying and liquidating the value stolen from ADG during the ESOP period. To succeed, the group needed to conceal its misconduct from GreatBanc, and GreatBanc and Blacksten needed to not ask questions about SFL and TIC. The scheme worked in all respects. The group then found additional ways to deprive the ESOP of sale proceeds at closing and after closing.

71

*i.    Favor to SFL and TIC in Negotiations and Price Manipulation*

241.   Johnson, Ward, and Hersey led the sale negotiations with Akumin. In October 2018, they sent a letter of intent to Akumin outlining their proposed deal terms.

242.   Johnson, Ward, and Hersey proposed that each entity would be valued and sold based on its EBITDA—earnings before interest, taxes, depreciation, and amortization—in 2018, multiplied by seven.

243.   As the deal progressed, and with Akumin's knowledge, Johnson, Hersey, and Ward adjusted their EBITDA calculations to present what they believed would be a fairer picture of the value of each entity. This included eliminating non-recurring items and limiting the SFL observation period to the period after the Elite management contracts, then annualizing the EBITDA observed during that period.

244.   Compared to the EBITDA figures cited in the letter of intent, Johnson, Ward, and Hersey's adjustments to EBITDA led to increases of $16 million to SFL's price, $5 million to TIC's price, and less than $500,000 to ADG's price.

245.   In this process, Johnson, Ward, and Hersey made no effort to fairly apportion value derived from shared ventures between the three entities. Instead, they ensured that ADG's valuation was weighed down with expenses associated with Elite and ICWPB while SFL and TIC captured

72

100% of the value of shared ventures. They also made no effort to recognize, through a higher valuation, ADG's position as the dominant company that brought Akumin to the deal, or that Akumin would not purchase TIC or SFL without ADG.

246.   Akumin conducted due diligence on Johnson, Hersey, and Ward's EBITDA adjustments with the assistance of PricewaterhouseCoopers ("PwC").

247.   PwC determined that TIC's EBITDA, as calculated by Johnson, Ward, and Hersey, had been "inflated" due to free services that TIC and ICWPB received from ADG. However, this was acceptable from Akumin's perspective so long as TIC- and ICWPB-related expenses were not eliminated from ADG's EBITDA calculation, which they were not (*i.e.*, so long as ADG's value was *de*flated by the same amount).

248.   PwC further found that Johnson, Ward, and Hersey had eliminated any income to ADG from the Elite management contracts and ensured that SFL was credited with 100% of the value derived from Elite. This was again deemed acceptable from Akumin's perspective so long as every dollar associated with Elite was only accounted for once.

249.   PwC further advised Akumin that ADG warranted a higher valuation due to anticipated savings to Akumin by consolidating its existing operations with ADG. This factor was unique to ADG because Akumin's sole

interest was in consolidating its operations with ADG—not with TIC or SFL. But because Akumin cared only about paying the lowest total price, it did not make any adjustments to the EBITDA calculations on this basis.

250.    PwC also reversed a proposed adjustment eliminating Hersey's salary from ADG's EBITDA. Earlier in the process, Hersey planned to leave the company after closing, but Akumin's due diligence found that he would be needed after closing. *See infra* ¶¶ 288-90.

251.    After Akumin's due diligence, the EBITDA calculations remained substantially the same as Johnson, Ward, and Hersey had calculated. ADG's valuation decreased by around $1.9 million (due in substantial part to reinsertion of Hersey's salary, multiplied by seven), TIC's valuation decreased by less than $200,000, and SFL's valuation remained the same.

252.    The agreed EBITDA calculations, multiplied by seven, constituted the sale price for each entity. The parties executed the purchase agreements on those terms on April 15, 2019, and closed the sale on the same terms on May 31, 2019, securing the windfall to SFL and TIC owners that Johnson, Ward, and Hersey manipulated. The proceeds paid to SFL and TIC owners should have been paid to the ESOP.

74

*ii.    False Statements to GreatBanc Regarding the Sale and Failure to Disclose Misconduct*

253.   Johnson, Ward, and Hersey brought GreatBanc into the sale process in February 2019. GreatBanc negotiated an additional $190,000 fee for its part and hired Stout once again as its advisor.

254.   In their presentation to GreatBanc and Stout, Johnson, Ward, and Hersey recommended the sale and the ADG price on behalf of ADG's board and the management team.

255.   In their presentation, Johnson, Ward, and Hersey misrepresented the history and terms of the deal. First, they represented that Akumin reached out to Johnson in November 2018 with a proposed acquisition. In fact, Johnson, Ward, and Hersey started shopping the company by August 2018, and communications with Akumin had sufficiently matured by October 2018 for Johnson, Hersey, and Ward to issue their letter of intent to Akumin.

256.   Second, Johnson, Ward, and Hersey represented that TIC and SFL "do not have any financial impact on ADG's valuation." This statement was false in numerous respects. In the valuation process, ADG's EBITDA was manipulated downward from ADG's baseline earnings to transfer income from the Elite contracts to SFL and to absorb certain costs booked by TIC. ADG's baseline earnings were also impoverished in the first instance due to

75

the misattribution of ADG's Elite contributions to SFL, absorption of other TIC costs, University Boulevard payments to SFL, and other unfair related-party transactions.

257.   Third, Johnson, Ward, and Hersey concealed their control of SFL and TIC. They stated that "certain stakeholders of ADG own minority interests," which was false because Johnson controlled 50% of SFL membership interests. This representation was also misleading because ADG stakeholders collectively owned a majority of membership interests in SFL and TIC, and Johnson, Ward, Hersey, and Fernandes controlled TIC through another entity called TIC Management Holdings, LLC.

258.   Throughout the sale process, in advocating for the deal and price on behalf of ADG's board and the company, Johnson, Ward, and Hersey never disclosed to GreatBanc the numerous breaches of the SRSIA, IRA, Johnson Employment Agreement, Fernandes Employment Agreement, Hersey Employment Agreement, University Boulevard purchase agreement, and their duties of loyalty under corporate law that generated SFL and TIC's high valuations and diminished ADG's valuation. They never disclosed that they inflated the University Boulevard purchase price by stealing referrals and other intangible assets from ADG and grossly underpaying ADG for its services, or that they usurped the University Boulevard center, the Georgia venture, the Port St. Lucie center, and the ICWPB opportunity from ADG.

76

259.   At closing, Hersey signed a letter to Stout falsely certifying, on behalf of ADG, that all "factual information" provided was accurate and that no information had been omitted that would render statements of the company's condition to be misleading.

260.   Johnson, Ward, and Hersey misrepresented the impact of TIC and SFL on ADG's price and concealed brazen misconduct during the ESOP period for the purpose of enriching themselves and their deal partners, McGruder, Schmickle, and Fernandes, at the ESOP's expense.

### iii.    Miscalculation of Warrant Proceeds

261.    Johnson and his transferee should not have exercised or been permitted to exercise the warrants in connection with the Akumin transaction. The warrants were wrongfully obtained through false representations and omissions in connection with the ESOP formation transaction and their proceeds constituted an improper benefit from that transaction.

262.   Regardless, Johnson and Hersey overallocated sale proceeds that were due to Johnson and the other warrant holder and shorted the ESOP.

263.   The warrants provided three methods of exercise: cash exercise, net exercise, and redemption. Each method involved a particular exercise process and formula.

77

264.   The cash exercise method required the holder to wire the exercise price—the number of shares exercised multiplied by $5.00—to ADG in immediately available funds. The cash exercise method then granted the number of shares exercised to the holder.

265.   Johnson's exercise price was $3.12 million and the other holder's exercise price was $518,180. Neither paid his cash exercise price (or any funds) to ADG. The warrant therefore did not allow use of the cash exercise formula to determine the division of equity proceeds between ADG and the warrant holders.

266.   The exercise method that Johnson and the other holder used to obtain consideration for their warrants was the redemption method, which applied to an exercise wherein the holder did not contribute new cash to the company. Pursuant to the redemption method, the holder was entitled to the product of the number of shares exercised and the difference between the fully diluted share price of ADG's equity and $5.00.

267.   Johnson and Hersey overallocated ADG equity proceeds to warrant holders and underallocated proceeds to the ESOP by using the cash exercise formula instead of the redemption formula to determine the respective share of each stakeholder. ADG's equity was valued at around $17.87 million in the Akumin deal, or $10.35 per share on a fully diluted

78

basis. The warrant holders were therefore due at most $3.9 million,[29] and the balance of the equity proceeds (after seller-paid expenses), $13.2 million, was due to the ESOP.

268.   By calculating the proportionate share of each stakeholder based on the false premise that he and the other warrant holder paid their exercise price in cash to ADG, Johnson shorted the ESOP $2.8 million.

### iv.   Johnson's Retention of the Price Adjustment

269.   The ESOP termination transaction called for a post-closing adjustment to ADG's purchase price based on deviation of the company's working capital on the date of closing from the working capital target identified in the sale agreement.

270.   In January 2020, Hersey calculated the ADG sellers to be due an additional $1.34 million from Akumin based on the working capital price adjustment.[30]

271.   Hersey instructed Akumin to pay Johnson, as the representative of the ESOP and the other potential interest holders, the $1.34 million purchase price adjustment.

---

[29] 727,273 x ($10.35 - $5.00).

[30] This price adjustment was separate from, and in addition to, funds held in escrow after closing to account for a potential working capital shortfall.

272. The sale agreement required Johnson, in turn, to distribute the additional purchase price between the ESOP and other potential interested parties.

273. As additional equity proceeds of the sale of the ESOP's stock (all expenses and debts of the company having been paid at closing), the purchase price adjustment was owed to the ESOP. At minimum, the ESOP was entitled to the same share of the price adjustment as its share of initial equity proceeds.

274. Johnson received the funds and did not pay any portion of it to the ESOP, shorting the ESOP between $940,000 and $1.34 million.

275. GreatBanc designated Johnson as the ESOP's representative for purposes of receiving and distributing the purchase price adjustment. GreatBanc failed to monitor this process and demand an account of the price due to the ESOP.

     *v.*    *Appointment of Conflicted Members to the Board*

276. After ADGMH and GreatBanc failed throughout the ESOP period to seat a full board of five members as required by the Bylaws, Fernandes and Hersey were appointed to the two vacant board seats in May 2019. The full board assumed control in time to issue final directives to GreatBanc to transfer certain ESOP shares to the company, to close the sale of the remaining shares to Akumin, and to terminate the ESOP.

277. Although Ward, McGruder, and Schmickle, as the members of ADGMH, had previously abdicated their duties under the IRA, the final board appointments were an opportunity for them to direct GreatBanc to seat board members who would discharge their remaining duties prudently, objectively, in good faith, and in the interests of the company and the ESOP.

278. Instead, Ward, McGruder, and Schmickle either selfishly appointed conflicted members to the final ADG board seats to ensure that they received their windfall, or they continued to abdicate their duty by delegating it to other Defendants who appointed conflicted members to secure their windfall.

279. GreatBanc failed to override the appointment of conflicted board members who would profit individually from the termination transaction.

*vi.    Unwarranted and Unlawful Officer Bonuses and Severance*

280. As a director tasked with deciding whether to issue final approvals necessary to complete the Akumin transaction on behalf of the ESOP, Fernandes should not have received bonuses of $1.525 million (from SFL proceeds) or $475,000 (from ESOP proceeds).

281. Fernandes had a plain conflict of interest, and her $2 million payout should have belonged to the ESOP.

81

282.   Fernandes also improperly negotiated an individual earnout payment based on post-closing performance of a new ADG center in Wesley Chapel, Florida. That consideration should also have belonged to the ESOP.

283.   For comparison, Elite established two new centers in 2019, which were not fully operational before the Akumin deal closed. Because there was no 2018 EBITDA associated with those two centers accounted for in the base sale price of SFL, Johnson, Ward, McGruder, and Schmickle negotiated additional sale consideration through SFL in the form of an earnout payment based on post-sale earnings at the new centers.

284.   Fernandes' post-sale compensation was structured similarly, where ADG had established the Wesley Chapel center in 2019, and Akumin agreed, as part of the ESOP termination transaction, to a contingent earnout payment based on performance of the center once it was fully operational. But instead of awarding that payment to the equity owner of ADG (the ESOP), as SFL's owners received, Fernandes negotiated the earnout to be paid to her individually.

285.   GreatBanc reviewed or had a duty to review the closing documents and allowed the transaction to close despite these improper payments and promises to Fernandes.

286.   Hersey also received improper consideration. As a director tasked with deciding whether to issue final approvals necessary to complete the

Akumin transaction on behalf of the ESOP, Hersey should not have received bonuses of $750,000 (from SFL proceeds) and $250,000 (from ESOP proceeds).

287. Hersey had a plain conflict of interest, and his $1 million in bonuses should have belonged to the ESOP.

288. Hersey also improperly obtained a severance payment of $187,500.

289. Hersey did not stop working for ADG after the ESOP termination transaction. Rather than deliver a restated employment contract at closing that affirmed post-ESOP employment (as did Johnson and Fernandes), Hersey executed an employment contract with Akumin outside of closing that was effective the next day, June 1, 2019. Hersey did so after PwC advised Akumin prior to closing that ADG could not forgo Hersey's position.

290. Hersey was not due severance and the $187,500 payment that he received should have been paid to the ESOP.

> vii. *Payment of SFL's Contingent Earnout at Future Value*

291. ADG carried its liability to SFL for the remainder of the University Boulevard purchase price at present value, applying a 13.5% discount rate.

292. The University Boulevard purchase agreement did not require ADG to accelerate the earnout and pay in full upon a change of control.

83

293.   In connection with the Akumin transaction, Johnson and Ward insisted without a claim of right that the earnout liability be accelerated and paid in full from ESOP proceeds.

294.   At most, SFL should have received the present value of its earnout claim. This inequity cost the ESOP more than $600,000.

*viii.   Trustee's Failure to Fulfill its Duties to the ESOP*

295.   GreatBanc's review process was limited to accepting earnings figures supplied by Johnson, Hersey, and Ward and analyzing what the company was worth in its diminished form.

296.   Nevertheless, Stout concluded in its initial analysis for GreatBanc that the ESOP should receive a higher price, even limiting its review of ADG to its diminished state. GreatBanc failed to leverage this analysis to obtain a higher price.

297.   GreatBanc reviewed the distribution of ADG sale proceeds before signing the purchase agreement, and again before the transaction closed. GreatBanc failed to advocate for the ESOP's interest in obtaining a fair distribution. GreatBanc allowed miscalculation of warrant proceeds, payment of the University Boulevard earnout at future value instead of present value, and payment of Fernandes and Hersey's bonuses and severance, all to reduce ESOP proceeds by at least $6 million.

298.    GreatBanc was a party to the transaction in which the warrants were issued and the University Boulevard purchase agreement. GreatBanc should have understood the terms of those instruments. GreatBanc also knew that Fernandes and Hersey were seated as directors before closing and therefore ineligible to receive bonuses from the transaction due to their position as fiduciaries of the ESOP.

299.    GreatBanc signed the Akumin sale agreement and knew that the sale included a post-closing adjustment to the purchase price. GreatBanc agreed in the sale agreement to put Johnson in charge of collecting and distributing the price adjustment. GreatBanc failed to demand an accounting of the price adjustment and allowed Johnson to steal the price adjustment of $1.34 million.

300.    GreatBanc ignored the concurrent and contingent sales of SFL and TIC. GreatBanc ignored transactions between ADG, SFL, and TIC. GreatBanc failed to use its rights of access to records under the IRA, Trust Agreement, and Florida law to investigate related-party transactions.

301.    GreatBanc unreasonably relied on Johnson, Ward, and Hersey's representation that SFL and TIC "do not have any financial impact on ADG's valuation." Although Johnson, Ward, and Hersey were not forthright regarding the extent of their interests, GreatBanc knew they were conflicted and therefore had a duty to investigate confirm their representations.

85

302. Had GreatBanc reviewed documents showing how ADG's valuation and price were constructed by Johnson, Ward, Hersey, and Akumin, GreatBanc would have seen that ADG's valuation was diminished by ceding income to SFL and absorbing costs of TIC.

303. GreatBanc also ignored red flags contained in the ADG sale documents regarding the relationships between ADG, Elite, SFL, ICWPB, and TIC, including that:

- the ADG sale agreement required ADG to reconcile "intercompany balances between ADG, TIC and SFL" before closing;

- the ADG sale disclosure identified that ADG leased clinic space in Atlanta, Georgia;

- the press release—which GreatBanc received in advance and had to consent to as part of the sale agreement—attributed all Georgia clinics to SFL;

- the press release stated that SFL and TIC clinics were "managed by ADG's management team"; and

- the press release identified that nearly $100 million was credited to SFL and TIC in the deal.

304. GreatBanc ignored its prior knowledge of the relationship between ADG and SFL. As far as GreatBanc knew, SFL sold its only

86

overlapping interest to ADG in 2017. Yet SFL came to the Akumin deal with a nearly $50 million valuation and disclosures that its clinics were managed by ADG's management team and one clinic was leased by ADG.

305.   Had GreatBanc reviewed the SFL and TIC sale documents, additional red flags were evident, including that:

- the SFL sale disclosure identified a "Shared Services Agreement, dated as of May 1, 2018, by and among ADG Acquisition Holdings Inc. and SFL Radiology Holdings LLC," which was omitted from the ADG sale disclosure;

- the SFL sale disclosure identified that ADG paid Elite's expenses prior to institution of the 2018 contracts;

- the SFL sale disclosure identified public applications to Georgia regulatory authorities on behalf of Elite, which contained additional disclosures regarding ADG's role in developing the Georgia venture;

- the SFL sale disclosure identified SFL's use of ADG's business name at the University Boulevard center;

- the TIC sale disclosure identified that ADG contracted to design and build out the Port St. Lucie center and then later assigned the architect and builder contracts to ICWPB;

87

- the TIC sale disclosure identified that ADG purchased MRI equipment for the Port St. Lucie center and then later transferred its rights to ICWPB; and

- the TIC sale disclosure identified TIC's use of ADG's business name at the Port St. Lucie center.

306. These valuation documents and sale documents put GreatBanc on notice of related-party transactions adverse to ADG and demanded further investigation of those transactions before consenting to the sale on behalf of the ESOP.

307. A reasonable investigation would have discovered that value assigned to SFL and TIC rightly belonged to ADG, as ADG's role developing and managing Elite was falsely attributed to SFL, and TIC's increase in value from $18 million to $47 million in one year was due to consolidation with ADG. GreatBanc failed to claim this value for the ESOP by negotiating a higher price for the sale of the ESOP's shares.

308. A reasonable investigation also would have discovered (1) breaches of director and officer fiduciary duties under corporate law by Ward, Johnson, Hersey, and Fernandes; (2) violations of the Johnson Employment Agreement, Fernandes Employment Agreement, and Hersey Employment Agreement by Johnson, Hersey, and Fernandes; (3) violations of the Formation SPA, SRSIA, University Boulevard purchase agreement, and

other agreements by Johnson, Ward, McGruder, Schmickle, and/or SFL; and (5) violations of ERISA by Johnson, Ward, McGruder, and Schmickle as a result of their misrepresentations and omissions in connection with the ESOP formation transaction and their resulting unjust enrichment.

309. GreatBanc failed to identify and leverage ADG and the ESOP's legal claims to negotiate a higher price for the sale of the ESOP's shares.

310. ADG and the ESOP's legal claims against Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey had substantial value. Absent reasonable satisfaction of those claims through negotiation of a higher sale price, GreatBanc should have exercised its rights to remove Johnson, Ward, Blacksten, Fernandes, and Hersey as directors (or vetoed the appointment of Fernandes and Hersey) to prevent them from completing the sale and obtaining their windfall at the ESOP's expense. GreatBanc also should have asserted claims against Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey on behalf of ADG and the ESOP and taken all necessary steps to satisfy procedural prerequisites to assert and preserve claims on behalf of ADG and the ESOP.

311. GreatBanc failed to consider or exercise its shareholder powers in the process of approving the sale of the ESOP's shares and thereafter.

312. The sale of the ESOP's shares divested the ESOP of standing to pursue certain contract and corporate law claims on behalf of ADG.

89

GreatBanc's failure to assert ERISA claims related to the ESOP formation transaction caused the default statute of limitations to run on those claims.

313.   GreatBanc failed to investigate the transaction as a whole and failed to discover that Akumin assigned unique value to ADG due to Akumin's desire to consolidate its own operations with ADG. GreatBanc failed to obtain a higher EBITDA multiple for ADG for this unique value recognized by Akumin.

314.   GreatBanc's numerous and repeated failures in connection with the ESOP termination transaction allowed Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey to obtain their windfall through SFL and TIC at the ESOP's expense.

  ix.    *Independent Director's Failure to Fulfill His Duties to the ESOP*

315.   Blacksten deferred to the self-interested directors in the sale process.

316.   Blacksten was aware of transactions between ADG, SFL, Elite, ICWPB, and TIC and knew that these transactions conferred a personal financial benefit on his co-directors.

317.   Blacksten had a right and duty to review the ADG, TIC, and SFL sale agreements and disclosures; documents related to ADG's EBITDA calculation and adjustments (which directly resulted in the ADG purchase

90

price); the proposed distribution of ADG proceeds in the sale; and underlying contracts and documents.

318. Such documents put Blacksten on notice of the inequitable sale price allocation between ADG, SFL, and TIC; the uncompensated legal claims possessed by ADG and the ESOP against the company's officers and his co-directors; and undue and unlawful payments to warrant holders, SFL, Fernandes, and Hersey from sale proceeds.

319. Blacksten did not object to any term of the proposed transaction. He joined all official actions taken by the board to direct GreatBanc to transfer the ESOP's shares to the company and Akumin in connection with the ESOP termination transaction.

## VII. PLAINTIFFS' LACK OF ACTUAL KNOWLEDGE

320. Until shortly before filing this First Amended Complaint, Plaintiffs did not have knowledge of the false statements and omissions by Johnson, Ward, McGruder, and Schmickle in connection with the formation of the ESOP.

321. Plaintiffs' positions at ADG did not involve finance, legal, contracts, mergers and acquisitions, or ESOP administration. Plaintiffs did not have knowledge of the legal, financial, and operational terms with respect to ADG's involvement in the Georgia centers, University Boulevard center, the ICWPB centers, or the Port St. Lucie center. Plaintiffs did not have

knowledge that ADG was connected to these centers for the purpose of enriching Johnson, Ward, McGruder, Schmickle, Fernandes, Hersey, and others in their individual capacities, and not for the purpose of benefiting ADG and ESOP participants. Plaintiffs also lacked knowledge of the ESOP governance terms, including the terms of the Trust Agreement, Plan Document, and IRA, and the fiduciary powers of the board, GreatBanc, and ADGMH members.

322.  Prior to formal discovery in this case, Plaintiffs did not have access to company documents and other insider information involving the ESOP formation transaction; the business operations of SFL, Elite, Priority, K12, TIC, or ICWPB; the negotiations and valuation processes related to the ESOP termination transaction; or the distribution of proceeds of the ESOP termination transaction.

## VIII.  **PLAN-WIDE RELIEF**

323.  29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision.

324.  Plaintiffs seek recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches and seek equitable relief on behalf of the ESOP as a whole.

92

325. Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their abilities to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

## IX.  CLASS ALLEGATIONS

326. Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

327. Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Advanced Diagnostic Group Employee Stock Ownership Plan, except that Fernandes and Hersey shall be excluded from the class.

328. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 200 participants.

329. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were ESOP participants and suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

93

330.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their abilities to represent such Class members.

331.    Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

A.    Whether each Defendant was a fiduciary of the ESOP and the scope of each Defendant's fiduciary duties;

B.    Whether Johnson and Ward failed to comply with ERISA's fiduciary standards of prudence and loyalty in the process of making statements to GreatBanc and its agents in connection with the ESOP formation transaction;

C.    Whether Defendants failed to comply with ERISA's fiduciary standards of prudence and loyalty in the process of monitoring the ESOP's investment during the ESOP period;

D.    Whether Defendants failed to comply with ERISA's fiduciary standards of prudence and loyalty in the process of negotiating, providing information to facilitate, or approving the ESOP termination transaction;

E.    Whether Johnson and Ward received consideration for their personal accounts as fiduciaries in connection with the ESOP formation transaction;

F.    Whether ADG, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey were parties in interest to the

94

ESOP in connection with the ESOP termination transaction;

G.  Whether Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey received consideration for their personal accounts as fiduciaries in connection with the ESOP termination transaction;

H.  Whether the ESOP formation transaction or ESOP termination transaction included one or more prohibited transactions;

I.  Whether any prohibited transaction exemption pursuant to ERISA applies to prohibited transactions included in the ESOP formation transaction or ESOP termination transaction;

J.  Whether Johnson and Ward knowingly participated in one or more non-exempt prohibited transactions in connection with the ESOP formation transaction and may be compelled to account for proceeds to the ESOP;

K.  Whether Johnson, Ward, McGruder, Schmickle, Fernandes, or Hersey knowingly participated in one or more non-exempt prohibited transactions in connection with the ESOP termination transaction and may be compelled to account for proceeds to the ESOP;

L.  The proper form of equitable and injunctive relief; and

M.  The proper measure of monetary relief.

332.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

333.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

334.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this First Amended Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

96

efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

335.    Plaintiffs and undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## X.    CAUSES OF ACTION

### PART ONE – CLAIMS RELATED TO ESOP FORMATION

### Count I – Breach of Fiduciary Duty

### Breaches of ERISA Fiduciary Duties – 29 U.S.C. § 1104(a)(1) Against Johnson and Ward

336.    Plaintiffs incorporate by reference paragraphs 10–11, 18, and sections IV, V.A, V.B., and VI.A of this First Amended Complaint.

337.    Johnson and Ward were responsible for orchestrating the ESOP formation transaction from start to finish. They concocted the scheme to sell ADG to an ESOP in or around April 2015, jointly hired legal and financial advisors to help structure the deal, and guided the process on behalf of the company and ADG's board through closing in December 2015.

338.    Johnson and Ward jointly decided to appoint GreatBanc as the ESOP trustee. Johnson signed the GreatBanc engagement agreement and the Trust Agreement on behalf of ADG.

339.    After appointing GreatBanc as trustee, Johnson and Ward were responsible, on behalf of ADG and the board, for providing GreatBanc and its

97

advisor, Stout, with all material information used to value ADG's shares and evaluate the fairness and legality of the transaction. Johnson and Ward exercised discretion in serving this function by (among other things) (1) selecting inputs and assumptions relating to the company's future growth; (2) electing how to characterize the University Boulevard arrangement; and (3) electing whether to disclose other related-party arrangements and compensation.

340. Throughout this process, up to and including the date of closing and their execution of the SRSIA, Formation SPA, Johnson Employment Agreement, and Johnson's closing letter to Stout, Johnson and Ward made false representations and concealed material information related to (among other things) (1) their actions over the preceding months to appropriate ADG assets and use them to advance their personal financial interests; (2) the number, character, and terms of related-party arrangements that would injure and impair ADG the during the ESOP period; (3) related-party compensation that would result from the transaction; and (4) risks associated with Johnson's unfavorable employment history.

341. Ward and Johnson's false representations and material omissions affected the transaction by (among other things) (1) causing Stout and GreatBanc to overvalue ADG shares; (2) inducing GreatBanc to proceed with the ESOP's purchase of ADG shares; (3) inducing GreatBanc to authorize

Johnson's warrant and increases to his salary and bonus as additional consideration; (4) inducing GreatBanc to authorize, in principle, the University Boulevard shared services arrangement (through which Johnson and Ward profited after Johnson executed the arrangement on terms less favorable than had been disclosed); and (5) shielding the unlawful Strategic Healthcare Fee Agreement and ADGMH Fee Agreement from trustee scrutiny. But for their false representations and material omissions, Johnson and Ward would not have received the same price for ADG shares or additional consideration from the ESOP formation transaction.

342.   Johnson and Ward were ESOP fiduciaries by virtue of their role in selecting and appointing GreatBanc as the trustee to the ESOP pursuant to 29 U.S.C. § 1001(21)(A)(i) and (iii). This fiduciary position carried with it a duty to monitor GreatBanc and Stout to ensure they were adequately performing their fiduciary duties. Part of ERISA's fiduciary monitoring duty includes a duty to provide the trustee with all information that it needs to perform an accurate valuation and an appropriate review of the transaction as a whole. *Chao v. Hall Holding Co.*, 285 F.3d 415, 431 (6th Cir. 2002); *Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 923 (D. Hawaii 2019).

343.   Johnson and Ward also acted as fiduciaries in connection with the ESOP formation transaction pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii) by orchestrating the entire transaction, including conceiving the scheme,

99

hiring advisors to help implement the scheme, hiring a trustee and valuation expert they believed would get them the price they wanted, and then selectively withholding certain information and furnishing other false information to ensure that they received the desired compensation for their ADG shares, retained control of the company, and induced GreatBanc to approve the entire transaction.

344.   Indeed, Johnson and Ward's central role in orchestrating the ESOP transaction was acknowledged through compensation paid to each of them as a reward for effectuating the ESOP formation: Ward received a portion of the $500,000 "success fee" paid to PBC, and Johnson received 5% of all principal and interest payments to other sellers in express recognition of his efforts completing the ESOP formation transaction.

345.   In "orchestrating" the formation of the ESOP, Johnson and Ward acted as fiduciaries. *Scalia v. Reliance Trust Co.*, 2021 WL 795270, at *29 (D. Minn. Mar. 2, 2021); *Keach v. U.S. Trust Co.*, 234 F. Supp. 2d 872, 882–83 (C.D. Ill. 2002).

346.   Additionally, Johnson and Ward, as board members, were Named Fiduciaries of the ESOP pursuant to 29 U.S.C. § 1102(a)(2) effective with the execution of the Plan Document and Trust Agreement on December 8, 2015, and were therefore Named Fiduciaries of the ESOP at the time of closing. The Trust Agreement also gave board members control over how the ESOP

shares were voted, making them functional fiduciaries of the ESOP pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii).

347.    ERISA's fiduciary duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1) requires persons acting in a fiduciary capacity to abstain from making false representations and to disclose all information material to the fiduciary function at issue. As ESOP fiduciaries, Johnson and Ward breached their fiduciary duty pursuant to ERISA by engaging in the conduct described in this section and in Sections V.A and VI.A of this First Amended Complaint.

348.    ESOP participants received lower benefits from the ESOP due to the excessive sale price that the ESOP paid for ADG shares and other consideration granted to Johnson and Ward in connection with the ESOP's purchase of ADG shares. Johnson and Ward also profited as a result of the ESOP's purchase of ADG shares. The ESOP is entitled to recover losses to the ESOP and profits from Johnson and Ward pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2).

349.    Johnson and Ward's fiduciary breaches related to the ESOP formation transaction occurred through December 11, 2015, more than six years before the filing of the Complaint on April 14, 2022.

350.    29 U.S.C. § 1113 provides that an ERISA claim for breach of fiduciary duty must be filed within six years of the breach, "except that in the

101

case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation."

351. The "fraud or concealment" provision in § 1113 extends the statute of limitations in instances "where the breach of fiduciary duty is a self-concealing act," in addition to instances "'when the alleged breach of fiduciary duty involves a claim the defendant made a false representation of a matter of fact, whether by words or conduct, by false or misleading allegations or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury.'" *Turner v. Allstate Ins. Co.*, 2016 WL 5422071, at \*8 (M.D. Ala. Sept. 27, 2016) (quoting *Fulghum v. Embarq Corp.*, 785 F.3d 395, 415 (10th Cir. 2015)).

352. Johnson and Ward's actions described in this section and sections V.A and VI.A constituted self-concealing acts of fraud and concealment and acts of fraud and concealment against the ESOP trustee and its advisors. Each fiduciary breach identified in Count One and all losses and profits caused by those breaches relate to one or more acts of fraud or concealment. Count One is therefore timely pursuant to 29 U.S.C. § 1113.

## Count II –Prohibited Transactions Between Plan and Fiduciary

### 29 U.S.C. § 1106(b)(3)
### Against Johnson and Ward

353.   Plaintiffs incorporate by reference the allegations in paragraphs 10–11, 18, and 342–46, and sections IV, V.A, V.B, and VI.A of this First Amended Complaint.

354.   For the reasons identified in paragraphs 342–46, at the time that the ESOP formation transaction closed, Johnson and Ward were ESOP fiduciaries.

355.   Through the ESOP formation transaction, Johnson and Ward received consideration for their personal accounts from parties dealing with the ESOP in connection with a transaction involving assets of the ESOP, in violation of 29 U.S.C. § 1106(b)(3). Johnson and Ward's unlawful consideration included (among other things): (1) the amount by which the value of their seller notes was inflated due to their false statements and omissions; (2) Johnson's warrant and increases to his salary and bonuses pursuant to the Johnson Employment Agreement; (3) the difference between the price SFL was supposed to pay ADG in the University Boulevard arrangement and the price actually paid through the Jacksonville SMSA; (4) the Strategic Healthcare Fee Agreement, (5) the ADGMH Fee Agreement; and (6) the "success fee" paid to PBC at closing.

356.   Johnson and Ward received each of these items of consideration for their personal accounts (through LLCs or trusts from which they benefit personally) from a party dealing with the ESOP (ADG) in connection with a transaction involving the assets of the ESOP (the ESOP formation transaction). Johnson and Ward received each item of consideration from ADG in connection with the exchange of the ESOP Note for ADG shares— and thus in connection with a transaction involving ESOP assets—because each instrument was transferred concurrent with, and only as a result of, the ESOP's purchase of ADG shares in exchange with the ESOP Note.

357.   Johnson and Ward are liable to the ESOP for losses to the ESOP and profits to themselves that resulted from their violations of 29 U.S.C. § 1106(b)(3).

358.   Johnson and Ward received each item of unlawful consideration due to self-concealing acts of fraud and concealment and acts of fraud and concealment against the ESOP trustee and its advisors. Count Two is therefore timely pursuant to 29 U.S.C. § 1113. *See supra* ¶¶ 350–51.

104

## *PART TWO – CLAIM RELATED TO OPERATION OF THE ESOP*

## Count III – Breach of Fiduciary Duty

**29 U.S.C. § 1104(a)(1)**
**29 U.S.C. § 1105(a)(1)–(3)**
**Against All Defendants**

359.   Plaintiffs incorporate by reference paragraphs 10–18, 342–46, and sections IV, V.B, and VI.B of this First Amended Complaint.

360.   Johnson and Ward were fiduciaries of the ESOP during the ESOP period based on their powers and actions described in paragraphs 342–46 of this First Amended Complaint.

361.   Additionally, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey were fiduciaries of the ESOP during the ESOP period pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii) based on their powers under the Bylaws and IRA to appoint members of the ESOP's fiduciary committee (deemed to be ADG's board of directors pursuant to the Trust Agreement).

362.   Ward, McGruder, and Schmickle were fiduciaries of the ESOP during the ESOP period pursuant to 29 U.S.C. § 1002(21)(i) and (iii) based on discretionary powers granted to them by GreatBanc and ADG through the IRA, including (1) shareholder powers of the ESOP pursuant to Fla. Stat. § 607.0732 with respect to officer appointments, director appointments, approval of related-party transactions, and authority to terminate or modify the shareholder agreement; (2) powers of ADG to amend the Plan Document

105

with respect to distribution of benefits under the ESOP; and (3) powers of ADG and GreatBanc to amend the Trust Agreement with respect to the ESOP's voting authority. Such powers were fiduciary in character pursuant to ERISA, trust law, and the Plan Document and Trust Agreement, and their delegation to ADGMH conferred fiduciary status and duties on Ward, McGruder, and Schmickle with respect to the ESOP. *See Reich v. Lancaster*, 55 F.3d 1034, 1047 (5th Cir. 1995) (fiduciary status "includes those to whom some discretionary authority has been delegated").

363. In connection with the ESOP formation transaction, Johnson, Ward, McGruder, and Schmickle made materially false statements and omissions, as described in section VI.A of this First Amended Complaint, to the detriment of the ESOP and to their personal profit.

364. Johnson, Ward, Fernandes, and Hersey, in their capacity as ADG officers and directors, engaged in egregious misconduct detrimental to ADG and the ESOP, as described in sections VI.A and VI.B of this First Amended Complaint, including contract violations and fiduciary duty violations under common law and the Florida Business Corporation Act.

365. Johnson, Ward, McGruder, and Schmickle had knowledge of false statements and omissions in connection with the ESOP formation transaction, and their profits reaped, as direct participants in those false statements and omissions and recipients of those profits.

106

366. Johnson, Ward, Fernandes, and Hersey had knowledge of their own misconduct as directors and officers of ADG because they were direct participants in their misconduct.

367. McGruder and Schmickle had knowledge of misconduct by Johnson, Ward, Fernandes, and Hersey as directors and officers of ADG because (among other things) McGruder and Schmickle (1) advised on the ESOP formation transaction and related arrangements as PBC managers and knew of the scheme to extract value from the ESOP from the start; (2) participated in the misconduct during the ESOP period as SFL, TIC, and Priority members; and (3) worked out of the same office as Ward, Johnson, and Hersey and engaged in discussions with them during the ESOP period regarding the group's strategy to profit personally from ADG through SFL, TIC, and Priority.

368. In their capacities as ESOP fiduciaries, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey's duty of loyalty and care required them to promptly redress known misconduct detrimental to the ESOP, including by (1) exercising their own fiduciary powers of redress and (2) disclosing known misconduct to other ESOP fiduciaries.

369. In their own ESOP fiduciary capacities as persons with power over board member appointments, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey failed to redress known ADG director misconduct by

107

directing GreatBanc to remove Johnson and Ward from the board and appoint a board loyal to ADG.

370.  In their own ESOP fiduciary capacities as persons holding some of the ESOP's discretionary authority over officer appointments as ADG's shareholder pursuant Fla. Stat. § 607.0732, Ward, McGruder, and Schmickle failed to redress known officer misconduct by removing Johnson, Fernandes, and Hersey and appointing officers loyal to ADG.

371.  In their own ESOP fiduciary capacities as persons holding some of the ESOP's discretionary authority over transactions with affiliates as ADG's shareholder pursuant Fla. Stat. § 607.0732, Ward, McGruder, and Schmickle failed to reject transactions with affiliates as contrary to the interests of the ESOP. Ward, McGruder, and Schmickle further failed to exercise their power to appoint a board majority loyal to ADG as a remedy for transactions undertaken by ADG officers without their prior written consent.

372.  In their own ESOP fiduciary capacities as persons holding some discretionary authority over the manner in which the ESOP may exercise its voting power, Ward, McGruder, and Schmickle failed to amend the ESOP voting provisions to ensure that conflicted directors would not be permitted to instruct GreatBanc with respect to voting the ESOP's shares.

373.  In their capacities as ESOP fiduciaries with knowledge of their own false statements and omissions in connection with the ESOP formation

108

transaction and their receipt of undue profits, Johnson, Ward, McGruder, and Schmickle failed to disclose their prior false statements and omissions to GreatBanc. Notifying GreatBanc of their prior false statements and omissions would have allowed GreatBanc to timely assert claims on behalf of ADG and the ESOP to recover assets and pursue other relief for breach of contract and relief pursuant 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3) of ERISA.

374.    In their capacities as ESOP fiduciaries with knowledge of director and officer misconduct detrimental to ADG and the ESOP, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey failed to disclose known misconduct to GreatBanc, or made or authorized false or misleading statements to GreatBanc that concealed misconduct. Notifying GreatBanc of known misconduct would have allowed GreatBanc to take the actions described in paragraph 238 of this First Amended Complaint to protect the ESOP's investment in ADG shares.

375.    Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey violated their duty of loyalty and care pursuant to 29 U.S.C. § 1104(a)(1) by failing to redress known misconduct detrimental to the ESOP.

376.    Johnson and Ward also violated their duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1) by using their power to direct GreatBanc with respect to voting the ESOP's shares to direct GreatBanc to issue written consent, as ADG's shareholder, to the University Boulevard purchase agreement.

109

377.   GreatBanc acted in a fiduciary capacity throughout the ESOP period pursuant 29 U.S.C. § 1002(21)(A)(i) and (iii) and 29 U.S.C. § 1102(a) based on the terms of the Trust Agreement, Bylaws, and IRA.

378.   GreatBanc had discretion to exercise shareholder powers on behalf of the ESOP, including (among other things) requesting records, calling shareholder meetings, forcing official votes on directors, and asserting claims on behalf of ADG and the ESOP, and therefore acted as a fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii).

379.   GreatBanc further had discretion as trustee of the ESOP to override instructions that would cause a prohibited transaction or a fiduciary breach, and therefore acted as a fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii).

380.   GreatBanc had a duty pursuant to 29 U.S.C. § 1104(a)(1) to exercise its fiduciary powers with care, including a duty to monitor the ESOP's investment in ADG stock and take actions within its fiduciary powers to redress director and officer misconduct harmful to the ESOP.

381.   GreatBanc breached its fiduciary duty pursuant to 29 U.S.C. § 1104(a)(1) by failing to demand annual shareholder meetings (as required by the Bylaws) and abdicating its position in the director election process, allowing Johnson and Ward to retain their fiduciary positions unchecked.

110

382.    GreatBanc breached its fiduciary duty pursuant to 29 U.S.C. § 1104(a)(1) by ignoring red flags related to the operation of ADG and the self-interested, illegal conduct of the company's directors and officers. This included (among other things) (1) failing to investigate ADG's purchase of the University Boulevard center and failing to override Johnson and Ward's instruction to issue written consent on behalf of the ESOP; (2) failing to investigate ADG's Georgia expansion and the function served by the ESOP's Georgia participants; (3) failing to investigate the TIC-ICWPB deal that violated contracts protective of the ESOP; and (4) failing to investigate all related-party transactions based on findings related (1)–(3).

383.    As a result of its failures to monitor and investigate, GreatBanc failed to exercise its powers of redress described in paragraph 238 of this First Amended Complaint, in further breach of its fiduciary duty pursuant to 29 U.S.C. § 1104(a)(1).

384.    As a member of ADG's board of directors throughout the ESOP period, Blacksten was also a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii). As a board member, he had authority to direct GreatBanc regarding voting the ESOP's shares, and he exercised the power of the company as the Administrator of the ESOP.

385.    Blacksten had a duty pursuant to 29 U.S.C. § 1104(a)(1) to exercise his fiduciary powers with care, including a duty to monitor the

111

ESOP's investment in ADG stock and take actions within his fiduciary powers to redress director and officer misconduct harmful to the ESOP.

386. Blacksten breached his fiduciary duties pursuant to 29 U.S.C. § 1104(a)(1) by failing to call annual shareholder meetings (as required by the Bylaws) to elect directors and therefore allowing Johnson and Ward to retain their fiduciary positions unchecked.

387. Blacksten further breached his fiduciary duties pursuant to 29 U.S.C. § 1104(a)(1) by failing to competently review related-party transactions and failing to object to actions by his co-directors or disclose their misconduct to GreatBanc. Among other things, Blacksten failed to object to the board's direction to GreatBanc to consent to the University Boulevard purchase on behalf of the ESOP. Blacksten also knew that the Port St. Lucie center was an ADG business opportunity usurped by SFL (and later TIC) and failed to notify GreatBanc of Johnson, Ward, Hersey, and Fernandes' misconduct.

388. Due to their interlocking duties in the ESOP governance structure, all Defendants caused, enabled, or failed to remedy the breaches of other fiduciaries with respect to Count III, and are liable as co-fiduciaries pursuant to 29 U.S.C. § 1105(a)(1)–(3). The actions and omissions described and incorporated in this section constituted one or more violations of 29 U.S.C. § 1105(a)(1)–(3) by each Defendant, including participation in and

112

concealment of breaches of fiduciary duties by co-fiduciaries, and failure to make reasonable attempts to remedy such fiduciary breaches, by Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey; and the failure of all Defendants to follow ESOP governance processes or exercise their fiduciary powers of redress under the Bylaws, IRA, and Trust Agreement, which enabled fiduciary breaches by their co-fiduciaries.

389. Defendants' violations of their ERISA fiduciary duties with respect to operation of the ESOP caused substantial losses to the ESOP through diminution of the value of the ESOP's investment in ADG and failure to recover assets and losses for the benefit of the ESOP. The same violations generated profits for Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey. The ESOP is entitled, pursuant to 29 U.S.C. §§ 1109, 1132(a)(2), and 1132(a)(3), to recover the resulting losses and profits from Johnson, Ward, McGruder, Schmickle, Fernandes, Hersey, GreatBanc, and Blacksten.

113

## *PART THREE – CLAIMS RELATED TO ESOP TERMINATION*

### Count IV – Breach of Fiduciary Duty

**29 U.S.C. § 1104(a)(1)**
**29 U.S.C. § 1105(a)(1)–(3)**
**Against All Defendants**

390.   Plaintiffs incorporate by reference the allegations contained in paragraphs 10–18, 342–46, 361–62, 377–79, and 384 and sections IV, V and VI of this First Amended Complaint.

391.   Johnson, Ward, and Hersey acted as lead negotiators on behalf of the ESOP, as ADG's shareholder, throughout the ESOP termination transaction process. Johnson, Ward, and Hersey negotiated with Akumin regarding the price at which ADG would be sold and were solely responsible for representing the ESOP's interest in those negotiations. GreatBanc and its agents did not communicate with Akumin. Johnson, Ward, and Hersey also managed the EBITDA adjustment process and exercised discretion with respect to how to adjust ADG's financial results to present a fair picture of the company's value. These actions by Johnson, Ward, and Hersey directly affected the ESOP's proceeds for the sale of its shares. Johnson, Hersey, and Ward therefore exercised discretion and control in the management and disposition of ESOP assets and acted as fiduciaries of the ESOP pursuant to 29 U.S.C. § 1002(21)(A)(i) in connection with their role negotiating on behalf

114

of the ESOP and constructing ADG's value in connection with the ESOP termination transaction.

392.   Johnson, Ward, Blacksten, Fernandes, and Hersey acted as ESOP fiduciaries pursuant to 29 U.S.C. § 1001(21)(A)(i) when they exercised the authority of the board to dispose of the ESOP's ADG shares based on the price negotiated by Johnson, Ward, and Hersey. As board members, Johnson, Ward, Blacksten, Fernandes, and Hersey directed disposition of the ESOP's shares by directing GreatBanc to transfer the shares to ADG and Akumin. These actions were Named Fiduciary actions pursuant to the Trust Agreement, and the board members had discretion whether to accept the price that was determined by Johnson, Ward, and Hersey.

393.   Johnson, Ward, and Hersey also managed the process of providing information to GreatBanc on behalf of ADG regarding the sale of ADG shares. Johnson, Ward, and Hersey knew that such information would be used by GreatBanc and its advisors in execution of GreatBanc's fiduciary duty with respect to determining whether to exercise its override authority with respect to the sale. Johnson, Ward, and Hersey exercised discretion with respect to this function by determining (1) how to characterize the concurrent and contingent SFL and TIC sales; (2) whether to disclose factors that adversely affected ADG's valuation and ESOP proceeds, including (a) director and officer misconduct immediately prior to the ESOP period, (b) director and

115

officer misconduct during the ESOP period, and (c) false statements and omissions in connection with the ESOP formation transaction; and (3) whether to disclose the EBITDA adjustment process with respect to ADG, TIC, and SFL through which they evaluated and adjusted how costs and earnings were divided between the three entities to determine each entity's sale price. In exercising this function, Johnson, Ward, and Hersey acted as fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(i).

394.   GreatBanc had veto power over the sale of the ESOP's shares pursuant to the Trust Agreement. GreatBanc acted as an ESOP fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i) in connection with its decision whether to exercise its override authority. In performing this fiduciary role, GreatBanc had discretion with respect to (1) hiring the valuation advisor responsible for evaluating whether the transaction as a whole was fair to the ESOP; (2) determining the valuation advisor's scope of work; (3) reviewing the valuation advisor's work and determining whether to accept any conclusions; and (4) ensuring that the transaction was in the interests of the ESOP participants pursuant to 29 U.S.C. § 1104(a)(1) and did not result in any prohibited transactions as defined by 29 U.S.C. § 1106.

395.   Ward, McGruder, and Schmickle, in their capacities as ADGMH managers, also acted as ESOP fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii) in connection with the ESOP termination

116

transaction. Ward, McGruder, and Schmickle had discretion with respect to (1) filling the final board seats necessary to direct the sale of the ESOP's shares and (2) whether to issue their independent approval of the sale of the ESOP's shares as required by the IRA.

396.    Hersey executed fiduciary powers on behalf of the company as Administrator of the ESOP after the sale in connection with taking account of ESOP proceeds and overseeing distribution of ESOP assets to participants after termination. Johnson was a fiduciary of the ESOP pursuant 29 U.S.C. § 1002(21)(A)(i) after the sale based on the terms of the ADG sale agreement appointing Johnson as the ESOP's representative for purposes of receiving and distributing the post-closing price adjustment. GreatBanc was a fiduciary of the ESOP pursuant to 29 U.S.C. § 1002(21)(A)(i) after the sale based on its appointment of Johnson as the fiduciary responsible for handling the post-closing adjustment on behalf of the ESOP pursuant to the sale agreement, and its duty to monitor Johnson in performance of that duty.

397.    Based on their actions and omissions described in section VI.C of this First Amended Complaint, all Defendants violated their standard of care as ERISA fiduciaries pursuant to 29 U.S.C. § 1104(a)(1) in execution of their duties with respect to the ESOP termination transaction.

398.    Johnson, Ward, and Hersey breached their fiduciary duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1) during negotiation and finalization

117

of terms of the sale of the ESOP's shares by placing their own personal interests above those of ADG's shareholder, the ESOP. These self-interested acts included (among other things) (1) favoring SFL and TIC owners in the EBITDA adjustment process and disregarding, or working against, the interests of the ESOP; (2) calculating warrant exercise proceeds in a manner that was unduly favorable to Johnson, decreasing ESOP proceeds; (3) negotiating ADG's contingent University Boulevard earnout liability to be paid at future value, decreasing ESOP proceeds; (4) negotiating or approving Fernandes' bonuses and Hersey's bonuses and severance, decreasing ESOP proceeds; (5) failing to advocate for the allocation of additional consideration to the ESOP given the unique value ADG had for Akumin relative to SFL and TIC; (6) making false representations and material omissions to GreatBanc and Stout when communicating the terms of the deal and offering guidance on the advisability of the deal; and (7) failing to disclose to GreatBanc all factors identified in paragraph 393 that adversely affected ADG's valuation and ESOP proceeds.

399.  Fernandes and Hersey, in their capacity as directors, breached their fiduciary duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1) by negotiating, approving, or accepting their bonuses and severance in connection with the ESOP termination transaction.

118

400.   Johnson, Ward, Blacksten, Hersey, and Fernandes breached their fiduciary duties pursuant to 29 U.S.C. § 1104(a)(1) in their capacity as directors by (among other things) (1) failing to independently investigate and negotiate a fair price for the ESOP's shares before directing GreatBanc to transfer the ESOP's shares; (2) approving unlawful payments to or for the benefit of fiduciaries and parties-in-interest of the ESOP; (3) failing to disclose to GreatBanc known misconduct by ADG officers and directors that adversely affected ADG's price and ESOP proceeds; (4) failing to investigate potential causes of action against ADG officers, ADG directors, and ADGMH for breach of contract, violations of corporate fiduciary duties, and usurpation of business opportunities and subsequently causing those causes of action to terminate when the sale was approved.

401.   GreatBanc breached its fiduciary duties pursuant to 29 U.S.C. § 1104(a)(1) in the process of reviewing and declining to exercise its veto powers with respect to any aspect of the ESOP termination transaction. GreatBanc (among other things) (1) failed to consider conflicts of interest between ADG and SFL and TIC; (2) failed to investigate how the ADG, SFL, and TIC sale prices were constructed and manipulated; (3) failed to investigate red flags presented by the sale documents with respect to misconduct by ADG officers and directors during the ESOP period and in connection with (and leading to) the ESOP formation transaction; (4) failed

119

identify—and leverage for a higher sale price—legal claims for damages and equitable relief on behalf of ADG and the ESOP related to misconduct during the ESOP period and in connection with (and leading to) the ESOP formation transaction; (5) failed to withhold the ESOP's stock certificates or file shareholder and ERISA lawsuits to obtain satisfaction of ADG and the ESOP's (a) breach of contract claims, (b) claims for breach of officer and director fiduciary duties pursuant to common law and the Florida Business Corporation Act, and (c) claims for relief pursuant to 29 U.S.C. §§ 1132(a)(2), (3); (6) failed to attempt direct negotiations with Akumin regarding the sale price of ADG; (7) permitted Johnson to receive greater compensation for his warrant than was allowed by the terms of the warrant; (8) permitted Hersey and Fernandes to receive bonuses prohibited by ERISA; (9) failed to limit the University Boulevard earnout payment from ADG sale proceeds to present value; (10) allowed Fernandes to receive compensation for ADG's newest clinic that should have belonged to the ESOP as the seller; and (11) failed to stop Hersey from collecting severance from ADG proceeds despite the fact that he retained his job.

402.   Ward, McGruder, and Schmickle as managers of ADGMH, breached their fiduciary duties pursuant to 29 U.S.C. § 1104(a)(1) by (1) failing to make board appointments in the interests of the ESOP or, alternatively, by allowing another party to exercise their appointment

120

authority in an imprudent and self-serving manner; (2) advocating for or accepting accelerated earn-out payments to SFL without a present value adjustment; (3) failing to exercise their powers pursuant to the IRA to appoint a board majority loyal to ADG to carry out fiduciary functions related to the negotiation, approval, and direction of the sale; (4) consenting to the sale of the ESOP's shares based upon their own self-interest rather than the interests of ESOP participants; and (5) failing to disclose to GreatBanc (a) known misconduct by ADG officers and directors and (b) false statements and omissions in connection with the ESOP formation transaction.

403.   Johnson, Hersey, and GreatBanc breached their fiduciary duties pursuant to 29 U.S.C. § 1104(a)(1) in connection with the post-closing price adjustment. Johnson breached his duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1) by keeping the price adjustment and not paying the price adjustment, or any portion of it, to the ESOP. Hersey and GreatBanc breached their duty of care pursuant to 29 U.S.C. § 1104(a)(1) by failing to monitor Johnson's actions with respect to the post-closing price adjustment and demand an accounting of the funds transferred to Johnson.

404.   Due to their interlocking duties in the ESOP governance structure and with respect to the sale of the ESOP's share, all Defendants caused, enabled, or failed to remedy the breaches of other fiduciaries with respect to Count IV, and are liable as co-fiduciaries pursuant to 29 U.S.C.

121

§ 1105(a)(1)–(3). The actions and omissions described and incorporated in this section constituted one or more violations of 29 U.S.C. § 1105(a)(1)–(3) by each Defendant, including participation in and concealment of breaches of fiduciary duties by co-fiduciaries, and failure to make reasonable attempts to remedy such fiduciary breaches, by Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey; and the failure of all Defendants to follow ESOP governance process or exercise their fiduciary powers of redress under the Bylaws, IRA, and Trust Agreement, which enabled fiduciary breaches by their co-fiduciaries.

405.    Defendants' violations of their ERISA fiduciary duties with respect to the ESOP termination transaction caused substantial losses to the ESOP through the sale of ADG shares for less than the shares were worth and diversion of the ESOP's proceeds to other parties. The same violations resulted in profits for Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey. The ESOP is entitled, pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2), to recover the resulting losses and profits from Johnson, Ward, McGruder, Schmickle, Fernandes, Hersey, GreatBanc, and Blacksten.

### Count V – Prohibited Transaction Between Plan and Party in Interest

**29 U.S.C. § 1106(a)**
**29 U.S.C. § 1105(a)**
**Against All Defendants**

406. Plaintiffs incorporate by reference the allegations contained in paragraphs 391–96 and sections V.C and VI.C of this First Amended Complaint.

407. As fiduciaries of the ESOP, all members of the board (Johnson, Ward, Fernandes, Hersey, and Blacksten,), and all members of ADGMH (Ward, McGruder, and Schmickle), were parties in interest pursuant to 29 U.S.C. § 1002(14)(A). ADGMH members were also parties in interest as providers of services to the ESOP. *Id.* § 1002(14)(B). Ward, Johnson, Hersey, and Fernandes were also parties in interest as officers or directors of ADG. *Id.* § 1002(14)(H).

408. As the employer of the ESOP's participants, ADG was also a party in interest pursuant 29 U.S.C. § 1002(14)(C).

409. 29 U.S.C. § 1106(a)(1)(D) prohibits a plan from engaging in any transaction that constitutes a direct or indirect transfer of any assets of the plan to or for the benefit of a party in interest.

410. Numerous transfers to or for the benefit of parties in interest in connection with the ESOP termination transaction violated § 1106(a)(1)(D):

123

(1) the ESOP shares transferred directly to ADG; (2) proceeds from the sale of ESOP shares transferred to or for the benefit of Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey in the form of (a) warrant redemption proceeds, (b) bonuses, (c) severance, and (d) satisfaction of the future contingent liability for the University Boulevard purchase; (3) the portions of the SFL and TIC sale prices that should have been attributed to ADG; (4) the post-closing price adjustment paid to Johnson; and (5) the earnout payment to Fernandes associated with the Wesley Chapel center. *See Carter v. San Pasqual Fiduciary Trust Co.*, 2016 WL 6803768, at *6 (C.D. Cal. Apr. 18, 2016) (company directors "caused …[the company] to redeem [the company's] stock held by the Plan" in order to sell that stock to a third-party and thereby "indirectly transferred Plan assets to [themselves]" because the directors received other consideration from the buyer in the same deal).

411.   The price received by the ESOP for its ADG shares was less than the fair market value of ADG shares, and the portion of the value of ADG shares diverted to or for the benefit of each party in interest was more than each party was due (to the extent any amount was due).

412.   As described in section V.C, each Defendant's approval was required for the sale of the ESOP's shares to proceed, and therefore each Defendant is liable for causing these prohibited transactions.

124

413.    To the extent any prohibited transactions are deemed to have been "caused" by fewer than all Defendants, the remaining Defendants are liable as co-fiduciaries pursuant to 29 U.S.C. § 1105(a)(2) because their failure to exercise their own fiduciary authority in accordance with 29 U.S.C. § 1104(a)(1) enabled the Defendants with primary liability to violate 29 U.S.C. § 1106(a), and pursuant to 29 U.S.C. § 1105(a)(3) because they had knowledge of the violations and failed to make reasonable efforts to remedy them.

414.    Defendants' violations of 29 U.S.C. § 1106(a) with respect to the ESOP termination transaction caused substantial losses to the ESOP through the sale of ADG shares for less than the shares were worth and diversion of the ESOP's proceeds to parties in interest. The same violations resulted in profits for Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey. The ESOP is entitled, pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2), to recover the resulting losses and profits from Johnson, Ward, McGruder, Schmickle, Fernandes, Hersey, GreatBanc, and Blacksten.

125

## <u>Count VI – Prohibited Transaction Between Plan and Fiduciary</u>

**29 U.S.C. § 1106(b)**
**29 U.S.C. § 1105(a)**
**Against All Defendants**

415. Plaintiffs incorporate by reference the allegations contained in paragraphs 391–96 and sections V.C and VI.C of this First Amended Complaint.

416. Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey were ESOP fiduciaries at the time that the ESOP termination transaction closed and when its proceeds were distributed.

417. Johnson, Ward, Fernandes, and Hersey dealt with assets of the ESOP in their own interest, in violation of 29 U.S.C. § 1106(b)(1), by extracting value from ADG shares and awarding it to themselves through (1) inflated sale prices for SFL and TIC membership interests; (2) warrant redemption proceeds; (3) bonuses; (4) severance; (5) satisfaction of the future contingent liability for the University Boulevard purchase at future value; (6) the Wesley Chapel center earnout provision; and (7) the post-closing price adjustment.

418. Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey violated 29 U.S.C. § 1106(b)(3) by receiving the consideration identified in paragraph 417 for their own personal accounts from a party dealing with the

126

ESOP (ADG or Akumin) in connection with a transaction involving the assets of the ESOP (the sale of the ESOP's shares to ADG and Akumin).

419.  Johnson, Ward, and Hersey violated § 1106(b)(2) by taking an adversarial position against the ESOP in negotiation of the Akumin sale by representing SFL owners and TIC owners in the same negotiation. The sale of ADG, SFL, and TIC was a package deal and pitted ADG's owner (the ESOP) against SFL owners and TIC owners with respect to determining how to allocate the value of shared operations between the three entities. This conflict was present in (among other things) the EBITDA adjustment process and determination of whether each entity warranted the same EBITDA multiplier. Johnson, Ward, and Hersey represented the ESOP side and the TIC and SFL sides at the same time, favoring the TIC and SFL sides and disregarding or working against the ESOP side, in violation of 29 U.S.C. § 1106(b)(2).

420.  The price received by the ESOP for its ADG shares was less than the fair market value of ADG shares, and the value of ADG shares diverted to or for the benefit of each ESOP fiduciary was more than each fiduciary was due (to the extent any amount was due).

421.  All Defendants are liable for all violations of 29 U.S.C. § 1106(b) as co-fiduciaries pursuant to 29 U.S.C. § 1105(a)(2) because their failure to exercise their own fiduciary authority in accordance with 29 U.S.C.

127

§ 1104(a)(1) enabled other Defendants' violations of 29 U.S.C. § 1106(b), and pursuant to 29 U.S.C. § 1105(a)(3) because they had knowledge of the violations and failed to make reasonable efforts to remedy them.

422.   Defendants' violations of 29 U.S.C. § 1106(b) with respect to the ESOP termination transaction caused substantial losses to the ESOP through the sale of ADG shares for less than the shares were worth and diversion of the ESOP's proceeds to fiduciaries. The same violations resulted in profits for Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey. The ESOP is entitled, pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2), to recover the resulting losses and profits from Johnson, Ward, McGruder, Schmickle, Fernandes, Hersey, GreatBanc, and Blacksten.

## Count VII – Knowing Participation in ERISA Violation

### 29 U.S.C. § 1132(a)(3)
### Against Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey

423.   Plaintiffs incorporate by reference the allegations contained in paragraphs 363, 365, and 367 and sections IV, V, and VI of this First Amended Complaint.

424.   Should the Court determine that any of Johnson, Ward, McGruder, Schmickle, Fernandes, or Hersey is not liable as a fiduciary in connection with any claim in Counts IV through VI, Plaintiffs assert Count

128

VII in the alternative for equitable relief to deprive them of any benefit knowingly received as a result of another Defendant's violation of ERISA.

425.    Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations". Such "appropriate equitable relief" includes recovering proceeds of a fiduciary breach or prohibited transaction from a knowing participant in the ERISA violation, without regard to whether that person was a fiduciary. *See Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000). "Liability under Harris Trust applies … to a knowing participation in a fiduciary's breach of fiduciary duties under § 404(a)." *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 284 F. Supp. 2d 511, 571 (S.D. Tex. 2003).

426.    Liability for knowing participation generally requires the non-fiduciary to have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris*, 530 U.S. at 251. In connection with an ESOP transaction, this includes instances when a non-fiduciary is deemed to "have knowledge" that a party in interest or fiduciary received consideration "in excess of fair market value" in the transaction. *Walsh v. Vinoskey*, 19 F.4th 672, 677–78 (4th Cir. 2021)

427.    Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey each possessed actual as well as constructive knowledge of the circumstances that rendered the ESOP termination transaction unlawful. Each of the six

self-interested Defendants had knowledge of the fiduciary status of the other Defendants through their own positions in the governance structure, as set forth in the IRA, Bylaws, and Trust Agreement.

428.  Each of the six self-interested Defendants had constructive knowledge of the terms of the ESOP termination transaction based on their authority as a person whose consent to the transaction as required.

429.  Each of the six self-interested Defendants had actual knowledge that SFL and TIC sale proceeds included value that rightfully belonged to ADG and the ESOP but was misattributed or diverted to SFL and TIC. Johnson, Ward, Fernandes, and Hersey and had knowledge of the misattribution and diversion of value to SFL and TIC as the officers and directors of ADG responsible for carrying out the underlying transactions and valuation processes. McGruder and Schmickle had actual knowledge of the misattribution and diversion of value from ADG for the reasons identified in paragraphs 363, 365, and 367.

430.  The proceeds received by each of the Defendants subject to this Count VII can be traced to a specific bank account number in which their proceeds were deposited. To the extent any Defendants have since transferred those assets from those accounts, the location of those assets is traceable through the discovery process.

431.  Pursuant to principles of equity, as applied by federal courts in ERISA cases, Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey are liable to the ESOP for all benefits received from the prohibited transactions and fiduciary breaches identified in Counts IV through VI, regardless of their status as fiduciaries or non-fiduciaries.

## XI.   PRAYER FOR RELIEF

432.  Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.  Certify Plaintiffs' authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.  Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as class representatives, and their counsel as class counsel;

C.  Order Johnson, Ward, McGruder, Schmickle, Fernandes, Hersey, Blacksten, and GreatBanc to make good to the ESOP all losses resulting from their violations of ERISA;

D.  Order Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey to disgorge all profits received through use of the assets of the ESOP;

E.  Impose a constructive trust or equitable lien or surcharge with respect to, and an accounting of, all proceeds of fiduciary breaches and prohibited transactions received by Johnson, Ward, McGruder, Schmickle, Fernandes, and Hersey;

F.  Appoint an independent trustee of the ESOP to oversee the allocation of losses, profits, and proceeds recovered on behalf of the ESOP to ESOP participants consistent with the terms of the Plan and ERISA;

131

G.    Approve a fair and equitable plan of allocation of any losses, profits, or proceeds recovered on behalf of the ESOP to ESOP participants;

H.    Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

I.    Award prejudgment and post-judgment interest; and

J.    Award such other and further relief as the Court deems just and equitable.

132

Dated: March 6, 2023

Respectfully submitted,

*/s/Jennifer K. Lee*
**ENGSTROM LEE MCDONOUGH THOMPSON & THOMSON LLC**
729 N Washington Ave., Suite 600
Minneapolis, MN 55401
Main Number: 612-305-8349
Facsimile: 612-677-3050
**Jennifer K. Lee**
Minnesota Bar Number: 0399012*
Direct Dial: 612-293-6184
Email: jlee@engstromlee.com
**Brandon T. McDonough**
Minnesota Bar Number: 0393259*
Direct Dial: 612-293-7301
Email: bmcdonough@engstromlee.com
**Carl F. Engstrom**
Minnesota Bar Number: 0396298*
Direct Dial: 612-293-7843
Email: cengstrom@engstromlee.com
**Mark E. Thomson**
Minnesota Bar Number: 0398260*
Direct Dial: 612-293-8488
Email: mthomson@engstromlee.com
**Charlie C. Gokey**
Minnesota Bar Number: 0402225*
Direct Dial: 612-293-0128
Email: cgokey@engstromlee.com

**WENZEL FENTON CABASSA P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main Number: 813-224-0431
Facsimile: 813-229-8712
**Brandon J. Hill**
Florida Bar Number: 0037061
Direct Dial: 813-337-7992
Email: bhill@wfclaw.com
**Luis A. Cabassa**
Florida Bar Number: 053643
Direct No.: 813-379-2565
Email: lcabassa@wfclaw.com
**Amanda E. Heystek**
Florida Bar Number: 0285020
Direct Dial: 813-379-2560
Email: aheystek@wfclaw.com

\* *Admitted by special admission*

**ATTORNEYS FOR PLAINTIFFS**

133